[No. S168047. May 26, 2009.]

KAREN L. STRAUSS et al., Petitioners, v.
MARK B. HORTON, as State Registrar of Vital Statistics, etc., et al.,
Respondents;
DENNIS HOLLINGSWORTH et al., Interveners.

[No. S168066. May 26, 2009.]

ROBIN TYLER et al., Petitioners, v.
THE STATE OF CALIFORNIA et al., Respondents;
DENNIS HOLLINGSWORTH et al., Interveners.

[No. S168078. May 26, 2009.]

CITY AND COUNTY OF SAN FRANCISCO et al., Petitioners, v.
MARK B. HORTON, as State Registrar of Vital Statistics, etc., et al.,
Respondents;
DENNIS HOLLINGSWORTH et al., Interveners.

[redacted]

COUNSEL

National Center for Lesbian Rights, Shannon P. Minter, Christopher F. Stoll, Melanie Rowen, Catherine Sakimura, Ilona M. Turner, Shin-Ming Wong; Munger, Tolles & Olson, Gregory D. Phillips, Jay M. Fujitani, David C. Dinielli, Michelle Friedland, Lika C. Miyake, Mark R. Conrad; Lambda Legal Defense and Education Fund, Jon W. Davidson, Jennifer C. Pizer, Tara Borelli; ACLU Foundation of Northern California, Alan L. Schlosser, James D. Esseks, Elizabeth O. Gill; ACLU Foundation of Southern California, Mark Rosenbaum, Clare Pastore, Lori Rifkin; ACLU Foundation of San Diego and Imperial Counties, David Blair-Loy; Law Office of David C. Codell, David C. Codell; Orrick, Herrington & Sutcliffe and Stephen V. Bomse for Petitioners Karen L. Strauss, Ruth Borenstein, Brad Jacklin, Dustin Hergert, Eileen Ma, Suyapa Portillo, Gerardo Marin, Jay Thomas, Sierra North, Celia Carter, Desmund Wu, James Tolen and Equality California.

Allred, Maroko & Goldberg, Gloria Allred, Michael Maroko and John S. West for Petitioners Robin Tyler, Diane Olson, Cheri Schroder and Coty Rafaely.

Dennis J. Herrera, City Attorney, Therese M. Stewart, Danny Chou, Kathleen S. Morris, Sherri Sokeland Kaiser, Vince Chhabria, Erin Bernstein, Tara M. Steeley and Mollie Lee, Deputy City Attorneys, for Petitioner City and County of San Francisco.

Howard Rice Nemerovski Canady Falk & Rabkin, Jerome B. Falk, Jr., Steven L. Mayer, Amy E. Margolin, Amy L. Bomse, Adam Polakoff and Michelle S. Ybarra for Petitioners City and County of San Francisco, Helen Zia, Lia Shigemura, Edward Swanson, Paul Herman, Zoe Dunning, Pam Grey, Marian Martino, Joanna Cusenza, Bradley Akin, Paul Hill, Emily Griffen, Sage Andersen, Suwanna Kerdkaew and Tina M. Yun.

Ann Miller Ravel, County Counsel, Tamara Lange, Lead Deputy County Counsel, and Juniper Lesnik for Petitioner County of Santa Clara.

Rockard J. Delgadillo, City Attorney, Richard H. Llewellyn, Jr., Chief Deputy City Attorney, David Michaelson, Chief Assistant City Attorney, and Michael J. Bostrom, Deputy City Attorney, for Petitioner City of Los Angeles.

Raymond G. Fortner, Jr., County Counsel, Leela A. Kapur, Chief Deputy County Counsel, Elizabeth M. Cortez, Assistant County Counsel, and Judy W. Whitehurst, Deputy County Counsel, for Petitioner County of Los Angeles.

Richard E. Winnie, County Counsel, Brian E. Washington, Assistant County Counsel, and Claude Kolm, Deputy County Counsel, for Petitioner County of Alameda.

Patrick K. Faulkner, County Counsel, and Sheila Shah Lichtblau, Deputy County Counsel, for Petitioner County of Marin.

Michael P. Murphy, County Counsel, Brenda B. Carlson, Chief Deputy County Counsel, and Glenn M. Levy, Deputy County Counsel, for Petitioner County of San Mateo.

Dana McRae, County Counsel, for Petitioner County of Santa Cruz.

Harvey E. Levine, City Attorney, and Nellie R. Ancel, Deputy City Attorney, for Petitioner City of Fremont.

Philip D. Kohn, City Attorney, for Petitioner City of Laguna Beach.

John Russo, City Attorney, and Barbara Parker, Chief Assistant City Attorney, for Petitioner City of Oakland.

Jan I. Goldsmith, City Attorney, and George F. Schaefer, Deputy City Attorney, for Petitioner City of San Diego.

John G. Barisone, City Attorney, for Petitioner City of Santa Cruz.

Marsha Jones Moutrie, City Attorney, and Joseph Lawrence, Assistant City Attorney, for Petitioner City of Santa Monica.

Lawrence W. McLaughlin, City Attorney, for Petitioner City of Sebastopol.

Proskauer Rose, Clifford S. Davidson, Lois D. Thompson and Albert C. Valencia for Anti-Defamation League, Asian Law Caucus, Americans United for Separation of Church and State, Japanese American Citizens League, Southern California Chinese Lawyers Association, Asian Pacific Islander Legal Outreach, Legal Aid Foundation of Los Angeles, Bet Tzedek Legal Services, Public Counsel, Orange County Asian Pacific Islander Community Alliance, National Senior Citizens Law Center, API Equality—LA, API Equality, API Parents and Friends of Lesbians and Gays (Los Angeles Chapter), Chicana Latina Foundation, American Jewish Committee, Barbara

Jordan/Bayard Rustin Coalition, Asian Pacific Americans for Progress, BIENESTAR, Asian Law Alliance, National Asian Pacific American Women's Forum, Gay Vietnamese Alliance, South Asian Network, Chinese for Affirmative Action, Gay Asian Pacific Alliance, Gay Asian Pacific Support Network, Korean Resource Center, Asian Communities for Reproductive Justice, And Marriage for All, Korean Community Center of the East Bay, Advocacy Coalition of Tulare County for Women and Girls, Asian & Pacific Islander Wellness Center, Filipinos for Affirmative Action, National Korean American Service & Education Consortium, Asian & Pacific Islander Family Pride, O-Moi, Asian and Pacific Islander American Health Forum, Asian Pacific AIDS Intervention Team, Asian Pacific Policy & Planning Council and Philippine American Bar Association as Amici Curiae on behalf of Petitioners.

Ronald Steiner, M. Katherine Baird Darmer, Richard Faulkner, Jenny Carey, Kurt Eggert, John Hall, Jayne Kacer, Steven Krone, Francine Lipman, Elizabeth L. MacDowell, Henry Noyes; Crowell & Moring, Steven P. Rice, Deborah E. Arbabi; Ashleigh E. Aitken, Casey Johnson, Michael Penn; Roman E. Darmer II; Rosanne M. Faul; Sallie Kim; Stephanie Mullen; Alexis Penn-Loya; Emily Samuelsen Quinlan; and Jeffrey L. Van Hoosear for Chapman Outlaw, Chapman Queer-Straight Alliance, Chapman Feminists and Chapman SPEAK (Students for Peaceful Empowerment, Action and Knowledge), Wylie Aitken, Deepa Badrinarayana, Rimvydas Baltaduonis, Marisa Cianciarulo, M. Katherine Baird Darmer, James Doti, Kurt Eggert, Kelly Graydon, Elizabeth MacDowell, Steven Krone, Francine Lipman, Lynn Mayer, Dale A. Merrill, Nancy Schultz, Suzanne Soohoo, Ronald Steiner, Sheri Maeda-Akau, Lisa Clark, Sandra L. Hague, Brian Scott Hamilton, Annie Knight, Mark Lawrence, AJ Place, Erin M. Pullin, Demisia Razo, Tara Riker, Christopher J. Roach, Gloria Rogers, Zara Ahmed, Sasha Anderson, Elliot Balsley, James E. Blalock, Claudia Brena, Anne L. Card, Tiffany Chang, Doug Clark, Kimberlee Cyphers, Alexa Hahn-Dunn, Linnea Esselstrom, Sara Gapasin, Ashley Ann Hanson, Cortney Johnson, Anais Keenon, Breanna Kenyon, Samantha Kohler, Timothy Lam, Craig Leets, Jr., David Nungary, Michelle Pascucci, Kitty Porter, Regina Rivera, Brian Rouse, Angela Wilhite, Preston Whitehurst, Emily Wilkinson, Lauren Jessica Wolf, Orange County Equality Coalition, James Albright, Thomas J. Peterson, Karla Bland, Laura Kanter, Lindsey Etheridge, John Dumas, James Nowick, Hung Y. Fan, Michael David Feldman, Mary Katherine Holman-Romero, Deborah Ann Romero-Holman, Jeffrey L. Van Hoosear, Gregory T. McCollum, Heather Ellis, Rosanne Faul, Sharon Nantell, Judy Gordon, Linda J. May, Dean Erwin Chemerinksy, James D. Herbert, Cecile Whiting, Dean Inada and Emily Quinlan as Amici Curiae on behalf of Petitioners.

Alice O'Brien; Altshuler Berson, James M. Finberg, Eve H. Cervantez and Barbara J. Chisholm for California Teachers Association as Amicus Curiae on behalf of Petitioners.

Raoul D. Kennedy and Elizabeth Harlan for Professors of State Constitutional Law Robert F. Williams, Lawrence Friedman, Vincent M. Bonventre, Daniel Gordon, Ann Lousin, James G. Pope and Jeffrey M. Shaman as Amici Curiae on behalf of Petitioners.

Joel Franklin; Michelle A. Welsh; Michael W. Stamp; and Amy M. Larson for The Constitutional Law Center of the Monterey College of Law as Amicus Curiae on behalf of Petitioners.

Prodigylaw.com and Dennis W. Chiu for Steven Mattos, Amor Santiago, Harry Martin and Paul J. Dorian as Amici Curiae on behalf of Petitioners.

City of West Hollywood Legal Services Division, Michael Jenkins and J. Stephen Lewis for City of Berkeley, City of Cloverdale, City of Davis, City of Emeryville, Town of Fairfax, County of Humboldt, City of Long Beach, City of Palm Springs, City of Sacramento, County of Sonoma and City of West Hollywood as Amici Curiae on behalf of Petitioners.

Bryan Cave, Jonathan Solish, Julie E. Patterson, James C. Pettis, Meghan C. Sherrill, Curt M. Dombek, Michael B. Zara, Marwa Hassoun and Vanessa A. Sunshine for Pacific Yearly Meeting of the Religious Society of Friends, Santa Monica Monthly Meeting of the Religious Society of Friends, Orange Grove Monthly Meeting of the Religious Society of Friends and Claremont Monthly Meeting of the Religious Society of Friends as Amici Curiae on behalf of Petitioners.

Townsend and Townsend and Crew, Eugene Crew, Timothy R. Cahn, Nancy L. Tompkins, Holly Gaudreau, David J. Tsai and James D. Kiryakoza for Dr. Frank M. Alton, Immanuel Presbyterian Church, Netivot Shalom Synagogue, Reverend Dr. Jane Adams Spahr, Reverend Dr. John T. Norris, Reverend Dr. Glenda Hope, Rabbi David J. Cooper, Kehilla Community Synagogue, Reverend Laura Rose, Reverend Dr. Janet McCune Edwards, Reverend Kathryn M. Schreiber, Reverend Susan A. Meeter, Mira Vista United Church of Christ, Nancy McKay, Rabbi Menachem Creditor, Reverend Dr. Paul Tellstrom, Irvine United Congregational Church, Covenant Network of Presbyterians and More Light Presbyterians as Amici Curiae on behalf of Petitioners.

Gibson, Dunn & Crutcher, Frederick Brown, Ethan Dettmer, Sara Piepmeier, Rebecca Justice Lazarus, Enrique Monagas, Kaiponanea Matsumura, Douglas Champion, Heather Richardson, Lauren Eber and Lindsay Pennington for Current and Former California Legislators as Amici Curiae on behalf of Petitioners.

Eric Alan Isaacson, Alexandra S. Bernay, Samantha A. Smith, Stacey M. Kaplan; Eisenberg and Hancock, Jon B. Eisenberg; Winston & Strawn and

Peter E. Perkowski for California Council of Churches, Right Reverend Marc Handley Andrus, Right Reverend J. Jon Bruno, The General Synod of the United Church of Christ, Northern California Nevada Conference of the United Church of Christ, Southern California Nevada Conference of the United Church of Christ, Progressive Jewish Alliance, Unitarian Universalist Association of Congregations and Unitarian Universalist Legislative Ministry California as Amici Curiae on behalf of Petitioners.

Dickstein Shapiro and Cassandra S. Franklin for Faith in America, Inc., as Amicus Curiae on behalf of Petitioners.

Troy M. Yoshino and Gonzalo C. Martinez for San Francisco La Raza Lawyers Association as Amicus Curiae on behalf of Petitioners.

Edward P. Howard; Chapman, Popik & White, Susan M. Popik, Merri A. Baldwin, Raquel A. Lacayo-Valle; Cooley Godward Kronish, Gordon C. Atkinson, Craig C. Daniel, Kyle C. Wong, Erin L. Dominguez and Daniel R. Redman for Professor Karl M. Manheim as Amicus Curiae on behalf of Petitioners.

Shay Aaron Gilmore; HoenningerLaw and Jo Hoenninger for Marriage Equality USA as Amicus Curiae on behalf of Petitioners.

James T. Linford as Amicus Curiae on behalf of Petitioners.

Perkins Coie, John S. Rossiter, Kirk A. Dublin, Jason A. Yurasek, Joren S. Bass, Geraldine M. Alexis, Farschad Farzan, Troy P. Sauro, Philip A. Leider, Gigi C. Hoang, Mamta Ahluwalia, David P. Chiappetta, Kaycie L. Wall and Liling Poh for Human Rights Watch, Human Rights Watch California Committee North and Human Rights Watch California Committee South as Amici Curiae on behalf of Petitioners.

Stephen Kent Ehat for Professors of Law as Amicus Curiae on behalf of Petitioners.

Law Offices of Stephan C. Volker, Stephan C. Volker and Joshua A. H. Harris for John Emmanuel Domine, Bradley Eric Aouizerat, Betsy Jo Levine and Lisa Lynn Brand as Amici Curiae on behalf of Petitioners.

Tobias Barrington Wolff; Bingham McCutchen, Raymond C. Marshall; Julie Su, Karin Wang; Eva Paterson, Kimberly Thomas Rapp; Nancy Ramirez, Cynthia Valenzuela Dixon; and Holly A. Thomas for Asian Pacific American Legal Center, California State Conference of the NAACP, Equal Justice Society, Mexican American Legal Defense and Educational Fund, NAACP

Legal Defense and Educational Fund, Inc., and Southern Christian Leadership Conference of Greater Los Angeles as Amici Curiae on behalf of Petitioners.

Robert Lott for Zakary Akin, Naomi Canchela, Terrence Fong, Jessica Hirschfelder, Adrienne Loo, Carolyn Lott, Robert Lott, Quang Nguyen, Agata Opalach, Jeff Pilisuk, Shalini Ramachandran, Vidhya Ramachandran, Joseph Robinson, Lee Schneider and Nathan Wilcox as Amici Curiae on behalf of Petitioners.

Lieff, Cabraser, Heimann & Bernstein, Elizabeth J. Cabraser, Kelly M. Dermody and Allison S. Elgart for Alameda County Bar Association, Bar Association of San Francisco, Los Angeles County Bar Association, Marin County Bar Association, Santa Clara County Bar Association, AIDS Legal Referral Panel, Asian American Bar Association of the Greater Bay Area, Asian American Justice Center, Asian Pacific American Bar Association of Los Angeles County, Bay Area Lawyers for Individual Freedom, California Employment Lawyers Association, California Rural Legal Assistance, Inc., Central California Legal Services, Inc., Charles Houston Bar Association, Consumer Attorneys of San Diego, East Bay La Raza Lawyers Association, Fred T. Korematsu Center for Law and Equality, Gay & Lesbian Advocates & Defenders, Impact Fund, Japanese American Bar Association of Greater Los Angeles, Korean American Bar Association of Northern California, Korean American Bar Association of Southern California, Latina Lawyers Bar Association, Law Foundation of Silicon Valley, Lawyers' Club of San Francisco, Lawyers' Committee for Civil Rights of the San Francisco Bay Area, Legal Aid Society—Employment Law Center, Lesbian and Gay Lawyers Association of Los Angeles, Mexican American Bar Association, Minority Bar Coalition, National LGBT Bar Association, National Asian Pacific American Bar Association, National Lawyers Guild San Francisco Bay Area Chapter, Public Justice, Queen's Bench Bar Association of the San Francisco Bay Area, San Francisco Trial Lawyers Association, South Asian Bar Association of Northern California, South Asian Bar Association of San Diego, Tom Homann Law Association and Transgender Law Center as Amici Curiae on behalf of Petitioners.

Paul, Weiss, Rifkind, Wharton & Garrison, Walter Rieman and Roberta A. Kaplan for C. Edwin Baker, Robert A. Burt and Kermit Roosevelt III as Amici Curiae on behalf of Petitioners.

Brune & Richard, Laurie Edelstein, Randall T. Kim and Thomas J. Ringer for William N. Eskridge, Jr., and Bruce E. Cain as Amici Curiae on behalf of Petitioners.

Courtney G. Joslin and Michael S. Wald for Professors of Family Law Scott Altmann, R. Richard Banks, Sarah Rigdon Bensinger, Grace Ganz Blumberg,

Janet Bowermaster, Carol S. Bruch, Patricia A. Cain, Jan C. Costello, Barbara J. Cox, Jay Folberg, Deborah L. Forman, Joan H. Hollinger, Lisa Ikemoto, Courtney G. Joslin, Herma Hill Kay, Lawrence Levine, Jean C. Love, Maya Manian, Mary Ann Mason, Anthony Miller, Melissa Murray, Patti Paniccia, Shelley Ross Saxer, E. Gary Spitko, Michael S. Wald, D. Kelly Weisberg, Lois Weithorn and Michael Zamperini as Amici Curiae on behalf of Petitioners.

Steven Meiers as Amicus Curiae on behalf of Petitioners.

Hastings Civil Justice Clinic, Donna M. Ryu; Morrison & Foerster, Lawrence R. Katzin, Dorothy L. Fernandez, Scott M. Reiber, Bethany Lobo and Samuel J. Boone-Lutz for Constitutional and Civil Rights Law Professors as Amici Curiae on behalf of Petitioners.

Law Offices of Lawrence A. Organ, Lawrence A. Organ and Meghan A. Corman for The Civil Rights Forum as Amicus Curiae on behalf of Petitioners.

Paul & Hanley, J. Rae Lovko and Jason E. Hasley as Amici Curiae on behalf of Petitioners.

Leslie Ellen Shear; Katherine E. Stoner; Garrett C. Dailey; and Shane R. Ford for Association of Certified Family Law Specialists and American Academy of Matrimonial Lawyers, Northern California Chapter as Amici Curiae on behalf of Petitioners.

Pillsbury Winthrop Shaw Pittman, Kevin M. Fong and Alice K. M. Hayashi for League of Women Voters of California as Amicus Curiae on behalf of Petitioners.

Vincent H. Chieffo, Philippe A. Phaneuf, Dennis J. Rasor, Marc B. Koenigsberg, Alexandra Aquino-Fike; Jason H. Farber; Dewey & LeBoeuf, Jonathan A. Damon, Dean Hartsell, Todd L. Padnos, Benjamin M. Heuer, Ryan K. Tyndall and Mark M. Rabuano for San Francisco Chamber of Commerce, Google, Inc., H5 and Levi Strauss & Co., as Amici Curiae on behalf of Petitioners.

Greines, Martin, Stein & Richland, Irving Greines, Cynthia E. Tobisman and Jennifer C. Yang for Beverly Hills Bar Association, California Women Lawyers, Women Lawyers Association of Los Angeles and Women Lawyers of Sacramento as Amici Curiae on behalf of Petitioners.

Sullivan & Cromwell, Jason de Bretteville, Robert A. Sacks, Edward E. Johnson, Stacey R. Friedman, Maura E. Miller and David A. Castleman for Our Family Coalition and COLAGE as Amici Curiae on behalf of Petitioners.

Bate, Peterson, Deacon, Zinn & Young, Harry A. Zinn and Lester F. Aponte for Love Honor Cherish as Amicus Curiae on behalf of Petitioners.

Farella Braun + Martel, Grace K. Won, David K. Ismay, Brett R. Wheeler and Julie Wahlstrand for Children's Law Center of Los Angeles, Family Equality Council, Gay, Lesbian, Bisexual, and Transgender Therapists Association, Human Rights Campaign, Human Rights Campaign Foundation, Kids in Common, Legal Services for Children, National Black Justice Coalition, National Center for Youth Law, National Gay and Lesbian Task Force Foundation, Parents, Families and Friends of Lesbians and Gays, Inc., and San Francisco Court Appointed Special Advocates as Amici Curiae on behalf of Petitioners.

Paul, Hastings, Janofsky & Walker, Eve Coddon, Jeffrey S. Haber, James W. Gilliam, Sean D. Unger, Kimberley A. Donohue, Eleanor K. Mercado and Stephen B. Kinnaird for Billy DeFrank LGBT Community Center, L.A. Gay & Lesbian Center, Pacific Pride Foundation, Sacramento Gay & Lesbian Center, San Diego Lesbian, Gay, Bisexual, Transgender Community Center, San Francisco LGBT Community Center, Santa Cruz County Lesbian, Gay, Bisexual and Transgender Community Center and The Center Orange County as Amici Curiae on behalf of Petitioners.

Steptoe & Johnson, Rebecca Edelson, Robbin L. Itkin, Katherine C. Piper, Colleen O'Brien and Matthew A. Williams for California National Organization for Women, National Organization for Women and Feminist Majority Foundation as Amici Curiae on behalf of Petitioners.

S. Michelle May for Sacramento Lawyers for Equality of Gays and Lesbians as Amicus Curiae on behalf of Petitioners.

Irell & Manella, Laura W. Brill, Moez M. Kaba, Richard M. Simon, Mark A. Kressel; Irma D. Herrera, Lisa J. Leebove; Vicky Barker; Rebecca Connolly, Sara Sturtevant, Emily Trexel; Nadia P. Bermudez; Julie F. Kay; Lisa Horowitz and Margaret B. Drew for Concerned with Gender Equality, Equal Rights Advocates, California Women's Law Center, Women Lawyers of Santa Cruz County, Lawyer's Club of San Diego, Legal Momentum and National Association of Women Lawyers as Amici Curiae on behalf of Petitioners.

Phalen G. Hurewitz and Mary K. Lindsay for Jewish Family Service of Los Angeles as Amicus Curiae on behalf of Petitioners.

Mark S. Shirilau as Amicus Curiae on behalf of Petitioners.

Weinberg, Roger & Rosenfeld, William A. Sokol, David A. Rosenfeld and John Plotz for California Federation of Labor, AFL-CIO, National Federation

of Federal Employees, Screen Actors Guild, Unite Here!, Alameda Labor Council, AFL-CIO, Fresno-Madera-Tulare-Kings Counties Central Labor Council, AFL-CIO, Los Angeles County Federation of Labor, AFL-CIO, Sacramento Central Labor Council, AFL-CIO, San Mateo County Central Labor Council, AFL-CIO, San Francisco Labor Council, AFL-CIO, South Bay Labor Council, AFL-CIO, California Federation of Teachers, American Federation of Teachers, AFL-CIO, California Faculty Association, California Nurses Association/National Nurses Organizing Committee, American Federation of State, County, and Municipal Employees, District Council 57, AFL-CIO, American Federation of State, County, and Municipal Employees, Local 2019, AFL-CIO, American Federation of State, County, and Municipal Employees, Local 2428, AFL-CIO, American Federation of State, County, and Municipal Employees, Local 3299, AFL-CIO, American Federation of State, County, and Municipal Employees, Local 3916, AFL-CIO, American Federation of Teachers, Local 6119, Compton Council of Classified Employees, AFL-CIO, American Federation of Teachers, Local 6157, San Jose/Evergreen Faculty Association, AFL-CIO, El Camino College Federation of Teachers, Local 1388, California Federation of Teachers, American Federation of Teachers, AFL-CIO, United Educators of San Francisco, AFT/CFT Local 61, AFL-CIO, NEA/CTA, University Council-American Federation of Teachers, Association of Flight Attendants-CWA, Communications Workers of America District 9, AFL-CIO, Association of Flight Attendants-CWA, Council 97, Association of Flight Attendants-CWA, Council 99, Communications Workers of America, Local 9000, AFL-CIO, Communications Workers of America, Local 9503, AFL-CIO, Communications Workers of America, Local 9505, AFL-CIO, Communications Workers of America, Local 9421, AFL-CIO, Communications Workers of America, Local 9575, AFL-CIO, District Council of Ironworkers of the State of California and Vicinity, Jewish Labor Committee Western Region, Maintenance Cooperation Trust Fund, National Federation of Federal Employees, Local 1450, Operative Plasterers' and Cement Masons' Local 300, AFL-CIO, Operative Plasterers' and Cement Masons' Local 400, AFL-CIO, Pride at Work, AFL-CIO, SEIU California State Council, SEIU Local 521, SEIU Local 721, SEIU Local 1000, SEIU Local 1021, SEIU Local 1877, SEIU United Healthcare Workers West, Teamsters Joint Council 7, International Brotherhood of Teamsters, Teamsters Local 853, International Brotherhood of Teamsters, United Food and Commercial Workers, Local 5, Unite Here Local 19, United Steelworkers, Local 5, Martinez, CA and University Professional and Technical Employees Communications Workers of America, Local 9119, AFL-CIO, as Amici Curiae on behalf of Petitioners.

Michael J. McDermott as Amicus Curiae on behalf of Petitioners.

White & Case, Dan Woods, Patrick Hunnius, Earle Miller, Aaron Kahn, Rachel Feldman and Adam Summerfield for Log Cabin Republicans as Amicus Curiae on behalf of Petitioners.

Kenneth W. Starr; Law Offices of Andrew P. Pugno and Andrew P. Pugno for Interveners.

James Joseph Lynch, Jr., for Margie Reilly as Amicus Curiae on behalf of Interveners.

Sweeney & Greene, James F. Sweeney; The Becket Fund for Religious Liberty, Eric Rassbach, Luke Goodrich and Lori Windham for The California Catholic Conference, The Seventh-Day Adventist Church State Council, The United States Conference of Catholic Bishops and The Union of Orthodox Jewish Congregations of America as Amici Curiae on behalf of Interveners.

Angela C. Thompson and Patrick Gillen for Fidelis Center for Law and Policy as Amicus Curiae on behalf of Interveners.

Alliance Defense Fund, Timothy Chandler, Benjamin W. Bull, Brian W. Raum and James A. Campbell for Family Research Council as Amicus Curiae on behalf of Interveners.

Brad W. Dacus, Kevin T. Snider, Karen D. Milam and Matthew B. McReynolds for Pacific Justice Institute as Amicus Curiae on behalf of Interveners.

Lawrence J. Joseph for Eagle Forum Education & Legal Defense Fund as Amicus Curiae on behalf of Interveners.

Institute for Marriage and Public Policy, Joshua K. Baker; Marriage Law Foundation and William C. Duncan for National Organization for Marriage California as Amicus Curiae on behalf of Interveners.

Law Offices of Charles S. LiMandri, Charles S. LiMandri; Bopp, Coleson & Bostrom, James Bopp, Jr., Anita Y. Woudenberg and Sarah E. Troupis for Catholic Answers as Amicus Curiae on behalf of Interveners.

Chavez-Ochoa Law Offices, Brian R. Chavez-Ochoa; and Vincent P. McCarthy for American Center for Law & Justice and Three Members of the United States Congress as Amici Curiae on behalf of Interveners.

Liberty Counsel and Mary E. McAlister for Campaign for California Families as Amicus Curiae on behalf of Interveners.

T. M. Reverend Messiah for The Church of the Messiah as Amicus Curiae on behalf of Interveners.

Edmund G. Brown, Jr., Attorney General, Manuel M. Medeiros, State Solicitor General, David S. Chaney, Chief Assistant Attorney General, Christopher E. Krueger, Assistant Attorney General, James M. Humes, Chief Deputy Attorney General, Kimberly J. Graham and Mark R. Beckington, Deputy Attorneys General, for Respondents.

Samuel Rodrigues as Amicus Curiae on behalf of Respondents.

Eric I. Gutierrez, Steven W. Fitschen and Douglas E. Myers for The National Legal Foundation as Amicus Curiae on behalf of Respondents.

D. Q. Mariette Do-Nguyen for Kingdom of Heaven as Amicus Curiae on behalf of Respondents.

---

OPINION

**GEORGE, C. J.**—For the third time in recent years, this court is called upon to address a question under California law relating to marriage and same-sex couples.

In *Lockyer v. City and County of San Francisco* (2004) 33 Cal.4th 1055 [17 Cal.Rptr.3d 225, 95 P.3d 459] (*Lockyer*), we were faced with the question whether public officials of the City and County of San Francisco acted lawfully by issuing marriage licenses to same-sex couples in the absence of a judicial determination that the California statutes limiting marriage to a union between a man and a woman were unconstitutional. We concluded in *Lockyer* that the public officials had acted unlawfully in issuing licenses in the absence of such a judicial determination, but emphasized in our opinion that the substantive question of the constitutional validity of the marriage statutes was not before our court in that proceeding.

In *In re Marriage Cases* (2008) 43 Cal.4th 757 [76 Cal.Rptr.3d 683, 183 P.3d 384] (hereafter the *Marriage Cases*), we confronted the substantive constitutional question that had not been addressed in *Lockyer*—namely, the constitutional validity, under the then-controlling provisions of the California Constitution, of the California marriage statutes limiting marriage to a union between a man and a woman. A majority of this court concluded in the *Marriage Cases* that same-sex couples, as well as opposite-sex couples, enjoy the protection of the constitutional right to marry embodied in the privacy and due process provisions of the California Constitution, and that by granting access to the designation of "marriage" to opposite-sex couples and denying such access to same-sex couples, the existing California marriage statutes impinged upon the privacy and due process rights of same-sex

couples and violated those couples' right to the equal protection of the laws guaranteed by the California Constitution.

Proposition 8, an initiative measure approved by a majority of voters at the November 4, 2008 election, added a new section—section 7.5—to article I of the California Constitution, providing: "Only marriage between a man and a woman is valid or recognized in California." The measure took effect on November 5, 2008. In the present case, we address the question whether Proposition 8, under the governing provisions of the California Constitution, constitutes a permissible change to the California Constitution, and—if it does—we are faced with the further question of the effect, if any, of Proposition 8 upon the estimated 18,000 marriages of same-sex couples that were performed before that initiative measure was adopted.

In a sense, this trilogy of cases illustrates the variety of limitations that our constitutional system imposes upon each branch of government—the executive, the legislative, and the judicial.

In addressing the issues now presented in the third chapter of this narrative, it is important at the outset to emphasize a number of significant points. First, as explained in the *Marriage Cases, supra,* 43 Cal.4th at page 780, our task in the present proceeding is not to determine whether the provision at issue is wise or sound *as a matter of policy* or whether we, as individuals, believe it *should* be a part of the California Constitution. Regardless of our views as individuals on this question of policy, we recognize as judges and as a court our responsibility to confine our consideration to a determination of the constitutional validity and legal effect of the measure in question. It bears emphasis in this regard that our role is limited to interpreting and applying the principles and rules embodied in the California Constitution, setting aside our own personal beliefs and values.

Second, it also is necessary to understand that the legal issues before us in this case are entirely distinct from those that were presented in either *Lockyer* or the *Marriage Cases*. Unlike the issues that were before us in those cases, the issues facing us here do not concern a public official's authority (or lack of authority) to refuse to comply with his or her ministerial duty to enforce a statute on the basis of the official's personal view that the statute is unconstitutional, or the validity (or invalidity) of a *statutory* provision limiting marriage to a union between a man and a woman *under state constitutional provisions that do not expressly permit or prescribe such a limitation.* Instead, the principal issue before us concerns the scope of *the right of the people, under the provisions of the California Constitution, to change or alter the state Constitution itself* through the initiative process so as to incorporate such a limitation as an explicit section of the state Constitution.

In considering this question, it is essential to keep in mind that the provisions of the California Constitution governing the procedures by which that Constitution may be amended are very different from the more familiar provisions of the United States Constitution relating to the means by which the federal Constitution may be amended. The federal Constitution provides that an amendment to that Constitution *may be proposed* either *by two-thirds of both houses of Congress* or by a convention called on the application *of two-thirds of the state legislatures,* and requires, in either instance, that any proposed amendment *be ratified* by the legislatures of (or by conventions held in) *three-fourths of the states.* (U.S. Const., art. V.) In contrast, the California Constitution provides that an amendment to that Constitution *may be proposed* either *by two-thirds of the membership of each house of the Legislature* (Cal. Const., art. XVIII, § 1) or *by an initiative petition signed by voters numbering at least 8 percent of the total votes cast for all candidates for Governor in the last gubernatorial election* (Cal. Const., art. II, § 8, subd. (b); *id.,* art. XVIII, § 3), and further specifies that, once an amendment is proposed by either means, the amendment becomes part of the state Constitution *if it is approved by a simple majority of the voters who cast votes on the measure at a statewide election* (*id.,* art. XVIII, § 4).

As is evident from the foregoing description, the process for amending our state Constitution is considerably less arduous and restrictive than the amendment process embodied in the federal Constitution, a difference dramatically demonstrated by the circumstance that only 27 amendments to the United States Constitution have been adopted since the federal Constitution was ratified in 1788, whereas more than 500 amendments to the California Constitution have been adopted since ratification of California's current Constitution in 1879. (See Council of State Governments, The Book of the States (2008 ed.) p. 10.)

At the same time, as numerous decisions of this court have explained, although the initiative process may be used to propose and adopt *amendments* to the California Constitution, under its governing provisions that process may not be used to *revise* the state Constitution. (See, e.g., *McFadden v. Jordan* (1948) 32 Cal.2d 330 [196 P.2d 787]; *Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization* (1978) 22 Cal.3d 208 [149 Cal.Rptr. 239, 583 P.2d 1281]; *Raven v. Deukmejian* (1990) 52 Cal.3d 336 [276 Cal.Rptr. 326, 801 P.2d 1077].) Petitioners' principal argument rests on the claim that Proposition 8 should be viewed as *a constitutional revision* rather than as *a constitutional amendment,* and that this change in the state Constitution therefore could not lawfully be adopted through the initiative process.

As we discuss at length below, in determining whether Proposition 8 constitutes a constitutional amendment or, instead, a constitutional revision,

we by no means write on a clean slate. Although the issue arises in this case in the context of an initiative measure, the distinction drawn in the California Constitution between constitutional amendments and constitutional revisions long predates the adoption in 1911 of the initiative process as part of the California Constitution. The origin and history in the preinitiative era of this distinction between an amendment and a revision shed considerable light upon the contemplated scope of the two categories. As we shall see, our state's original 1849 Constitution provided that *the Legislature* could propose *constitutional amendments,* but that *a constitutional revision* could be proposed only by means of *a constitutional convention,* the method used in 1849 to draft the initial Constitution in anticipation of California's statehood the following year. Thus, as originally adopted, the constitutional amendment/revision dichotomy in California—which mirrored the framework set forth in many other state constitutions of the same vintage—indicates that the category of *constitutional revision* referred to the kind of wholesale or fundamental alteration of the constitutional structure that appropriately could be undertaken only by a constitutional convention, in contrast to the category of *constitutional amendment*, which included any and all of the more discrete changes to the Constitution that thereafter might be proposed. (As we note later, it was not until the state Constitution was changed *in 1962*—through *a constitutional amendment*—that *the Legislature* obtained the authority to propose revisions to all or part of the Constitution.)

Furthermore, in addition to the historical background of the amendment/revision language that appears in the California Constitution itself, over the past three decades numerous decisions of this court have considered whether a variety of proposed changes to the California Constitution represented constitutional amendments or instead constitutional revisions. Those decisions establish both the analytical framework and the legal standard that govern our decision in this case, and further apply the governing standard to a wide array of measures that added new provisions and substantially altered existing provisions of the state Constitution. Those decisions explain that in resolving the amendment/revision question, a court carefully must assess (1) the meaning and scope of the constitutional change at issue, and (2) the effect—both quantitative and qualitative—that the constitutional change will have on *the basic governmental plan or framework* embodied in the preexisting provisions of the California Constitution.

In analyzing the constitutional challenges presently before us, we first explain that the provision added to the California Constitution by Proposition 8, when considered in light of the majority opinion in the *Marriage Cases, supra,* 43 Cal.4th 757 (which preceded the adoption of Prop. 8), properly must be understood as having a considerably narrower scope and more limited effect than suggested by petitioners in the cases before us. Contrary to petitioners' assertion, Proposition 8 does not *entirely repeal* or *abrogate* the

aspect of a same-sex couple's state constitutional right of privacy and due process that was analyzed in the majority opinion in the *Marriage Cases*— that is, the constitutional right of same-sex couples to "choose one's life partner and enter with that person into a committed, officially recognized, and protected family relationship that enjoys all of the constitutionally based incidents of marriage" (*Marriage Cases, supra,* 43 Cal.4th at p. 829). Nor does Proposition 8 *fundamentally alter* the meaning and substance of state constitutional equal protection principles as articulated in that opinion. Instead, the measure carves out a narrow and limited exception to these state constitutional rights, reserving the official *designation* of the term "marriage" for the union of opposite-sex couples as a matter of state constitutional law, but leaving undisturbed all of the other extremely significant substantive aspects of a same-sex couple's state constitutional right to establish an officially recognized and protected family relationship and the guarantee of equal protection of the laws.

By clarifying this essential point, we by no means diminish or minimize the significance that the official designation of "marriage" holds for both the proponents and opponents of Proposition 8; indeed, the importance of the marriage designation was a vital factor in the majority opinion's ultimate holding in the *Marriage Cases, supra,* 43 Cal.4th 757, 845–846, 855. Nonetheless, it is crucial that we accurately identify the actual effect of Proposition 8 on same-sex couples' state constitutional rights, as those rights existed prior to adoption of the proposition, in order to be able to assess properly the constitutional challenges to the proposition advanced in the present proceeding. We emphasize only that among the various constitutional protections recognized in the *Marriage Cases* as available to same-sex couples, it is only the designation of marriage—albeit significant—that has been removed by this initiative measure.

Taking into consideration the actual limited effect of Proposition 8 upon the preexisting state constitutional right of privacy and due process and upon the guarantee of equal protection of the laws, and after comparing this initiative measure to the many other constitutional changes that have been reviewed and evaluated in numerous prior decisions of this court, we conclude Proposition 8 constitutes a constitutional amendment rather than a constitutional revision. As a quantitative matter, petitioners concede that Proposition 8—which adds but a single, simple section to the Constitution— does not constitute a revision. As a qualitative matter, the act of limiting access to the designation of marriage to opposite-sex couples does not have a substantial or, indeed, even a minimal effect on *the governmental plan or framework of California* that existed prior to the amendment. Contrary to petitioners' claim in this regard, the measure does not transform or undermine the judicial function; this court will continue to exercise its traditional responsibility to faithfully enforce *all* of the provisions of the California

Constitution, which now include the new section added through the voters' approval of Proposition 8. Furthermore, the judiciary's authority in applying the state Constitution always has been limited by the content of the provisions set forth in our Constitution, and that limitation remains unchanged.

Petitioners contend, however, that even if Proposition 8 does not affect the *governmental plan* or *framework* established by the state Constitution, the measure nonetheless should be considered to be a revision because it conflicts with an assertedly fundamental constitutional principle that protects a minority group from having its constitutional rights diminished *in any respect* by majority vote. Petitioners, however, cannot point to any authority supporting their claim that under the California Constitution, a constitutional amendment—proposed and adopted by a majority of voters through the initiative process—cannot diminish in any respect the content of a state constitutional right as that right has been interpreted in a judicial decision. As we shall see, there have been many amendments to the California Constitution, adopted by the people through the initiative process in response to court decisions interpreting various provisions of the California Constitution, that have had just such an effect.

We agree with petitioners that the state constitutional right to equal protection of the laws unquestionably represents a long-standing and fundamental constitutional principle (a constitutional principle that, as we already have explained, has *not generally* been repealed or eliminated by Prop. 8). There are many other constitutional rights that have been amended in the past through the initiative process, however, that also are embodied in the state Constitution's Declaration of Rights and reflect equally long-standing and fundamental constitutional principles whose purpose is to protect often unpopular individuals and groups from overzealous or abusive treatment that at times may be condoned by a transient majority. Neither the language of the relevant constitutional provisions, nor our past cases, support the proposition that any of these rights is totally exempt from modification by a constitutional amendment adopted by a majority of the voters through the initiative process.

The constitutions of a number of other states contain express provisions precluding the use of the initiative power to amend portions or specified provisions of those states' constitutions (see, e.g., Mass. Const., amend. art. XLVIII, pt. II, § 2 ["No proposition inconsistent with any one of the following rights of the individual, as at present declared in the declaration of rights, shall be the subject of an initiative . . . petition: [listing a number of rights, including the rights to just compensation, jury trial, and protection from unreasonable search, and the freedoms of speech, assembly, and of the press]"]; Miss. Const., art. 15, § 273, subd. (5) ["The initiative process shall not be used: [¶] (a) For the proposal, modification or repeal of any portion of

the Bill of Rights of this Constitution . . ."]). In contrast, the California Constitution contains no comparable limitation. In the absence of such an express restriction on the initiative power, and in light of past California authorities, we conclude that the California Constitution cannot be interpreted as restricting the scope of the people's right to amend their Constitution in the manner proposed by petitioners.

Petitioners also claim that Proposition 8 violates the separation of powers doctrine embodied in the California Constitution. We conclude this claim similarly lacks merit. Contrary to petitioners' assertion, Proposition 8 does not "readjudicate" the issue that was litigated and resolved in the *Marriage Cases, supra*, 43 Cal.4th 757. The initiative measure does not declare the state of the law as it existed under the California Constitution at the time of the *Marriage Cases*, but rather establishes a new substantive state constitutional rule that took effect upon the voters' approval of Proposition 8. Because the California Constitution explicitly recognizes the right of the people to amend their state Constitution through the initiative process, the people, in exercising that authority, have not in any way impermissibly usurped a power allocated by the Constitution exclusively to the judiciary or some other entity or branch of government.

The Attorney General, in his briefing before this court, has advanced an alternative theory—not raised by petitioners in their initial petitions—under which he claims that even if Proposition 8 constitutes a constitutional amendment rather than a constitutional revision, that initiative measure nonetheless should be found invalid under the California Constitution on the ground that the "inalienable rights" embodied in article I, section 1 of that Constitution are not subject to "abrogation" by constitutional amendment without a compelling state interest. The Attorney General's contention is flawed, however, in part because, like petitioners' claims, it rests inaccurately upon an overstatement of the effect of Proposition 8 on both the fundamental constitutional right of privacy guaranteed by article I, section 1, and on the due process and equal protection guarantees of article I, section 7. As explained below, Proposition 8 does not abrogate any of these state constitutional rights, but instead carves out a narrow exception applicable only to access to the *designation* of the term "marriage" but not to any other of "the core set of basic *substantive* legal rights and attributes traditionally associated with marriage . . ." (*Marriage Cases, supra*, 43 Cal.4th at p. 781), such as the right to establish an officially recognized and protected family relationship with the person of one's choice and to raise children within that family.

In addition, no authority supports the Attorney General's claim that a constitutional amendment adopted through the constitutionally prescribed procedure is invalid simply because the amendment affects a prior judicial

interpretation of a right that the Constitution denominates "inalienable." The natural-law jurisprudence reflected in passages from the few early judicial opinions relied upon by the Attorney General has been discredited for many years, and, in any event, *no* decision suggests that when a constitution has been explicitly amended to modify a constitutional right (including a right identified in the Constitution as "inalienable"), the amendment may be found unconstitutional on the ground that it conflicts with some *implicit or extra-constitutional* limitation that is to be framed and enforced by the judiciary. Although the amending provisions of a constitution can *expressly* place some subjects or portions of the constitution off-limits to the amending process—as already noted, some state constitutions contain just such explicit limits—the California Constitution contains no such restraints. This court would radically depart from the well-established limits of the judicial function were it to engraft such a restriction onto the Constitution in the absence of an explicit constitutional provision limiting the amendment power.

Accordingly, we conclude that each of the state constitutional challenges to Proposition 8 advanced by petitioners and the Attorney General lacks merit. Having been approved by a majority of the voters at the November 4, 2008 election, the initiative measure lawfully amends the California Constitution to include the new provision as article I, section 7.5.

In a sense, petitioners' and the Attorney General's complaint is that it is just too easy to amend the California Constitution through the initiative process.[1] But it is not a proper function of this court to curtail that process; we are

---

[1] In contrast to the process by which the California Constitution may be amended, in both Connecticut and Iowa—two states in which supreme courts recently have held that a statute limiting marriage to opposite-sex couples violates the provisions of their respective state constitution (see *Kerrigan v. Commissioner of Public Health* (2008) 289 Conn. 135 [957 A.2d 407]; *Varnum v. Brien* (Iowa 2009) 763 N.W.2d 862)—the state constitution may not be amended through the initiative process, and in each state an amendment proposed by a majority of the legislators in each house must be approved in two successive legislative sessions before it can be submitted to the voters for ratification at the next general election. (See Conn. Const., amend. art. VI; Iowa Const., art. X, § 1.) (In Connecticut, an amendment approved by three-quarters of the legislators in each house may be submitted directly to the voters for ratification at the next general election (Conn. Const., amend. art. VI).)

In Massachusetts—the other state in which a statute limiting marriage to opposite-sex couples has been found unconstitutional under the state constitution (see *Goodridge v. Department of Public Health* (2003) 440 Mass. 309 [798 N.E.2d 941])—the state constitution may in some circumstances be amended through the initiative process, but in that state, after an initiative petition has been signed by the requisite number of electors, the proposed constitutional amendment must be approved by one-fourth of the state legislators in two successive legislative sessions before it can be placed on the ballot. (See, *post*, at p. 462, fn. 40.)

In Vermont, where the state legislature recently amended that state's marriage statute (over a gubernatorial veto) to permit same-sex couples to marry (Vt. Act No. 3, S. 115 (2009–2010 Legis. Sess.) eff. Sept. 1, 2009), the state constitution may not be amended through the

constitutionally bound to uphold it. If the process for amending the Constitution is to be restricted—perhaps in the manner it was explicitly limited in an earlier version of our state Constitution (see, *post*, at pp. 414–420), or as limited in the present-day constitutions of some of our sister states (see, *post*, at pp. 454–457)—this is an effort that the people themselves may undertake through the process of amending their Constitution in order to impose further limitations upon their own power of initiative.

Finally, we consider whether Proposition 8 affects the validity of the marriages of same-sex couples that were performed prior to the adoption of Proposition 8. Applying well-established legal principles pertinent to the question whether a constitutional provision should be interpreted to apply prospectively or retroactively, we conclude that the new section cannot properly be interpreted to apply retroactively. Accordingly, the marriages of same-sex couples performed prior to the effective date of Proposition 8 remain valid and must continue to be recognized in this state.

## I

To place the constitutional change effected by Proposition 8 in context, we review the relevant historical circumstances that preceded the drafting, circulation, and adoption of this initiative measure.

We begin with a condensed summary of the relevant history of California's marriage statutes, a history described in greater detail by the majority opinion in the *Marriage Cases, supra,* 43 Cal.4th 757. As explained in that opinion, "[f]rom the beginning of California statehood, the legal institution of civil marriage has been understood to refer to a relationship between a man and a woman." (*Id.* at p. 792, fn. omitted.) In the mid-1970's, however, at least in part as a consequence of changes in the language of the California marriage

---

initiative process, and an amendment proposed by the legislature must be approved in two successive legislative sessions before it can be submitted to the voters for ratification. (Vt. Const., ch. II, § 72.)

In Maine, where the state legislature also recently amended that state's marriage statute to permit same-sex couples to marry (Me. Pub.L 2009, ch. 82 (124th Leg., 1st Sess.) enacted May 6, 2009), the state constitution similarly may not be amended through the initiative process. In that state, an amendment to the state constitution may be proposed by a two-thirds vote of both houses of the legislature, and becomes effective if approved by a majority of voters at the next biennial statewide election. (Me. Const., art. X, § 4.)

Finally, in New Hampshire, where the state legislature even more recently enacted similar legislation permitting same-sex couples to marry (N.H. 2009 chs. 59–61 (161st Sess. Gen. Ct.) enacted June 3, 2009 [H.B. Nos. 436, 310 & 73]), the state constitution also may not be amended through the initiative process. An amendment to the New Hampshire Constitution may be proposed either by three-fifths of the entire membership of each house of the legislature or by three-fifths of the entire membership of a constitutional convention, and in either case a proposed amendment becomes effective only if approved by a two-thirds vote of the electorate at a statewide election. (N.H. Const., pt. II, art. 100.)

statutes made in response to an unrelated subject (*id.* at p. 794), same-sex couples applied for marriage licenses from county clerks in a number of California counties. At that point in time all of the county clerks denied the applications, "but in order to eliminate any uncertainty as to whether the then existing marriage statutes authorized marriage between two persons of the same sex, legislation was introduced in 1977 at the request of the County Clerks' Association of California to amend [the relevant statutory provisions] to clarify that the applicable California statutes authorized marriage only between a man and a woman." (*Id.* at p. 795.) The 1977 bill was enacted into law, and as a result the relevant statutory provision—now embodied in Family Code section 300—declared in relevant part that "[m]arriage is a personal relation arising out of a civil contract between a man and a woman . . . ." The intent of this statute clearly was to limit marriages that lawfully could be performed in California to marriages of opposite-sex couples. (43 Cal.4th at p. 795.)

This marriage statute, as amended in 1977, remained in effect throughout the 1980's, 1990's, and 2000's, and continued to limit marriages that lawfully could be performed in California to marriages of opposite-sex couples. In the mid- and late-1990's and early 2000's, however, in response to a 1993 decision of the Hawaii Supreme Court that raised the possibility that the courts of that state might conclude that the Hawaii statute limiting marriage to opposite-sex couples violated the provisions of the Hawaii Constitution and that same-sex couples lawfully could marry in Hawaii (see *Baehr v. Lewin* (1993) 74 Haw. 530 [852 P.2d 44]), the United States Congress and many states adopted so-called defense of marriage acts generally setting forth, in varying terms, the particular jurisdiction's policies of (1) limiting marriage to opposite-sex couples, and (2) recognizing only those marriages, entered into in another jurisdiction, that involved opposite-sex couples.

In California, supporters of this "defense of marriage" movement drafted and circulated an initiative petition that ultimately appeared on the March 7, 2000 primary election ballot as Proposition 22. Unlike comparable measures in some other states that took the form of state *constitutional amendments*, Proposition 22 proposed the adoption in California of a new *statutory* provision, Family Code section 308.5.[2] That statute provided, in full: "Only marriage between a man and a woman is valid or recognized in California." At the March 7, 2000 election, the voters of California approved Proposition 22, and section 308.5 became part of the Family Code.

---

[2] Under article II, section 8, subdivision (b) of the California Constitution, an initiative petition that proposes the adoption of *a statutory provision* must be signed by electors "equal in number to [at least] 5 percent . . . of the votes [cast] for all candidates for Governor at the last gubernatorial election," whereas an initiative petition that proposes the adoption of *a constitutional amendment* must be signed by a number of voters equal to at least 8 percent of the votes cast for all candidates for Governor at the last gubernatorial election.

Notwithstanding the provisions of Family Code sections 300 and 308.5, in February 2004 public officials of the City and County of San Francisco, acting on their personal opinion that the provisions of the California marriage statutes limiting marriage to opposite-sex couples were unconstitutional—but in the absence of any judicial determination of that legal question—began issuing marriage licenses to, and solemnizing marriages of, numerous same-sex couples. Shortly thereafter, the Attorney General and a number of taxpayers filed original proceedings in this court, maintaining that the actions of the city officials were unlawful and requesting our immediate intervention. (*Lockyer v. City and County of San Francisco*, S122923, and *Lewis v. Alfaro*, S122865, consolidated and decided in *Lockyer, supra*, 33 Cal.4th 1055.) On March 11, 2004, we issued an order to show cause in those proceedings, and, pending our determination of the matters, directed the local officials to enforce the existing marriage statutes and to refrain from issuing marriage licenses to same-sex couples. At the same time, we indicated that our order did not preclude the filing of a separate action in superior court raising, for judicial determination, a direct challenge to the constitutionality of California's marriage statutes.

Shortly thereafter, several new actions were filed in superior court challenging the constitutionality of the California marriage statutes. Subsequently those actions, along with several others, were combined into a single coordination proceeding entitled *In re Marriage Cases* (JCCP No. 4365) and assigned to a superior court judge.

In August 2004, while the *Marriage Cases* coordination proceeding was pending in superior court, our court rendered its decision in *Lockyer, supra*, 33 Cal.4th 1055. We concluded that the local officials had exceeded their authority in issuing marriage licenses to same-sex couples in the absence of a judicial determination that the statutory provisions limiting marriage to opposite-sex couples were unconstitutional, and further held that the approximately 4,000 marriages of same-sex couples performed in San Francisco prior to our March 11, 2004 order were void and of no legal effect. At the same time, our opinion in *Lockyer* emphasized that the substantive question of the constitutionality of California's statutes limiting marriage to opposite-sex couples was not before this court in that case, and that we were expressing no view on that issue.

After we filed our decision in *Lockyer, supra*, 33 Cal.4th 1055, the superior court in the *Marriage Cases* coordination proceeding obtained briefing and conducted a hearing on the substantive question of the validity, under the state Constitution, of California's statutes limiting marriage to opposite-sex couples. After considering the parties' positions, the superior court concluded that the California marriage statutes, in limiting marriage to opposite-sex couples and denying access to marriage to same-sex couples, violated the

equal protection clause of the California Constitution. The superior court entered judgment in favor of the parties challenging the constitutionality of the marriage statutes.

On appeal, the Court of Appeal in a split decision reversed the superior court's ruling, concluding that the superior court had erred in finding the marriage statutes unconstitutional. One appellate justice dissented from that holding.

On petition of the parties in the *Marriage Cases*, we granted review, subsequently receiving extensive briefing by the parties and by a large number of amici curiae.

During the period in which the *Marriage Cases* proceeding was pending in this court but before we issued our decision, individuals circulated for signature an initiative petition proposing the adoption of the constitutional initiative measure at issue in the present case—that is, the initiative measure ultimately designated as Proposition 8.[3] As set forth in the initiative petition, the measure proposed to add one new section—section 7.5—to article I of the California Constitution. The proposed new article I, section 7.5 read in full: "Only marriage between a man and a woman is valid or recognized in California." As we have seen, these are the identical 14 words that were embodied in Proposition 22 and adopted as Family Code section 308.5 at the March 2000 election. The difference between the measure proposed by Proposition 8 and the one contained in Proposition 22 is that Proposition 8 proposed to add this language as *a provision of the California Constitution*, whereas by Proposition 22 this language had been adopted as *a statutory provision*. (A California statute, of course, is invalid if it conflicts with the governing provisions of the California Constitution.)

On May 15, 2008, prior to the date the Secretary of State certified that Proposition 8 had obtained sufficient valid signatures to qualify for the November 4, 2008 election ballot, this court issued its decision in the *Marriage Cases, supra,* 43 Cal.4th 757. We shall discuss the majority opinion in the *Marriage Cases* in greater detail below in analyzing the scope and effect of Proposition 8 (see, *post,* at pp. 399–412), but at this juncture it is sufficient simply to point out that the majority concluded that (1) the constitutional "right to marry," as embodied in the privacy and due process provisions of the California Constitution, is distinct from, and encompasses a much broader set of core elements than, the right to have one's official family relationship designated as "marriage," (2) same-sex couples, as well as

---

[3] Although the initiative measure was not designated Proposition 8 until after the Secretary of State certified that the measure had qualified for the ballot, for convenience we shall describe it as Proposition 8 even when referring to its existence prior to the time it was so designated.

opposite-sex couples, enjoy the full protection of, and all of the rights encompassed by, the state constitutional rights of privacy and due process, (3) statutes that treat persons differently on the basis of their sexual orientation, like statutes that accord differential treatment on the basis of race or gender, are constitutionally suspect and subject to "strict scrutiny" under the California equal protection clause, and (4) by affording access to the designation of "marriage" to opposite-sex couples but denying that access to same-sex couples, the California statutes limiting marriage to the union of a man and a woman impinged upon same-sex couples' state constitutional rights of privacy and due process and violated such couples' right to the equal protection of the laws as guaranteed by the state Constitution. The majority opinion further concluded that to remedy these constitutional violations, the California marriage statutes should be interpreted to grant both opposite-sex and same-sex couples access to the designation of marriage and to the rights inherent in that institution.

Disagreeing with these conclusions, Justice Baxter, in a concurring and dissenting opinion joined by Justice Chin, argued that the acceptance of same-sex marriage should be determined through the political process, and not by this court. By relegating to itself the authority to alter and recast the traditional definition of marriage, these justices urged, the majority had violated the separation of powers among the three branches of government.

In specific response to the majority's analysis, Justices Baxter and Chin asserted that (1) it was unnecessary to decide whether same-sex couples had a fundamental state constitutional right to form legal unions with the substantive rights and benefits of marriage, because the Domestic Partner Rights and Responsibilities Act of 2003 (Domestic Partner Act), adopted by the Legislature, already grants to those couples all of these substantive rights the state can provide; (2) because marriage universally has been defined and understood as a formal relationship between a man and a woman, the California Constitution could not be construed to afford same-sex couples a fundamental "right to marry" that requires official use of the name "marriage" for same-sex legal unions; and (3) use of the common term "marriage" for same-sex and opposite-sex legal unions was not required by the state Constitution's equal protection clause.

On the last point, Justices Baxter and Chin reasoned that (1) same-sex and opposite-sex couples are not similarly situated in the context of statutes retaining the traditional definition of marriage; (2) sexual orientation is not a "suspect class" for state constitutional purposes; (3) state constitutional challenges to statutory distinctions on the basis of sexual orientation thus should be decided under the "rational basis" or "rational relationship" standard, not the "strict scrutiny" standard adopted by the majority; and

(4) rational grounds existed for the decision of the Legislature and the people to retain the traditional definition of marriage as between a man and a woman.

In a separate concurring and dissenting opinion, Justice Corrigan wrote that the equal protection clause of the California Constitution affords same-sex couples a right to form legal unions with all the substantive benefits and responsibilities of marriage—a right fully implemented by the Domestic Partner Act. She concluded that equal protection principles do not require same-sex legal unions to be officially identified by the name "marriage," even though—in her view—Californians should allow them to be so designated. Like Justices Baxter and Chin, Justice Corrigan reasoned that, in light of the age-old understanding of marriage as a relationship limited to that between a man and a woman, same-sex and opposite-sex couples are not similarly situated for the purpose of recognizing the availability of the label "marriage" to same-sex legal unions. Hence, she concluded, an equal protection challenge to such a statutory distinction must be rejected at the threshold. Justice Corrigan joined Justices Baxter and Chin in arguing that this court lacked authority to alter and recast the traditional definition of marriage, and that such a profound social change instead should be accomplished through the political process.

After this court issued its decision in the *Marriage Cases*, several parties filed a petition for rehearing, requesting that this court either grant rehearing or modify the opinion "to stay the effectiveness of its decision until after the Secretary of State compiles the result of the November 4, 2008, election." The rehearing petition noted that the proponents of Proposition 8 already had submitted the voter-signed initiative petition to county election officials for review and verification of the submitted signatures, and that the verification process was then under way. The rehearing petition maintained that "[i]f the voters approve the Marriage Initiative by a majority vote at the November 4, 2008 election, the language of the Marriage Initiative . . . will become part of the California Constitution" and would alter that Constitution "in a manner that will obviate the basis for the writ ordered in [the] Court's decision." On June 2, 2008, the Secretary of State certified that Proposition 8 had obtained a sufficient number of valid signatures to appear on the November 4, 2008 general election ballot. On June 4, 2008, by majority vote, this court denied the petition for rehearing in the *Marriage Cases*; Justices Baxter, Chin, and Corrigan voted to grant rehearing. Our order indicated that the decision filed on May 15, 2008, would become final at 5:00 p.m. on June 16, 2008. The request to stay the effect of our decision was denied unanimously.

On June 20, 2008, shortly after the decision in the *Marriage Cases* became final, a petition was filed in this court, seeking the issuance of an original writ of mandate directing the Secretary of State not to include Proposition 8 on the election ballot to be voted upon at the November 4, 2008 election.

(*Bennett v. Bowen*, S164520.) The petition contended, among other claims, that Proposition 8 embodied a constitutional revision rather than a constitutional amendment and for that reason could not lawfully be proposed by the initiative process. On July 16, 2008, this court summarily denied the petition.

Accordingly, Proposition 8 remained on the November 4, 2008 election ballot. The Attorney General prepared a title and summary of the proposition; the Legislative Analyst prepared an analysis of the measure; ballot arguments in favor of and against the proposition were submitted; and a ballot pamphlet containing these materials was compiled by the Secretary of State and was sent to all voters prior to the November 4, 2008 election. At that election, Proposition 8 was approved by a majority (52.3 percent) of the voters casting votes on the proposition. (See Cal. Sect. of State, Votes for and Against November 4, 2008 State Ballot Measures <http://www.ss.ca.gov> [as of May 26, 2009].) Pursuant to article XVIII, section 4 of the California Constitution, the measure took effect on November 5, 2008.

On November 5, 2008, the day following the election, three separate petitions for an original writ of mandate were filed in this court challenging the validity of Proposition 8. In *Strauss v. Horton* (S168047), petitioners—a number of same-sex couples who seek to marry notwithstanding the provisions of Proposition 8, along with Equality California (an organization whose members include numerous similarly situated same-sex couples throughout California)—seek a writ of mandate directing the relevant state officials to refrain from performing any act enforcing Proposition 8 and from instructing any other person or entity to enforce that measure, on the ground that Proposition 8 constitutes an invalid revision of the California Constitution. In *Tyler v. State of California* (S168066), petitioners—one same-sex couple who married in California prior to the adoption of Proposition 8 and one same-sex couple who want to marry notwithstanding Proposition 8—seek similar relief, asserting both that Proposition 8 constitutes an impermissible constitutional revision and that Proposition 8 violates the separation of powers doctrine. In *City and County of San Francisco v. Horton* (S168078), petitioners— numerous California municipal entities and several same-sex couples who married in California prior to the adoption of Proposition 8—also seek a writ of mandate directing state officials to refrain from implementing, enforcing, or applying Proposition 8, on the ground that this measure constitutes a constitutional revision, and further seek an order, in the event the court concludes that Proposition 8 is not unconstitutional, declaring that it operates prospectively only and does not invalidate existing marriages between same-sex couples. The petitions filed in the *Strauss* and *Tyler* cases also requested that we stay the operation of Proposition 8 pending our determination of these matters. On November 17, 2008, the official proponents of Proposition 8 filed a motion to intervene in all three cases.

On November 19, 2008, we issued an order to show cause in each of the three cases, granted the official proponents' motion to intervene, and at the same time denied the requests to stay the operation of Proposition 8 pending our consideration of these cases. Our order listed three issues to be briefed and argued,[4] and established an expedited briefing schedule.

The parties timely filed their briefs in this court,[5] and we also have received numerous amici curiae briefs (63 in number, representing hundreds of institutions and individuals) on behalf of petitioners and of respondents.[6] The cases were argued before this court on March 5, 2009, and after oral argument we filed an order consolidating the three cases for decision.

## II

As already noted, the constitutional challenges to Proposition 8 that have been advanced in this proceeding require us to evaluate the changes in the California Constitution actually effected by the addition of the constitutional provision embodied in Proposition 8. In order to accurately identify those changes, it is necessary to review at some length the majority opinion in the

---

[4] The three issues are as follows: (1) Is Proposition 8 invalid because it constitutes a revision of, rather than an amendment to, the California Constitution? (See Cal. Const., art. XVIII, §§ 1–4.) (2) Does Proposition 8 violate the separation of powers doctrine under the California Constitution? (3) If Proposition 8 is not unconstitutional, what is its effect, if any, on the marriages of same-sex couples performed before the adoption of Proposition 8?

[5] Although petitioners in each of the three cases before us have filed separate briefs and have framed their arguments in slightly differing terms, the gist of the claims raised by all petitioners is similar. For convenience, when we refer in this opinion to a contention or argument raised by "petitioners," we are referring to a claim raised in one or more of the briefs filed by petitioners.

[6] In their opposition brief filed in the *City and County of San Francisco* action (S168078) (in which the City and County of San Francisco and numerous other public entities appear as petitioners), interveners raise a threshold issue, challenging the standing of these public entities to bring such an action. In their reply brief, petitioner public entities vigorously contest interveners' lack-of-standing claim, relying, among other grounds, on a number of prior cases in which public entities have been permitted to challenge the constitutionality of a state law. (See, e.g., *County of San Diego v. San Diego NORML* (2008) 165 Cal.App.4th 798, 816–818 [81 Cal.Rptr.3d 461]; *Central Delta Water Agency v. State Water Resources Control Bd.* (1993) 17 Cal.App.4th 621, 630 [21 Cal.Rptr.2d 453]; *Selinger v. City Council* (1989) 216 Cal.App.3d 259, 270–271 [264 Cal.Rptr. 499]; cf. *City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 79–80 [124 Cal.Rptr.2d 519, 52 P.3d 695].) Because the individual petitioners in both the *Strauss* and *Tyler* actions, and the individuals who are additional petitioners in the *City and County of San Francisco* action, clearly have standing to maintain these actions, and because the significant legal issues before us are not affected by the standing issue, we conclude it is not necessary or advisable to address in this proceeding the general question of a public entity's standing to bring such an action. (Cf. *Marriage Cases, supra*, 43 Cal.4th 757, 791, fn. 9; *Lockyer, supra*, 33 Cal.4th 1055, 1099, fn. 27.)

*Marriage Cases, supra*, 43 Cal.4th 757. As we shall see, that opinion resolved a number of distinct issues that bear directly on the meaning and scope of Proposition 8.

### A

■ One of the questions presented in the *Marriage Cases, supra*, 43 Cal.4th 757, was the proper interpretation of the language embodied in Family Code section 308.5—"[o]nly marriage between a man and a woman is valid or recognized in California"—the statutory provision enacted in 2000 by the voters' approval of Proposition 22. The petitioners in the *Marriage Cases* asserted that this language was intended and should be interpreted to apply only to marriages entered into in a jurisdiction other than California, but this court unanimously rejected that contention, concluding that the statutory language in question reasonably must be interpreted to apply to marriages performed in California as well as to those performed in other jurisdictions. (43 Cal.4th at pp. 796–801.) In light of that holding, and the background and "legislative" history of Proposition 8 contained in the ballot pamphlet materials relating to that measure, it is clear that the section added to the California Constitution by Proposition 8—which contains language identical to that found in Family Code section 308.5—applies both to marriages performed in California and to those performed in other jurisdictions.[7]

### B

The main contention raised by the petitioners in the *Marriage Cases, supra*, 43 Cal.4th 757, was that both Family Code section 308.5 and Family Code section 300 ("[m]arriage is a personal relation arising out of a civil contract between a man and a woman . . .") violated the California Constitution. The petitioners argued that by limiting marriage to opposite-sex couples, the marriage statutes contravened both the state constitutional right to marry, as embodied in the privacy and due process clauses of the state Constitution (art. I, §§ 1, 7), and the state equal protection guarantee (art. I, § 7). The majority opinion initially addressed the state constitutional right to marry, discussing in considerable detail the meaning and scope of this right.

Analyzing, in the *Marriage Cases, supra*, 43 Cal.4th 757, 812, "the nature and substance of the interests protected by the constitutional right to marry," the majority opinion first expressly "put to the side . . . the question whether the substantive rights embodied within the constitutional right to marry

---

[7] The question whether Proposition 8 is prospective or retroactive—that is, whether it applies only to marriages performed after its effective date or also to marriages performed prior to that date—is addressed in a subsequent part of this opinion. (*Post*, at pp. 470–474.)

include the right to have the couple's official relationship designated by the name 'marriage' rather than some other term, such as 'domestic partnership,' " explaining that the latter issue would be addressed in a subsequent part of the opinion. (*Ibid.*)

The majority opinion then began its analysis of the state constitutional right to marry by reviewing numerous California cases that had discussed and applied this right. (*Marriage Cases, supra,* 43 Cal.4th at pp. 813–815.) The opinion concluded, after an assessment of the significant societal and individual interests underlying this right as reflected in those decisions (*id.* at pp. 815–818), that "[b]ecause our cases make clear that the right to marry is an integral component of an individual's interest in *personal autonomy* protected by the privacy provision of article I, section 1, and of the *liberty* interest protected by the due process clause of article I, section 7, . . . the right to marry—like the right to establish a home and raise children—has independent *substantive* content, and cannot properly be understood as simply the right to enter into such a relationship *if* (*but only if*) the Legislature chooses to establish and retain it." (*Marriage Cases, supra,* 43 Cal.4th at pp. 818–819.)

The majority opinion then went on to discuss some of the substantive aspects of this constitutional right. "One very important aspect of the substantive protection afforded by the California constitutional right to marry is . . . an individual's right to be free from undue governmental intrusion into (or interference with) integral features of this relationship—that is, the right of marital or familial privacy. [Citations.] The substantive protection embodied in the constitutional right to marry, however, goes beyond what is sometimes characterized as simply a 'negative' right insulating the couple's relationship from overreaching governmental intrusion or interference, and includes a 'positive' right to have the state take at least some affirmative action to acknowledge and support the family unit. [¶] Although the constitutional right to marry clearly does not obligate the state to afford specific tax or other governmental benefits on the basis of a couple's family relationship, the right to marry does obligate the state to take affirmative action to grant official, public recognition to the couple's relationship as a family [citations], as well as to protect the core elements of the family relationship from at least some types of improper interference by others. [Citation.] This constitutional right also has the additional affirmative substantive effect of providing assurance to each member of the relationship that the government will enforce the mutual obligations between the partners (and to their children) that are an important aspect of the commitments upon which the relationship rests." (*Marriage Cases, supra,* 43 Cal.4th at pp. 819–820, fn. omitted.)

In summarizing this aspect of the decision, the majority opinion in the *Marriage Cases, supra,* 43 Cal.4th 757, explained that "under this state's

Constitution, the constitutionally based right to marry properly must be understood to encompass the core set of basic *substantive* legal rights and attributes traditionally associated with marriage that are so integral to an individual's liberty and personal autonomy that they may not be eliminated or abrogated by the Legislature or by the electorate through the statutory initiative process. These core substantive rights include, most fundamentally, the opportunity of an individual to establish—with the person with whom the individual has chosen to share his or her life—an *officially recognized and protected family* possessing mutual rights and responsibilities and entitled to the same respect and dignity accorded a union traditionally designated as marriage. . . . [T]he substantive right of two adults who share a loving relationship to join together to establish an officially recognized family of their own—and, if the couple chooses, to raise children within that family— constitutes a vitally important attribute of the fundamental interest in liberty and personal autonomy that the California Constitution secures to all persons for the benefit of both the individual and society." (43 Cal.4th at p. 781.)

After discussing the basic contours of the substantive elements encompassed within the state constitutional right to marry, the majority opinion in the *Marriage Cases, supra*, 43 Cal.4th 757, went on to explain that although "as an historical matter in this state marriage always has been limited to a union between a man and a woman" (*id.* at p. 820), "[t]radition alone . . . generally has not been viewed as a sufficient justification for perpetuating, without examination, the restriction or denial of a fundamental *constitutional* right." (*Id.* at pp. 820–821.) Observing that "in recent decades, there has been a fundamental and dramatic transformation in this state's understanding and legal treatment of gay individuals and gay couples" resulting in a general recognition "that gay individuals are entitled to the same legal rights and the same respect and dignity afforded all other individuals and are protected from discrimination on the basis of their sexual orientation" (*id.* at pp. 821–822), the majority concluded in the *Marriage Cases* that "just as this court recognized in *Perez* [*v. Sharp* (1948) 32 Cal.2d 711 [198 P.2d 17]] that it was not constitutionally permissible to continue to treat racial or ethnic minorities as inferior [citation], and in *Sail'er Inn*[*, Inc. v. Kirby* (1971) 5 Cal.3d 1 [95 Cal.Rptr. 329, 485 P.2d 529]] that it was not constitutionally acceptable to continue to treat women as less capable than and unequal to men [citation], we now similarly recognize that an individual's homosexual orientation is not a constitutionally legitimate basis for withholding or restricting the individual's legal rights." (43 Cal.4th at pp. 822–823.) The opinion continued: "In light of this recognition, sections 1 and 7 of article I of the California Constitution cannot properly be interpreted to withhold from gay individuals the same basic civil right of personal autonomy and liberty (including the right to establish, with the person of one's choice, an officially recognized

and sanctioned family) that the California Constitution affords to heterosexual individuals." (*Id.* at p. 823.)

Subsequently, after discussing and rejecting numerous arguments that had been presented as justification for limiting the constitutional right to marry to opposite-sex couples only (*Marriage Cases, supra,* 43 Cal.4th at pp. 823–829), the majority opinion reiterated in clear and emphatic terms its holding on this aspect of the case: "[W]e conclude that *the right to marry, as embodied in article I, sections 1 and 7 of the California Constitution, guarantees same-sex couples the same substantive constitutional rights as opposite-sex couples to choose one's life partner and enter with that person into a committed, officially recognized, and protected family relationship that enjoys all of the constitutionally based incidents of marriage.*" (*Id.* at p. 829, italics added.)

## C

Having concluded that same-sex couples enjoy the same rights afforded by the state constitutional right to marry as opposite-sex couples, the majority opinion in the *Marriage Cases, supra,* 43 Cal.4th 757, turned to the issue that had been deferred earlier in the opinion—namely, whether the substantive rights embodied in the constitutional right to marry include the right to have one's family relationship designated by the term "marriage." The Attorney General argued that even if the state constitutional right to marry extends to same-sex couples, the marriage statutes did not violate the fundamental rights of same-sex couples by not making this designation available to them, " 'because all of the personal and dignitary interests that have traditionally informed the right to marry have been given to same-sex couples through the Domestic Partner Act.' " (*Id.* at p. 830.) The Attorney General asserted that " '[t]he fundamental right to marry can no more be the basis for same-sex couples to compel the state to denominate their committed relationships "marriage" than it could be the basis for anyone to prevent the state legislature from changing the name of the marital institution itself to "civil unions." ' " (*Ibid.*)

In responding to the Attorney General's argument, the majority opinion stated that "[w]e have no occasion in this case to determine whether the state constitutional right to marry necessarily affords *all* couples the constitutional right to require the state to designate their official family relationship a 'marriage,' " because "[w]hether or not the name 'marriage,' in the abstract, is considered a core element of the state constitutional right to marry, one of the core elements of this fundamental right is the right of same-sex couples to have their official family relationship accorded the *same* dignity, respect, and stature as that accorded to all other officially recognized family relationships.

The current statutes—by drawing a distinction between the name assigned to the family relationship available to opposite-sex couples and the name assigned to the family relationship available to same-sex couples, and by reserving the historic and highly respected designation of marriage exclusively to opposite-sex couples while offering same-sex couples only the new and unfamiliar designation of domestic partnership—pose a serious risk of denying the official family relationship of same-sex couples the *equal* dignity and respect that is a core element of the constitutional right to marry." (*Marriage Cases, supra*, 43 Cal.4th at pp. 830–831, italics added.)

Accordingly, although the majority opinion agreed with the Attorney General "that the provisions of the Domestic Partner Act afford same-sex couples most of the substantive attributes to which they are constitutionally entitled under the state constitutional right to marry" (*Marriage Cases, supra*, 43 Cal.4th at p. 831), the opinion concluded its discussion of the state constitutional right to marry by determining that "the current statutory assignment of different designations to the official family relationship of opposite-sex couples and of same-sex couples properly must be viewed as potentially impinging upon the state constitutional right of same-sex couples to marry." (*Ibid.*)

**D**

After describing the effect, upon the state constitutional right to marry, of the California statutes' assignment of different designations to the family relationship of opposite-sex couples and the family relationship of same-sex couples, the majority opinion in the *Marriage Cases, supra*, 43 Cal.4th 757, turned to the petitioners' claim that the use of different designations denied same-sex couples equal protection of the laws, as guaranteed by the state constitutional equal protection clause embodied in article I, section 7. In analyzing the equal protection claim, the opinion explained that the initial question to be resolved was the appropriate standard of review that should be applied in evaluating the difference in treatment accorded by the existing California statutes—whether the standard should be the ordinary "rational basis" standard of review that applies in most cases or, alternatively, the "strict scrutiny" standard of review that applies to statutory schemes that involve "suspect classifications" or that impinge upon "fundamental rights." (43 Cal.4th at pp. 831–833.)

In addressing the standard-of-review issue, the majority opinion first rejected the petitioners' claim that the difference in treatment between opposite-sex and same-sex couples properly should be viewed as discrimination on the basis of the suspect classification of sex or gender (*Marriage Cases, supra,* 43 Cal.4th 757, 833–838). The majority went on to conclude,

however, (1) that the California statutes in question imposed differential treatment on the basis of sexual orientation (*id.* at pp. 839–840), and (2) that sexual orientation constitutes a suspect classification for purposes of California equal protection analysis (*id.* at pp. 840–843). Because the statutes accorded different treatment on the basis of the suspect classification of sexual orientation, the opinion held that these provisions must be evaluated under the strict scrutiny standard. (*Id.* at pp. 843–844.) Furthermore, the opinion held that the strict scrutiny standard was applicable under the California Constitution in this instance not only because the statutes accorded different treatment on the basis of sexual orientation, but also because, by assigning different family designations that created a significant risk the family relationship of same-sex couples would not be afforded the same respect and dignity as the family relationship of opposite-sex couples, the statutes impinged upon the constitutional right of same-sex couples to marry. (43 Cal.4th at pp. 844–847.)

Having determined that strict scrutiny was the applicable standard of review, the majority opinion proceeded to apply the legal analysis dictated under that standard by considering whether the distinction between the designation of the family relationship of opposite-sex couples and that for same-sex couples served not only a constitutionally legitimate—but also a *compelling*—state interest, and, further, whether that difference in treatment not only was rationally related to but *necessary* to serve that interest. (*Marriage Cases, supra*, 43 Cal.4th at pp. 847–848.) After carefully reviewing the justifications for the strict scrutiny standard proffered by the state and other respondents in that case, the opinion concluded that the state interest in retaining the traditional definition of marriage does not constitute a state interest sufficiently compelling under the strict scrutiny standard to justify withholding that status from same-sex couples. The majority opinion consequently held that the provisions of Family Code sections 300 and 308.5 were unconstitutional insofar as they excluded same-sex couples from the designation of marriage. (43 Cal.4th at pp. 848–856.)

## E

Finally, in determining the appropriate remedy in light of the constitutional conclusion it reached, the majority opinion held that the language of Family Code section 300 limiting the designation of marriage to a union "between a man and a woman" must be stricken from the statute and the remaining statutory language must be understood as making the designation of marriage available to both opposite-sex and same-sex couples, and that the provisions of section 308.5 could have no constitutionally permissible effect and could not stand. The opinion directed that a writ of mandate issue, instructing state officials to take all steps necessary to ensure that local officials throughout the

state, in performing their duty to enforce the marriage statutes, applied those provisions in a manner consistent with the decision. (*Marriage Cases, supra,* 43 Cal.4th at pp. 856–857.)

**F**

Having carefully reviewed the majority opinion in the *Marriage Cases, supra,* 43 Cal.4th 757, we assess the actual scope of Proposition 8 against the background of that opinion.

**1**

First, as we already have noted, in light of the interpretation of the language of Proposition 22 in the *Marriage Cases, supra,* 43 Cal.4th at pages 796–800, as well as the history of Proposition 8 itself, there is no question but that article I, section 7.5—the section added by Proposition 8 to the California Constitution—properly must be interpreted to apply both to marriages performed in California and to marriages performed in other jurisdictions.

**2**

Second, we consider the effect that Proposition 8 has on the "constitutional right to marry" as that right is discussed and analyzed in the majority opinion in the *Marriage Cases, supra,* 43 Cal.4th 757, 809–831. As we have seen, the opinion explained that this right constitutes one aspect of the right of privacy embodied in article I, section 1 of the California Constitution, as well as a component of the liberty protected by the due process clause of article I, section 7 of the California Constitution (43 Cal.4th at pp. 809–810, 818–819), and encompasses "the core set of basic *substantive* legal rights and attributes traditionally associated with marriage," including, "most fundamentally, the opportunity of an individual to establish—with the person with whom the individual has chosen to share his or her life—an *officially recognized and protected family* possessing mutual rights and responsibilities and entitled to the same respect and dignity accorded a union traditionally designated as marriage" (*id.* at p. 781). Although the majority opinion in the *Marriage Cases* generally referred to this state constitutional right as the "constitutional right to marry," at the same time that opinion explained that this constitutional right is distinct from the right to have one's family relationship designated by the term "marriage." (*Id.* at pp. 812, 830–831.) Because in common speech the term "right to marry" is most often used and understood to refer to an individual's right to enter into the official relationship designated "marriage," and in order to minimize potential confusion in the future, instead of referring to this aspect of the state constitutional rights

of privacy and due process as "the constitutional right to marry," hereafter in this opinion we shall refer to this constitutional right by the more general descriptive terminology used in the majority opinion in the *Marriage Cases*—namely, the constitutional right to establish, with the person of one's choice, an officially recognized and protected family relationship that enjoys all of the constitutionally based incidents of marriage (or, more briefly, the constitutional right to establish an officially recognized family relationship with the person of one's choice).

■ What effect does Proposition 8 have on this aspect of the state constitutional rights of privacy and due process as set forth in the majority opinion in the *Marriage Cases, supra*, 43 Cal.4th 757? Although the new constitutional section added by Proposition 8—article I, section 7.5—does not explicitly purport to amend either the privacy or due process provisions of the California Constitution, our past cases make clear that this newly adopted provision must be understood as carving out an exception to the preexisting scope of the privacy and due process clauses with respect to the particular subject matter encompassed by the new provision.

■ The case of *Bowens v. Superior Court* (1991) 1 Cal.4th 36 [2 Cal.Rptr.2d 376, 820 P.2d 600] (*Bowens*) illustrates this point. In *Bowens*, our court considered the effect of a then-newly adopted constitutional provision—article I, section 14.1—that abrogated an indicted criminal defendant's right to a postindictment preliminary hearing, a right that this court, in *Hawkins v. Superior Court* (1978) 22 Cal.3d 584, 587–593 [150 Cal.Rptr. 435, 586 P.2d 916], had held must be afforded to such an individual by virtue of the equal protection clause of the state Constitution. The new article I, section 14.1 provided simply that "[i]f a felony is prosecuted by indictment, there shall be no postindictment preliminary hearing," and made no specific mention of the state equal protection clause. The question in *Bowens* was how to reconcile the two state constitutional provisions. In addressing that issue, the court in *Bowens* first set forth the applicable general principle of law: " '[W]hen constitutional provisions can reasonably be construed so as to avoid conflict, such a construction should be adopted. [Citations.] As a means of avoiding conflict, *a recent, specific provision is deemed to carve out an exception to and thereby limit an older, general provision.*' " (*Bowens, supra*, 1 Cal.4th at p. 45, italics added.) The court in *Bowens* then explained how that principle applied to the situation before it: "To the extent *Hawkins* mandates that an indicted defendant be afforded a postindictment preliminary hearing, the voters' adoption of article I, section 14.1 must be seen as abrogating that holding, and limiting the scope of the state constitutional right of equal protection (Cal. Const., art. I, § 7) as it relates to the constitutionally mandated indictment process. [Citations.] Similarly, article I, section 14.1, also limits and thereby precludes a challenge based on the due process clause contained in article I, section 7 of the California Constitution, an issue not

reached by the court in *Hawkins*." (*Bowens, supra,* 1 Cal.4th at p. 45; see also *Izazaga v. Superior Court* (1991) 54 Cal.3d 356, 371–372 [285 Cal.Rptr. 231, 815 P.2d 304] (*Izazaga*).)

■ Applying similar reasoning in the present context, we properly must view the adoption of Proposition 8 as carving out an exception to the preexisting scope of the privacy and due process clauses of the California Constitution as interpreted by the majority opinion in the *Marriage Cases, supra,* 43 Cal.4th 757. The scope of the exception created by Proposition 8, however, necessarily is determined and limited by the specific language and scope of the new constitutional provision added by the ballot measure. Here the new constitutional provision (art. I, § 7.5) provides in full: "Only marriage between a man and a woman is valid or recognized in California." By its terms, the new provision refers only to "marriage" and does not address the right to establish an officially recognized family relationship, which may bear a name or designation other than "marriage." Accordingly, although the wording of the new constitutional provision reasonably is understood as limiting use of *the designation of "marriage"* under California law to opposite-sex couples, and thereby modifying the decision in the *Marriage Cases, supra,* 43 Cal.4th 757, insofar as the majority opinion in that case holds that limiting the designation of "marriage" to the relationship entered into by opposite-sex couples constitutes an impermissible impingement upon the state constitutional rights of privacy and due process, the language of article I, section 7.5, on its face, does not purport to alter or affect the more general holding in the *Marriage Cases* that same-sex couples, as well as opposite-sex couples, enjoy the constitutional right, under the privacy and due process clauses of the California Constitution, to establish an officially recognized family relationship. Because, as a general matter, the repeal of constitutional provisions by implication is disfavored (see, e.g., *In re Thierry S.* (1977) 19 Cal.3d 727, 744 [139 Cal.Rptr. 708, 566 P.2d 610]; *Warne v. Harkness* (1963) 60 Cal.2d 579, 587–588 [35 Cal.Rptr. 601, 387 P.2d 377]), Proposition 8 reasonably must be interpreted in a limited fashion as eliminating only the right of same-sex couples to equal access to the designation of marriage, and as not otherwise affecting the constitutional right of those couples to establish an officially recognized family relationship.

■ This understanding of the limited scope of Proposition 8 is confirmed by the circumstance that the drafters of that measure drew the language of the initiative directly from the wording of Family Code section 308.5, the statutory provision embodied in Proposition 22. Prior to the drafting and adoption of Proposition 8, the identical language ("Only marriage between a man and a woman is valid or recognized in California")—when used in Family Code section 308.5—was interpreted in *Knight v. Superior Court* (2005) 128 Cal.App.4th 14 [26 Cal.Rptr.3d 687] (*Knight*) simply as limiting access to the relationship *designated as marriage* to a man and a woman, but

not as affecting the right of same-sex couples to possess comparable substantive rights so long as those rights did not include the designation of "marriage." (*Knight, supra,* 128 Cal.App.4th at pp. 23–25.) In view of the decision in *Knight,* the addition of this very same language to the California Constitution in new article I, section 7.5 does not affect the continued validity of the provisions of the California Constitution that protect the familial rights of same-sex couples, except to the extent those rights include access to the designation of "marriage." Because the provision added to the California Constitution by Proposition 8 is essentially the constitutional analog of Family Code section 308.5, which already had been construed as affecting only access to the designation of "marriage," the new constitutional provision cannot properly be interpreted as having repealed, by implication, the preexisting *state constitutional right* of same-sex couples to enter into an officially recognized and protected *family relationship* except insofar as that preexisting constitutional right included the right of access to the designation of marriage.

In addition to the language of Proposition 8 itself and the preexisting judicial interpretation of that language in the decision in *Knight, supra,* 128 Cal.App.4th 14, the ballot arguments submitted by the supporters of Proposition 8 establish that the purpose of that initiative measure was simply to restore the traditional definition of marriage as referring to a union between a man and a woman, and not to abrogate or eliminate the constitutional right of same-sex couples to establish an officially recognized family relationship (with comparable rights and responsibilities) bearing some other designation. (See Voter Information Guide, Gen. Elec. (Nov. 4, 2008) argument in favor of Prop. 8 and rebuttal to argument against Prop. 8, pp. 56–57 (November 2008 Voter Information Guide).)[8]

We recognize that the ballot argument in favor of Proposition 8 unquestionably indicates that the proponents of Proposition 8 very strongly disagreed with the majority opinion in the *Marriage Cases, supra,* 43 Cal.4th 757, but a reading of this ballot argument in its entirety demonstrates that the proponents' objection to that ruling was directed at the opinion's conclusions that the statutes limiting the designation of "marriage" to couples comprised

---

[8] We note in this regard that an alternative, much more sweeping initiative measure—proposing the addition of a new constitutional section that would have provided not only that "[o]nly marriage between one man and one woman is valid or recognized in California," but also that "[n]either the Legislature nor any court, government institution, government agency, initiative statute, local government, or government official shall . . . bestow statutory rights, incidents, or employee benefits of marriage on unmarried individuals"—was circulated for signature at the same time as Proposition 8, but did not obtain sufficient signatures to qualify for the ballot. (Sect. of State, 2008 Ballot Measure Update as of May 2, 2008, No. 1293 (07-0061) <http://www.sos.ca.gov/elections/elections_j_050208.htm#failed> [as of May 26, 2009].)

of a man and a woman were unconstitutional and that same-sex couples, like opposite-sex couples, have the right to obtain marriage licenses and enter into the institution designated as "marriage." Nothing in the ballot argument in favor of Proposition 8 or in the rebuttal to the argument against it informed the voters that this measure was intended to or would have the effect of abrogating the constitutional right of same-sex couples to enter into an officially recognized family relationship with a designation other than marriage. On the contrary, the rebuttal to the argument against Proposition 8 emphasized that adoption of Proposition 8 would mean that only marriage between a man and a woman will be valid or recognized in California, but that Proposition 8 would *not* take away "any other rights or benefits" of same-sex couples—rights that included the constitutional right, as set forth in the majority opinion in the *Marriage Cases*, to establish an officially recognized family union with the person of one's choice.[9]

It is perhaps arguable that the language of the official short title and summary of Proposition 8 prepared by the Attorney General is more ambiguous than the proposition's text with regard to the measure's scope, because the short title assigned by the Attorney General stated simply that Proposition 8 "eliminates [the] right of same-sex couples to marry" (capitalization omitted) and the Attorney General's summary indicated that Proposition 8 "[c]hanges the California Constitution to eliminate the right of same-sex couples to marry in California." (Nov. 2008 Voter Information Guide, *supra*, Official Title and Summary, p. 54.) In light of the language of Proposition 8 itself and the focus of the controversy surrounding the proposition, however, it is likely that voters who reviewed the ballot pamphlet understood the phrase "right to marry" in the Attorney General's title and summary to refer, in its common and most familiar meaning, to the right to enter into the official family relationship designated "marriage," and thus correctly understood that Proposition 8 would eliminate only the right of same-sex couples to enter into the relationship bearing the designation of "marriage." Nothing in the Attorney General's title or summary suggests that Proposition 8 would eliminate the constitutional right of same-sex couples to enter into an officially recognized family relationship bearing a designation other than "marriage."[10] Indeed, at oral argument, counsel for interveners acknowledged

---

[9] The rebuttal to the argument against Proposition 8 stated in this regard: "Your YES vote on Proposition 8 means that only marriage between a man and a woman will be valid or recognized in California, regardless of when or where performed. *But Prop. 8 will NOT take away any other rights or benefits of gay couples.*" (Nov. 2008 Voter Information Guide, *supra,* rebuttal to argument against Prop. 8, p. 57, italics added.)

[10] The analysis of Proposition 8 by the Legislative Analyst that also appeared in the ballot pamphlet similarly used the phrase "right to marry" to refer to the right to enter into the relationship designated "marriage." In describing Proposition 8, the analysis stated: "This measure amends the California Constitution to specify that only marriage between a man and a woman is valid or recognized in California. As a result, notwithstanding the California

that Proposition 8 properly is interpreted as affecting only access to the designation of "marriage" and not the other aspects of the rights of privacy and due process set forth in the majority opinion in the *Marriage Cases, supra*, 43 Cal.4th 757.

■ Accordingly, although Proposition 8 eliminates the ability of same-sex couples to enter into an official relationship designated "marriage," in all other respects those couples continue to possess, under the state constitutional privacy and due process clauses, "the core set of basic *substantive* legal rights and attributes traditionally associated with marriage," including, "most fundamentally, the opportunity of an individual to establish—with the person with whom the individual has chosen to share his or her life—an *officially recognized and protected family* possessing mutual rights and responsibilities and entitled to the same respect and dignity accorded a union traditionally designated as marriage." (*Marriage Cases, supra*, 43 Cal.4th 757, 781.) Like opposite-sex couples, same-sex couples enjoy this protection not as a matter of legislative grace, but of constitutional right.

### 3

■ Third, Proposition 8 also has a similarly limited effect on the holdings of the majority opinion in the *Marriage Cases, supra*, 43 Cal.4th 757, relating to the state constitutional equal protection clause. As we have seen, in the *Marriage Cases* the majority opinion held that sexual orientation constitutes a suspect classification for purposes of analysis under the state equal protection clause, and that statutes according differential treatment on the basis of sexual orientation are subject to the strict scrutiny standard of review. These general state equal protection principles established in the *Marriage Cases* are unaffected by the new section added to the California Constitution by Proposition 8. Of course, with respect to the specific subject of the designation of the word "marriage," Proposition 8 does change the rule, set forth in the majority opinion in the *Marriage Cases*, that limiting access to this designation to opposite-sex couples constitutes an impermissible violation of the state equal protection clause. ■ As explained above, by incorporating into the California Constitution a specific provision that expressly restricts the designation of "marriage" to the union of a man and a woman, Proposition 8 must be understood as creating a limited exception to the state equal protection clause as interpreted in the majority opinion in the *Marriage Cases*. (See, e.g., *Bowens, supra*, 1 Cal.4th 36, 45; *Izazaga, supra*, 54 Cal.3d 356, 371–372.) This exception—although constituting the governing state constitutional rule with regard to the specific matter it

Supreme Court ruling of May 2008, marriage would be limited to individuals of the opposite sex, and individuals of the same sex would not have the right to marry in California." (Nov. 2008 Voter Information Guide, *supra*, Analysis by Legis. Analyst, p. 55.)

addresses—does not alter the general equal protection principles set forth in the *Marriage Cases* and in other California decisions interpreting and applying the state constitutional equal protection clause. Those principles continue to apply in all other contexts.

## 4

In sum, although Proposition 8 changes the state Constitution, as interpreted in the majority opinion in the *Marriage Cases, supra,* 43 Cal.4th 757, to provide that restricting the family designation of "marriage" to opposite-sex couples only, and withholding that designation from same-sex couples, no longer violates the state Constitution, in all other respects same-sex couples retain the same substantive protections embodied in the state constitutional rights of privacy and due process as those accorded to opposite-sex couples and the same broad protections under the state equal protection clause that are set forth in the majority opinion in the *Marriage Cases,* including the general principle that sexual orientation constitutes a suspect classification and that statutes according differential treatment on the basis of sexual orientation are constitutionally permissible only if they satisfy the strict scrutiny standard of review.

## III

Having analyzed and clarified the effect of Proposition 8 on the state constitutional rights of same-sex couples as determined in the *Marriage Cases, supra,* 43 Cal.4th 757, we now address the multiple challenges under the California Constitution that have been advanced against Proposition 8 in the present proceeding.[11] We begin with the principal contention raised by petitioners in each of the cases before us—namely, that the constitutional change embodied in Proposition 8 constitutes a constitutional revision rather than a constitutional amendment, and, as such, may not be adopted through the initiative process.

## A

Article II, section 1 of the California Constitution states in full: "All political power is inherent in the people. Government is instituted for their protection, security, and benefit, and they have the right to alter or reform it when the public good may require." This provision originated in one of the initial sections of the Declaration of Rights contained in California's first

---

[11] In these cases, petitioners have not raised any federal constitutional challenge to Proposition 8.

Constitution (Cal. Const. of 1849, art. I, § 2),[12] and reflects a basic precept of our governmental system: that the people have the constitutional right to alter or reform their government. This fundamental principle underlies the provisions concerning the amendment and revision of our state Constitution.

The provisions of the California Constitution relating to amending and revising the Constitution currently are set forth principally in article XVIII. Section 1 of article XVIII provides in relevant part that "[t]*he Legislature* by rollcall vote entered in the journal, two-thirds of the membership of each house concurring, may propose *an amendment or revision of the Constitution* and in the same manner may amend or withdraw its proposal." (Italics added.) Section 2 provides in relevant part: "The Legislature by rollcall vote entered in the journal, two-thirds of the membership of each house concurring, may submit at a general election the question whether to call *a convention to revise* the Constitution. If the majority vote yes on that question, within 6 months the Legislature shall provide for the convention." (Italics added.) Section 3 provides: "The electors may *amend* the Constitution *by initiative*." (Italics added.) Finally, section 4 provides in relevant part: "A proposed *amendment* or *revision* shall be submitted to the electors and if approved by a majority of votes thereon takes effect the day after the election unless the measure provides otherwise." (Italics added.)[13]

---

[12] Article I, section 2 of the 1849 Constitution read in full: "All political power is inherent in the people. Government is instituted for the protection, security, and benefit of the people; and they have the right to alter or reform the same, whenever the public good may require it." When the California Constitution was revised in 1879, this section was carried over, without change, as article I, section 2. In a reorganization of article I approved by the voters at the November 1974 election, the language of the section was modified very slightly and moved to article I, section 26. Two years later, in a further reorganization of various constitutional provisions approved by the voters at the June 1976 election, this provision was renumbered as article II, section 1.

[13] Article XVIII of the California Constitution provides in full: .

"SEC. 1. The Legislature by rollcall vote entered in the journal, two-thirds of the membership of each house concurring, may propose an amendment or revision of the Constitution and in the same manner may amend or withdraw its proposal. Each amendment shall be so prepared and submitted that it can be voted on separately.

"SEC. 2. The Legislature by rollcall vote entered in the journal, two-thirds of the membership of each house concurring, may submit at a general election the question whether to call a convention to revise the Constitution. If the majority vote yes on that question, within 6 months the Legislature shall provide for the convention. Delegates to a constitutional convention shall be voters elected from districts as nearly as equal in population as may be practicable.

"SEC. 3. The electors may amend the Constitution by initiative.

"SEC. 4. A proposed amendment or revision shall be submitted to the electors and if approved by a majority of votes thereon takes effect the day after the election unless the measure provides otherwise. If provisions of 2 or more measures approved at the same election conflict, those of the measure receiving the highest affirmative vote shall prevail."

The other current provisions of our state Constitution pertaining to amendment or revision of the Constitution are contained in article II, section 8, the section that relates generally to the initiative power. Article II, section 8, subdivision (a) provides in full: "The *initiative* is the power of the electors to propose statutes and *amendments to the Constitution* and to adopt or reject them." (Italics added.) Article II, section 8, subdivision (b) provides in full: "An initiative measure may be proposed by presenting to the Secretary of State a petition that sets forth the text of the proposed statute or *amendment to the Constitution* and is certified to have been signed by electors equal in number to 5 percent in the case of a statute, and *8 percent in the case of an amendment to the Constitution,* of the votes for all candidates for Governor at the last gubernatorial election." (Italics added.)

█ As already noted, under these constitutional provisions an *amendment* to the California Constitution may be proposed to the electorate either by the required vote of the Legislature or by an initiative petition signed by the requisite number of voters. A *revision* to the California Constitution may be proposed either by the required vote of the Legislature or by a constitutional convention (proposed by the Legislature and approved by the voters). Either a proposed amendment or a proposed revision of the Constitution must be submitted to the voters, and becomes effective if approved by a majority of votes cast thereon at the election. Under these provisions, although the initiative power may be used *to amend* the California Constitution, it may not be used *to revise* the Constitution.

To understand the distinction between an amendment to, and a revision of, the Constitution, as those terms are used in the current provisions of the California Constitution, it is necessary to examine the origin and history of this distinction in our state Constitution as well as the numerous California decisions that have analyzed and applied the distinction over the course of many years. We proceed to review that history.

**B**

As explained by a number of 19th- and early 20th-century legal treatises, although the United States Constitution and a few of the earliest state constitutions provided for the proposal of constitutional changes either by a constitutional convention or by the jurisdiction's legislative body, most early state constitutions authorized the proposal of constitutional changes by only one of these means (that is, either by constitutional convention only or by the legislature only), and none of the early constitutions—including the United States Constitution—drew any distinction between the proposal of constitutional amendments and constitutional revisions. (See Dodd, The Revision and Amendment of State Constitutions (1910) pp. 118–120 (Dodd Treatise);

Jameson, A Treatise on Constitutional Conventions: Their History, Powers, and Modes of Proceeding (4th ed. 1887) §§ 530–532, pp. 550–552 (Jameson Treatise).) (The United States Constitution, of course, still does not distinguish between constitutional amendments and constitutional revisions, referring only to "amendments to this Constitution." (U.S. Const., art. V.))

Beginning in the 1830's, however, a number of states whose constitutions employed a constitutional convention for the proposal of any constitutional change found that such a convention's "cumbersomeness for small changes" rendered it advisable "to adopt in addition or as a substitute the method of initiating proposed amendments in the legislature." (Dodd Treatise, *supra*, at p. 120.) The treatises report that, over the next few decades, new constitutional provisions governing the procedure for changing state constitutions—adopted either in newly admitted states or through the modification of already existing state constitutions—demonstrated "a growing conviction that the legislative mode has advantages which make its more general adoption seem desirable, and yet that it alone is not adequate to the exigencies of the times, but needs to have coupled with it a provision for a Convention *when the people should deem it necessary or expedient to make a general revision of the Constitution.*" (Jameson Treatise, *supra*, § 531, p. 552, italics added; see also Dodd Treatise, *supra*, at p. 120.) Many of these state constitutional provisions—like the provision adopted as part of the original California Constitution—authorized the state legislative body to propose any constitutional amendment but provided that a constitutional revision could be proposed only by a constitutional convention. (See Jameson Treatise, § 574c, pp. 610–612.)

In 1849, in anticipation of California's application to the United States Congress for admission as a new state, a constitutional convention was held in California to draft a constitution to govern the state. (See generally Grodin et al., The California State Constitution: A Reference Guide (1993) pp. 2–3 (hereafter California Constitution Reference Guide); Burns, *Taming the Elephant: An Introduction to California's Statehood and Constitutional Era* (2003) Cal. History, vol. 81, No. 3/4, pp. 6–7.) In drafting the first California Constitution, the convention delegates frequently drew upon constitutional provisions contained in other state constitutions (see Browne, Rep. of the Debates in Convention of Cal. on Formation of State Const. (1850) *passim* (hereafter 1849 Debates)), and this was the case with respect to the constitutional provisions relating to the "Mode of Amending and Revising the Constitution," adopted as article X of the 1849 Constitution. (1849 Debates, at pp. 354–361.) Article X of that Constitution, modeled on similar provisions in New York's then-current constitution (1849 Debates, at pp. 355, 359), contained two sections. Section 1 of article X of the 1849 Constitution provided in relevant part that "[a]ny amendment or amendments to this Constitution, may be proposed in the Senate or Assembly . . ." (italics added),

and further specified that if such amendment was approved by a majority of each legislative chamber in two successive legislative sessions, the proposed amendment would be submitted to a statewide vote of the electors and would become part of the Constitution if ratified by a majority of those voting on the measure. Section 2 provided in relevant part: "And if, at any time two-thirds of the Senate and Assembly shall think it necessary *to revise and change this entire Constitution*, they shall recommend to the electors, at the next election for members of the Legislature, to vote for or against *the convention*" (italics added), and further provided that if a majority of electors voted in favor of calling a constitutional convention, the Legislature, at its next session, must call such a convention to consider such a revision.[14]

Accordingly, under the 1849 Constitution, *"any amendment or amendments"* to the Constitution could be proposed by the Legislature and submitted directly to the people, but if the Legislature thought it necessary *"to revise and change [the] entire Constitution,"* a constitutional convention had to be convened to propose such a revision. These provisions represent the origin of the amendment/revision distinction under the California Constitution, and reveal not only the narrow range of the type of proposed constitutional change that reasonably could be viewed as a constitutional revision (a proposal "to revise and change this entire Constitution"), but also that the amendment/revision distinction long predates the appearance of the initiative process in California.

---

[14] Article X of the 1849 Constitution, entitled "Mode of Amending and Revising the Constitution," read in full:

"Section 1. Any amendment, or amendments to this Constitution, may be proposed in the Senate or Assembly; and if the same shall be agreed to by a majority of the members elected to each of the two houses, such proposed amendment or amendments, shall be entered on their journals, with the yeas and nays taken thereon, and referred to the Legislature then next to be chosen, and shall be published for three months next preceding the time of making such choice. And if, in the Legislature next chosen as aforesaid, such proposed amendment or amendments, shall be agreed to by a majority of all the members elected to each house, then it shall be the duty of the Legislature to submit such proposed amendment or amendments to the people, in such manner, and at such time as the Legislature shall prescribe; and if the people shall approve and ratify such amendment or amendments, by a majority of the electors qualified to vote for members of the Legislature, voting thereon, such amendment or amendments shall become part of the Constitution.

"Section 2. And if, at any time two-thirds of the Senate and Assembly shall think it necessary to revise and change this entire Constitution, they shall recommend to the electors, at the next election for members of the Legislature, to vote for or against the convention; and if it shall appear that a majority of the electors voting at such election have voted in favor of calling a convention, the Legislature shall, at its next session, provide by law for calling a convention, to be holden within six months after the passage of such law; and such convention shall consist of a number of members not less than that of both branches of the Legislature."

## C

During the 30 years in which the 1849 Constitution was in effect, no published California decision addressed the amendment/revision dichotomy, apparently because no claim was raised that any constitutional amendment proposed by the Legislature in those years constituted a revision. In 1877, in response to significant economic and demographic changes in California (see Cal. Constitution Reference Guide, *supra*, at pp. 9–10), the Legislature submitted to the voters the question of calling a state constitutional convention to revise the 1849 Constitution, and a majority of voters approved the measure. As a result, a constitutional convention was convened, beginning its deliberations in September 1878 and concluding its work in March 1879. The resulting proposed revised Constitution was put before the voters in May 1879 and was ratified at that election. (See Lee, *The Revision of California's Constitution* (Apr. 1991) Cal. Policy Seminar Brief, p. 2.)

The provisions relating to the procedure for amending and revising the Constitution were set forth in article XVIII of the 1879 Constitution, and those provisions retained the same basic structure as the provisions of article X of the 1849 Constitution with respect to the amendment/revision dichotomy. As adopted in 1879, section 1 of former article XVIII provided that "[a]*ny amendment or amendments to this Constitution* may be proposed in the Senate or Assembly" (italics added), and further provided for direct submission of such proposed amendment or amendments to a vote of the electors if approved by the requisite vote of each legislative chamber.[15] Section 2 of article XVIII provided that "[w]henever two-thirds of the members elected to each branch of the Legislature *shall deem it necessary to revise this Constitution*, they shall recommend to the electors to vote at the next general election for or against *a Convention for that purpose*" (italics added), and that if a majority of voters approved the calling of a constitutional convention, the Legislature should call such a convention at its next session. Section 2 further provided that *"the Constitution that may be agreed upon by such Convention* shall be submitted to the people for their

---

[15] Section 1 of article XVIII of the 1879 Constitution differed from section 1 of article X of the 1849 Constitution in a number of respects. First, although the 1849 Constitution required approval of a proposed amendment by only *a majority* of the members of each house of the Legislature, the 1879 Constitution required a *two-thirds* vote of the members of each house, but unlike the 1849 Constitution, which required majorities in *two successive legislative sessions* to approve the proposed amendment or amendments, the 1879 Constitution permitted a proposed amendment to be submitted to the voters if approved by two-thirds of the members of each chamber *in a single legislative session.* Second, the 1879 constitutional provision added a new requirement, specifying that if more than one amendment were submitted at the same election, "they shall be so prepared and distinguished, by numbers or otherwise, that each can be voted on separately." (*Id.,* art. XVIII, § 1; see *Californians for an Open Primary v. McPherson* (2006) 38 Cal.4th 735 [43 Cal.Rptr.3d 315, 134 P.3d 299] (*Californians for an Open Primary*) [analyzing the separate-vote requirement].)

ratification or rejection . . . ," and that if a majority voted in favor of ratification "it shall be the duty of the Executive to declare . . . *such Constitution . . . to be the Constitution of the State of California.*" (Italics added.)[16]

Accordingly, under the 1879 Constitution as originally adopted, as under the 1849 Constitution, *a revision* of the Constitution could be proposed only *by a constitutional convention* and contemplated a potentially broad reworking of the constitutional structure and provisions, whereas *"any amendment or amendments"* to the Constitution could be proposed, and submitted directly to a vote of the people, *by the Legislature.*

### D

It was under the 1879 Constitution that the distinction drawn in our state Constitution between a constitutional amendment and a constitutional revision first elicited discussion in a decision of this court. In *Livermore v. Waite* (1894) 102 Cal. 113 [36 P. 424] (*Livermore*), an action was brought to restrain the Secretary of State from certifying placement on the ballot of a proposed amendment to the California Constitution that had been adopted by

---

[16] As adopted in 1879, article XVIII, entitled "Amending and Revising the Constitution," provided in full:

"SECTION 1. Any amendment or amendments to this Constitution may be proposed in the Senate or Assembly, and if two-thirds of all the members elected to each of the two Houses shall vote in favor thereof, such proposed amendment or amendments shall be entered in their Journals, with the yeas and nays taken thereon; and it shall be the duty of the Legislature to submit such proposed amendment or amendments to the people in such manner, and at such time, and after such publication as may be deemed expedient. Should more amendments than one be submitted at the same election, they shall be so prepared and distinguished, by numbers or otherwise, that each can be voted on separately. If the people shall approve and ratify such amendment or amendments, or any of them, by a majority of the qualified electors voting thereon such amendment or amendments shall become a part of this Constitution.

"SEC. 2. Whenever two-thirds of the members elected to each branch of the Legislature shall deem it necessary to revise this Constitution, they shall recommend to the electors to vote at the next general election for or against a Convention for that purpose, and if a majority of the electors voting at such election on the proposition for a Convention shall vote in favor thereof, the Legislature shall, at its next session, provide by law for calling the same. The Convention shall consist of a number of delegates not to exceed that of both branches of the Legislature, who shall be chosen in the same manner, and have the same qualifications, as members of the Legislature. The delegates so elected shall meet within three months after their election at such place as the Legislature may direct. At a special election to be provided for by law, the Constitution that may be agreed upon by such Convention shall be submitted to the people for their ratification or rejection, in such manner as the Convention may determine. The returns at such election shall, in such manner as the Convention shall direct, be certified to the Executive of the State, who shall call to his assistance the Controller, Treasurer and Secretary of State, and compare the returns so certified to him; and it shall be the duty of the Executive to declare, by his proclamation, such Constitution, as may have been ratified by a majority of all the votes cast at such special election, to be the Constitution of the State of California."

two-thirds of each chamber of the Legislature. The amendment in question proposed to change the location of the state capital from Sacramento to San Jose, but the change was conditioned upon the state's receipt, from the City of San Jose, of "a site of not less than ten acres and one million dollars before such removal shall be had."

The decision of this court in *Livermore*, rendered 115 years ago, made it plain that the measure in question in that case—proposing a change in the location of the state capital from one city to another—very clearly constituted a constitutional amendment rather than a constitutional revision, but in the course of its opinion the court set forth a general description of the amendment/revision dichotomy that, as we shall see, is relied upon in the present case by petitioners and by the concurring opinion of Justice Werdegar (*post*, at pp. 480–481) and the concurring and dissenting opinion of Justice Moreno (*post*, at pp. 487–488). In light of that reliance, we shall set forth the relevant passage at some length.

In describing the then-existing provisions governing changes to the California Constitution, the court in *Livermore, supra*, 102 Cal. 113, stated: "Article XVIII of the constitution provides two methods by which changes may be effected in that instrument, one by a convention of delegates chosen by the people for the express purpose of revising the entire instrument, and the other through the adoption by the people of propositions for specific amendments that have been previously submitted to it by two-thirds of the members of each branch of the legislature. . . . The legislature is not authorized to assume the function of a constitutional convention, and propose for adoption by the people a revision of the entire constitution under the form of an amendment . . . . The very term 'constitution' implies an instrument of a permanent and abiding nature, and the provisions contained therein for its revision indicate the will of the people that the underlying principles upon which it rests, as well as the substantial entirety of the instrument, shall be of a like permanent and abiding nature. On the other hand, the significance of the term 'amendment' implies such an addition or change within the lines of the original instrument as will effect an improvement, or better carry out the purpose for which it was framed. Experience may disclose defects in some of its details, or in the practical application of some of the principles or limitations which it contains. The changed condition of affairs in different parts of the state, or the changes of society or time, may demand the removal of some of these limitations, or an extended application of its principles. So, too, some popular wave of sociological reform, like the abolition of the death penalty for crime, or a prohibition against the manufacture or sale of intoxicating liquors, may induce a legislature to submit for enactment, in the permanent form of a constitutional prohibition, a rule which it has the power itself to enact as a law, but which might be of only temporary effect." (*Id.* at pp. 117–119.)

As noted, the court in *Livermore* thereafter went on to make clear that the type of measure at issue in that case—changing the location of the state capital—without question constituted a constitutional amendment rather than a constitutional revision. (*Livermore, supra,* 102 Cal. 113, 119.) Explaining that the designation of the seat of government of a state is not necessarily a matter that needs to be included within a state's constitution at all, the court emphasized that inasmuch as the existing California Constitution contained a provision designating the City of Sacramento as the seat of state government, that part of the Constitution "may be amended in the same manner as any other portion of that instrument." (102 Cal. at p. 119.)[17]

**E**

After the *Livermore* decision, the next relevant event in the historical background we are reviewing came in 1911, with the adoption of the initiative power as part of the California Constitution. As we have observed in past cases, "The amendment of the California Constitution in 1911 to provide for the initiative and referendum signifies one of the outstanding achievements of the progressive movement of the early 1900's." (*Associated Home Builders etc., Inc. v. City of Livermore* (1976) 18 Cal.3d 582, 591 [135 Cal.Rptr. 41, 557 P.2d 473] (*Associated Home Builders*).) The progressive movement, both in California and in other states, grew out of a widespread belief that "moneyed special interest groups controlled government, and that the people had no ability to break this control." (Waters, Initiative and Referendum Almanac (2003) p. 3; see generally Starr, Inventing the Dream: California Through the Progressive Era (1985) pp. 199–282; Olin, California's Prodigal Sons: Hiram Johnson and the Progressives, 1911–1917 (1968) pp. 1–56; Mowry, The California Progressives (1951) pp. 1–104.) In California, a principal target of the movement's ire was the Southern Pacific Railroad, which the movement's supporters believed not only controlled local public officials and state legislators but also had inordinate influence on the state's judges, who—in the view of the progressive movement—at times improperly had interpreted the law in a manner unduly favorable to the

---

[17] Although the court in *Livermore* determined that the measure at issue constituted a constitutional amendment rather than a constitutional revision, the court went on to find that because it contained a proviso specifying that the proposed constitutional provision would not become effective unless a condition subsequent were fulfilled, the measure was not a proper amendment and should not be submitted to the voters. (*Livermore, supra,* 102 Cal. at pp. 120–124.) This aspect of the *Livermore* decision was sharply criticized by legal commentary of that era (see Dodd Treatise, *supra,* at pp. 234–235 ["The California decision [in *Livermore v. Waite*] is indefensible; it cannot be justified and can be explained only upon the view that the court had determined to prevent the submission of the amendment for removing the capitol, and could find no better reason to present for its action"]), and in any event has no bearing on the present case because the operative effect of Proposition 8 is not dependent upon a condition subsequent.

railroad's interest. (See, e.g., Starr, Inventing the Dream, *supra*, at pp. 210, 254; Olin, Prodigal Sons, p. 3, fn. 8; Mowry, California Progressives, pp. 13–14, 140–142, 148–149.) The initiative was viewed as one means of restoring the people's rightful control over their government, by providing a method that would permit the people to propose and adopt statutory provisions and constitutional amendments.[18]

As we explained in *Associated Home Builders, supra*, 18 Cal.3d 582, 591: "Drafted in light of the theory that all power of government ultimately resides in the people, the [1911] amendment speaks of the initiative and referendum, not as a right granted the people, but as a power reserved by them." The 1911 measure, which amended the provisions of article IV, section 1, of the Constitution, provided in relevant part: "The legislative power of this state shall be vested in a senate and assembly which shall be designated 'The legislature of the State of California,' but *the people reserve to themselves the power to propose* laws and *amendments to the constitution,* and to adopt or reject the same, at the polls independent of the legislature . . . . [¶] The first power reserved to the people shall be known as the initiative. Upon the presentation to the secretary of state of a petition . . . signed by [the requisite number of] qualified electors, . . . proposing a law or *amendment to the constitution,* . . . the secretary of state shall submit the said proposed law or *amendment to the constitution* to the electors at the next succeeding general election . . . . [¶] . . . [¶] Any act, law or *amendment to the constitution* submitted to the people by . . . initiative . . . petition and approved by a majority of votes cast thereon, at any election, shall take effect five days after the date of the official declaration of the vote by the secretary of state." (Italics added.) By virtue of this provision, an amendment to the California Constitution could be proposed either by legislative action or by the people directly through the initiative process.

### F

In the years following the adoption of the initiative power in 1911, numerous constitutional amendments were proposed through the initiative process, and a substantial number of significant changes to the California Constitution were adopted by that means. (See Key & Crouch, The Initiative and Referendum in California (1938) pp. 459–471 [describing constitutional

---

[18] The ballot pamphlet argument in favor of the measure that proposed adding the initiative and referendum powers to the California Constitution concluded with these words: "Are the people capable of self-government? If they are, this amendment should be adopted. If they are not, this amendment should be defeated." (Sect. of State, Proposed Amends. to the Const. with Legis. Reasons, Special Elec. (Oct. 10, 1911) Reasons why Sen. Const. Amend. No. 22 should be adopted.) The measure was approved by a three-to-one margin. (See Sect. of State, Statement of the Vote of Cal. Special Elec. (Oct. 10, 1911) p. 5.)

amendments adopted through the initiative process between 1912 and 1936].) It was not until 1948, in the case of *McFadden v. Jordan, supra,* 32 Cal.2d 330 (*McFadden*), that our court had occasion to address the question whether an initiative measure that sought to change the California Constitution could not be submitted to the voters because the measure did not embody a constitutional amendment but instead constituted a constitutional revision.

In *McFadden, supra,* 32 Cal.2d 330, the petitioners sought an order prohibiting the Secretary of State from submitting to the voters a proposed initiative amendment to the California Constitution that had garnered the signatures of a sufficient number of qualified electors. The proposed amendment at issue in that case was referred to popularly as the "ham and eggs" initiative, because of the varied subjects it encompassed. In describing the proposition, the court in *McFadden* observed: "The measure proposes to add to our present Constitution 'a new Article to be numbered Article XXXII thereof and to consist of 12 separate sections (actually in the nature of separate articles) divided into some 208 subsections (actually in the nature of sections) set forth in more than 21,000 words. The Constitution as now cast, with the amendments added since its original adoption as revised in 1879, contains 25 articles divided into some 347 sections expressed in approximately 55,000 words." (32 Cal.2d at p. 334.)

The opinion then went on to summarize the content of each of the measure's sections, a summary that runs a full six pages in the decision in the Official Reports. (*McFadden, supra,* 32 Cal.2d at pp. 334–340.) A simple listing of the titles and a truncated summary of each of the measure's sections provides a flavor of the varied nature and wide breadth of the proposal. Section I, entitled "Principles and Policy," stated that it may be cited as "the 'California Bill of Rights' " and contained "declarations of various ethical, economic and governmental concepts and philosophies." (32 Cal.2d at p. 334.) Section II, entitled "The California Pension Commission," named the first five commissioners to serve on the commission and established their salaries. Section III, entitled "Retirement Pension Payments," specified pension benefits to be paid by the government to various categories of individuals. Section IV, entitled "Wagering and Gaming," contained 50 subsections related to that subject. Section V, entitled "Taxes," contained 16 subsections related to various types of taxes and tax exemptions. Section VI, entitled "Oleomargarine," provided that oleomargarine could not be sold in California without a license and without payment of a tax or fee. Section VII, entitled "Pertaining to the Healing Arts," contained 53 sections, creating a "California State Board of Naturopathic Examiners" to supplement the existing medical boards and granting to that board—whose first members were specifically named—extensive authority. Section VIII, entitled "Civic Centers," declared there to be a civic center at every public school building within the state, and granted every nonprofit and nonsectarian organization in the state formed for

" 'political, economic, educational, or moral activities' " (32 Cal.2d at p. 339) the right to use such a civic center without charge or fee. Section IX, entitled "Legislature, Elections, Committees," contained three subsections, which (1) provided for reapportionment of the state senate, (2) prohibited cross-filing at primary elections, and (3) regulated the selection of legislative committees. Section X, entitled "Fish, Game, Public Lands and Waters," contained five subsections regulating public lands and inland waters of the state and granting various powers to the Fish and Game Commission. Section XI, entitled "Surface Mining," contained nine subsections regulating surface mining in the state, including provisions for the issuance of operating permits and for the imposition of penalties for violation of the regulations. The final section, section XII, entitled "General," contained nine subsections, providing, among other things, for the repeal of any portion of the existing Constitution which " 'is in conflict with any of the provisions of this article' " and further specifying that " '[n]o injunction or writ of mandate, or other legal equitable process, shall ever issue or be maintained to interfere with the effectiveness or operation of this article . . . .' " (32 Cal.2d at p. 340.)

From this description of the measure at issue in *McFadden, supra*, 32 Cal.2d 330, it is apparent that were such an initiative measure to be proposed today, the proposal undoubtedly would be challenged and held invalid under the "single-subject rule" now embodied in article II, section 8, subdivision (d). (See, e.g., *Senate of the State of Cal. v. Jones* (1999) 21 Cal.4th 1142, 1156–1168 [90 Cal.Rptr.2d 810, 988 P.2d 1089].) At the time of the *McFadden* decision, however, there was no provision in the California Constitution that applied the single-subject rule to initiative measures.[19] The petitioners in *McFadden* rested their constitutional challenge on the ground that the measure proposed a revision of, rather than an amendment to, the state Constitution.

In addressing this question, the court in *McFadden* observed that "[t]he initiative power reserved by the people by amendment to the Constitution in 1911 (art. IV, § 1) applies only to the proposing and the adopting or rejecting of 'laws and amendments to the Constitution' and does not purport to extend to a constitutional revision." (*McFadden, supra*, 32 Cal.2d at p. 333.) Noting that the 1911 initiative amendment was drafted and adopted long after the decision in *Livermore, supra*, 102 Cal. 113, had discussed the distinction between a constitutional amendment and a constitutional revision and had explained that a constitutional revision could be proposed only by a constitutional convention, the court in *McFadden* concluded: "It is thus clear that a

---

[19] An amendment requiring initiative measures to comply with the single-subject rule was proposed and adopted within months of the *McFadden* decision (at the election held in Nov. 1948), apparently in response to the measure at issue in *McFadden*. (See *Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization, supra*, 22 Cal.3d 208, 229.)

revision of the Constitution may be accomplished only through ratification by the people of a revised constitution proposed by a convention called for that purpose . . . . Consequently *if the scope of the proposed initiative measure . . . now before us is so broad that if such measure became law a substantial revision of our present state Constitution would be effected,* then the measure may not properly be submitted to the electorate until and unless it is first agreed upon by a constitutional convention . . . ." (32 Cal.2d at p. 334, italics added.)

After summarizing (as referred to above) the varied and extensive contents of the measure at issue in that case, the court in *McFadden* stated: "Our review of the subjects covered by the measure and of its effect on the totality of our plan of government as now constituted does not purport to be exhaustive. It is amply sufficient, however, to demonstrate the wide and diverse range of subject matters proposed to be voted upon, and *the revisional effect which it would necessarily have on our basic plan of government.* The proposal is offered as *a single amendment* but it obviously is multifarious . . . . There is in the measure itself no attempt to enumerate the various and many articles and sections of our present Constitution which would be affected, altered, replaced, or repealed. It purports only to *add* one new article but its framers found it necessary to include the omnibus provision (§ XII, subdiv. (7)) that 'If any section, subsection, sentence, clause or phrase of the constitution is in conflict with any of the provisions of this article, such section, subsection, sentence, clause or phrase is to the extent of such conflict hereby repealed.' " (*McFadden, supra,* 32 Cal.2d at pp. 345–346, first italics added.)

In support of the validity of the measure, its proponents argued that only a measure affecting *all* of the sections of the current Constitution should be considered a revision, and that any measure affecting fewer than all such provisions should be considered an amendment. The court in *McFadden* responded: "We cannot accept such an arbitrary and strained minimization of difference between *amend* and *revise.* The differentiation required is not merely between two words; more accurately it is between two procedures and between their respective fields of application. . . . [The proponents'] contention—that any change less than a total one is but amendatory—would reduce to the rubble of absurdity the bulwark so carefully erected and preserved. *Each situation involving the question of amendment, as contrasted with revision, of the Constitution must, we think, be resolved upon its own facts.* A case might, conceivably, be presented where the question would be close and where there would be occasion to undertake to define with nicety the line of demarcation; but we have no such case or occasion here." (*McFadden, supra,* 32 Cal.2d at pp. 347–348, last italics added.)

The court concluded: "Applying the long established law to any tenable view of the facts which have been related, it is overwhelmingly certain that the measure now before us would constitute a revision of the Constitution rather than an amendment. . . ." (*McFadden, supra*, 32 Cal.2d at pp. 349–350.) Accordingly, the court issued a writ precluding the measure from being submitted to the voters. (*Id.* at p. 351.)

## G

In 1956, the California Legislature created a Citizens Legislative Advisory Commission to study and evaluate the organization and procedures of the Legislature, and a few years later that commission was requested to study and to provide a recommendation with regard to problems and methods of constitutional revision. (See Lee, *The Revision of California's Constitution, supra*, Cal. Policy Seminar Brief, pp. 3–4.) In March 1961, the commission presented its report and recommendations on this subject to the Legislature, pointing out that the California Constitution had been amended more frequently (323 times at that point) than any other state constitution except that of Louisiana, that many of the amendments were statutory in nature and required frequent amendment, and that other states increasingly and successfully had used means other than a constitutional convention—such as a legislatively appointed constitutional commission—to formulate a constitutional revision to be submitted to the voters. The commission's report ultimately recommended that former article XVIII of the California Constitution "be amended to permit the Legislature to submit to the people a revised Constitution or a revision of any part thereof." (Citizens Legis. Advisory Com., Rep. and Recommendation on Const. Revision (Mar. 9, 1961) p. 9, 2 Appen. to Assem. J. (1961 Reg. Sess.).)

In response to this recommendation, the Legislature approved a constitutional amendment to be submitted to the voters, which proposed to amend section 1 of former article XVIII to permit the Legislature to submit to the electorate not only constitutional amendments but also revisions of all or part of the Constitution. This proposed amendment was submitted to the voters as Proposition 7 at the November 1962 general election.

The ballot pamphlet sent to the voters in advance of the election contained an analysis of the measure prepared by the Legislative Counsel, as well as an argument in favor of the proposition. (No argument against the measure was submitted.) The Legislative Counsel's analysis described the distinction between constitutional amendments and constitutional revisions in the following terms: "Under existing provisions the Legislature can only propose *'amendments,' that is measures which propose changes specific and limited in nature. 'Revisions,' i.e., proposals which involve broad changes in all or a*

*substantial part of the Constitution,* can presently be proposed only by convening a constitutional convention." (Proposed Amends. to Const., Gen. Elec. (Nov. 6, 1962) analysis of Prop. 7 by Legis. Counsel, pt. I, p. 13, italics added.) The argument in favor of the proposition observed that "[s]hort of a constitutional convention, California has no way *to make coordinated broad changes* to renovate outdated sections and articles in its Constitution" (*ibid.,* argument in favor of Prop. 7, italics added), noted that in the preceding decade 10 states had effected constitutional improvement by the method proposed in the measure, and urged the electorate to vote in favor of the proposal in order to "allow an alternative approach to necessary revisions in the California Constitution." (*Ibid.*) Proposition 7 was approved by the voters at the November 1962 election.

As a consequence, since 1962 the California Constitution has authorized a constitutional revision to be proposed for submission to the voters either by a constitutional convention or by direct submission by the Legislature, permitting the Legislature to propose "coordinated broad changes to renovate outdated sections and articles" in the Constitution. (See also *Californians for an Open Primary, supra,* 38 Cal.4th 735, 790 (conc. opn. of Moreno, J.) [discussing 1962 amendment and explaining that "[*a*] *constitutional revision,* by its very nature and purpose," constitutes "*systematic, comprehensive constitutional renovation and reform*" (italics added)].)

## H

The latest change to the provisions of the California Constitution relating to amendment and revision of the Constitution occurred in 1970, when the provisions of article XVIII were substantially edited, reorganized, and set forth in the four-section format described, *ante,* at page 413. These changes were submitted to and approved by the voters as Proposition 16 at the November 3, 1970 election, but they reflect no substantive modification of the amendment/revision dichotomy or of the means by which either constitutional amendments or constitutional revisions may be proposed for submission to the voters.

## I

Although there have been no substantive changes in the relevant state constitutional provisions since 1970, during the course of the past four decades this court has had occasion to decide a significant number of cases in which an initiative measure, adding or altering a provision or provisions of the California Constitution, has been challenged on the ground that the measure represented a constitutional revision rather than a constitutional amendment and thus could not properly be adopted through the initiative

process. These numerous judicial opinions are highly significant to the issue before us, and accordingly we shall review them in some detail.

## 1

*Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization, supra*, 22 Cal.3d 208 (*Amador*), decided in 1978, was the first case after the 1948 decision in *McFadden, supra*, 32 Cal.2d 330, presenting this court with an amendment/revision claim. In *Amador*, the petitioners raised a multi-pronged constitutional challenge to Proposition 13, an initiative measure approved by the voters at the June 1978 election that added a new article (art. XIII A) to the California Constitution. Proposition 13 made major changes to the system of real property taxation and taxing powers throughout California, "imposing important limitations upon the assessment and taxing powers of state and local governments." (*Amador, supra*, at p. 218.) The initial claim addressed by the court in *Amador* was the petitioners' contention that "article XIII A represents such a drastic and far-reaching change in the nature and operation of our governmental structure that it must be considered a 'revision' of the state Constitution rather than a mere 'amendment' thereof." (*Id.* at p. 221.)

After relating the pertinent provisions of article XVIII, the court in *Amador* quoted from and discussed relevant portions of the *Livermore* and *McFadden* decisions, and then set forth the general mode of analysis that, as we shall see, has continued to be followed by our subsequent decisions. We stated in *Amador* in this regard: "Taken together our *Livermore* and *McFadden* decisions mandate that our analysis in determining whether a particular constitutional enactment is a revision or an amendment must be both quantitative and qualitative in nature. For example, an enactment which is so extensive in its provisions as to change directly the 'substantial entirety' of the Constitution by the deletion or alteration of numerous existing provisions may well constitute a revision thereof. However, even a relatively simple enactment may accomplish such far reaching changes *in the nature of our basic governmental plan* as to amount to a revision also. In illustration, the parties herein appear to agree that an enactment which purported to vest all judicial power in the Legislature would amount to a revision without regard either to the length or complexity of the measure or the number of existing articles or sections affected by such change." (*Amador, supra*, 22 Cal.3d at p. 223, italics added.)

In applying this analysis to Proposition 13, the court in *Amador, supra*, 22 Cal.3d 208, first considered the *quantitative* nature of the changes effected by the measure. Although the petitioners in that case claimed that eight separate articles and 37 sections of the preexisting California Constitution would be

affected by Proposition 13, the court determined that this assessment by the petitioners was based upon their erroneous interpretation of the new article and of its potential effect on the prior constitutional framework. (22 Cal.3d at p. 224.) While acknowledging that the new article would have a significant effect on many of the sections of article XIII (the preexisting article on taxation), the court rejected the claim that Proposition 13 amounted to a revision by reason of its quantitative effect upon the Constitution. (22 Cal.3d at p. 224.)

The court then turned to the *qualitative* effects of Proposition 13. The petitioners argued that Proposition 13 would have far-reaching qualitative effects upon the state's basic governmental plan in two respects: "(1) the loss of 'home rule' and (2) the conversion of our governmental framework from 'republican' to 'democratic' form." (*Amador, supra*, 22 Cal.3d at p. 224.) The decision in *Amador* analyzed each of these asserted effects and found that the measure would not be as disruptive as suggested by the petitioners. With respect to home rule, the court in *Amador* rejected the contention that simply because the Legislature was given the authority to allocate the limited property tax revenue authorized by the measure, Proposition 13 necessarily would lead to a system in which the Legislature directed and controlled all local budgetary decisions, programs, and service priorities. The court pointed out that legislation enacted after the passage of the measure belied that claim, and also noted that Proposition 13 left local entities free to raise additional revenue through special taxes approved by a two-thirds vote of the electors. (22 Cal.3d at pp. 225–227.) With respect to the charge that the measure would result in a change "from a 'republican' form of government (i.e., lawmaking by elected representatives) to a 'democratic' governmental plan (i.e., lawmaking directly by the people)" because Proposition 13 required that any special tax that a local entity wished to impose be approved by a two-thirds vote of the electors (22 Cal.3d at p. 227), the court in *Amador* concluded that the proposition was "more modest both in concept and effect [than the petitioners suggested] and [did] not change our basic governmental plan." We explained that the measure affected only the limited area of taxation, leaving undiminished the authority of representative elected bodies to enact appropriate laws and regulations in all other areas. (*Id.* at pp. 227–228.)

Although the court acknowledged that the changes wrought by Proposition 13 were very significant, it nonetheless concluded that the measure constituted an amendment rather than a revision. The court stated in this regard: "[I]t is apparent that article XIII A will result in various substantial changes in the operation of the former system of taxation. Yet, unlike the alterations effected by the *McFadden* initiative discussed above, the article XIII A changes operate functionally within a relatively narrow range to accomplish a new system of taxation which may provide substantial tax relief for our

citizens. We decline to hold that such a limited purpose cannot be achieved directly by the people through the initiative process." (*Amador, supra,* 22 Cal.3d at p. 228.)

## 2

The year following *Amador, supra,* 22 Cal.3d 208, our court confronted the amendment/revision question in the context of an initiative measure that amended the California Constitution to permit the imposition of the death penalty in response to this court's decision in *People v. Anderson* (1972) 6 Cal.3d 628 [100 Cal.Rptr. 152, 493 P.2d 880] (*Anderson*), which had concluded that imposition of the death penalty violated the provision of the California Constitution prohibiting the infliction of cruel or unusual punishment. In *People v. Frierson* (1979) 25 Cal.3d 142 [158 Cal.Rptr. 281, 599 P.2d 587] (*Frierson*), the defendant mounted a constitutional challenge to a death penalty statute enacted in 1977, and one of the claims he raised was that the 1972 initiative measure reinstating the death penalty in California after *Anderson* constituted a constitutional revision rather than a constitutional amendment and therefore was invalid.

In the decision in *Anderson, supra,* 6 Cal.3d 628—issued on February 17, 1972—this court found California's then-existing death penalty statute unconstitutional on the ground that the death penalty itself was "unnecessary to any legitimate goal of the state and . . . incompatible with the dignity of man and the judicial process" (6 Cal.3d at p. 656) and thus violated the cruel or unusual punishment clause of the California Constitution (then set forth in art. I, former § 6). (6 Cal.3d at pp. 645–656.)[20] In response to *Anderson,* an initiative measure was proposed to add a new section (§ 27) to article I of the California Constitution. The new section provided: "All statutes of this State in effect on February 17, 1972, requiring, authorizing, imposing, or relating to the death penalty are in full force and effect, subject to legislative amendment or repeal by statute, initiative, or referendum. [¶] The death penalty provided for under these statutes shall not be deemed to be, or to constitute, the infliction of cruel or unusual punishments within the meaning of Article I, Section 6 nor shall such punishment for such offenses be deemed to contravene any other provision of this constitution." The voters approved this initiative measure at the November 1972 election.

In *Frierson, supra,* 25 Cal.3d 142, the defendant claimed the 1972 initiative measure constituted a revision rather than an amendment of the Constitution, arguing that article I, section 27 "contemplates 'removal of

---

[20] Pursuant to a revision of article I in 1974, the state constitutional prohibition on cruel or unusual punishment is now set forth in article I, section 17.

judicial review' of the death penalty from a carefully built state constitutional structure, thereby resulting in 'a significant change in a principle underlying our system of democratic government and can only be accomplished by constitutional revision.' " (25 Cal.3d at p. 186.) In responding to this contention, the lead opinion in *Frierson* acknowledged the qualitative prong of the revision analysis set forth in *Amador, supra,* 22 Cal.3d 208—that is, a constitutional change that accomplishes " 'far reaching changes in the nature of our basic governmental plan' " may constitute a revision—but held that article I, section 27 "accomplishes no such sweeping result." (*Frierson,* at pp. 186–187.) The opinion explained that the provision did not displace judicial review of death sentences, and that the court would continue to review such death sentences for compliance with all currently applicable laws, including the restrictions placed on such sentences by the United States Constitution. The opinion also observed that "adoption of defendant's position might effectively bar the people from ever directly reinstating the death penalty, despite the apparent belief of a very substantial majority of our citizens in the necessity and appropriateness of the ultimate punishment." (*Frierson,* at p. 187.) Our opinion in *Frierson* concluded that article I, section 27 constituted a permissible constitutional amendment, not a revision. (*Frierson,* at p. 187.)[21]

### 3

Three years after *Frierson, supra,* 25 Cal.3d 142, in *Brosnahan v. Brown* (1982) 32 Cal.3d 236 [186 Cal.Rptr. 30, 651 P.2d 274] (*Brosnahan*), we addressed a multipronged constitutional challenge to a lengthy and diverse criminal justice initiative measure that amended various penal statutes and also made a number of significant changes to the California constitutional provisions relating to criminal proceedings. That measure, like the one currently before us, was commonly referred to by its ballot designation as

---

[21] The lead opinion in *Frierson, supra,* 25 Cal.3d 142, was signed by only three justices; four justices declined to join in the opinion's discussion of the constitutionality of the 1977 death penalty statute. A majority of the court later upheld the validity of the 1977 statute in *People v. Jackson* (1980) 28 Cal.3d 264 [168 Cal.Rptr. 603, 618 P.2d 149] (*Jackson*), stating that "[m]ost of the arguments advanced by defendant were discussed at considerable length in *People* v. *Frierson, supra,* 25 Cal.3d 142, 172–188, 191–195, and we do not repeat them here." (*Jackson, supra,* 28 Cal.3d at p. 315.) The portions of the decision in *Frierson* that were cited in *Jackson* include the discussion rejecting the claim that the 1972 measure reinstating the death penalty amounted to a constitutional revision rather than a constitutional amendment. Although three justices dissented in *Jackson* from the conclusion that the 1977 death penalty statute was constitutional, those justices based their conclusion on what they viewed as federal constitutional flaws in the 1977 statute. No justice in *Frierson, Jackson,* or any other decision of this court has disagreed with the conclusion that article I, section 27 constitutes a permissible amendment to, rather than an impermissible revision of, the California Constitution, and there can be no question that this resolution of the issue is now a firmly settled determination.

Proposition 8, and, to avoid confusion, we shall refer to that measure as the "1982 Proposition 8." Many of the changes embodied in the 1982 Proposition 8 reflected disagreement with decisions of the California Supreme Court concerning various issues relating to criminal procedure; the proposition added, deleted, and revised a number of statutory and constitutional provisions to change the rules embodied in those judicial decisions.

The main challenge to the 1982 Proposition 8 was the claim that the initiative measure violated the single-subject rule (see *Brosnahan, supra*, 32 Cal.3d at pp. 245–253), but the petitioners in *Brosnahan* additionally contended that the proposition was "such a 'drastic and far-reaching' measure as to constitute a 'revision' of the state Constitution rather than a mere amendment thereof." (32 Cal.3d at p. 260.)

In evaluating the latter claim, the court in *Brosnahan, supra*, 32 Cal.3d 236, assessed both the quantitative and qualitative effects of the initiative measure. The court initially found that the proposition had only "a limited quantitative effect" (*id.* at p. 260) on the preexisting constitutional provisions, repealing one section of article I (art. I, former § 12, relating to the right to bail) and adding, to that same constitutional article, one new section containing seven subdivisions (art. I, § 28, addressing the subjects of restitution for crime victims, the right to safe schools, the right to truth in evidence, public safety bail, and the use of prior convictions in criminal proceedings). The court in *Brosnahan* concluded that these changes, as a quantitative matter, were "not 'so extensive . . . as to change directly the "substantial entirety" of the Constitution by the deletion or alteration of numerous existing provisions . . . .' " (32 Cal.3d at p. 260.)

With respect to the qualitative effect of the measure, the court in *Brosnahan* stated that "while Proposition 8 does accomplish substantial changes in our criminal justice system, even in combination these changes fall considerably short of constituting 'such far reaching changes in the nature of our *basic governmental plan* as to amount to a revision . . . .' " (*Brosnahan, supra*, 32 Cal.3d at p. 260, italics added by *Brosnahan*.) In response to the petitioners' contention that the measure's limitation upon plea negotiation and its creation of a right to safe schools likely would have the effect of interfering with the judiciary's ability to perform its constitutional duty to decide cases and the further effect of abridging the constitutional right to public education, the court in *Brosnahan* noted that the "petitioners' forecast of judicial and educational chaos is exaggerated and wholly conjectural, based primarily upon essentially unpredictable fiscal or budgetary constraints" (*id.* at p. 261). The court pointed out additionally that our decision in *Amador* had "discounted similar dire predictions" and had rejected a similar claim, because " 'nothing on the face of the [initiative measure]' " compelled

such results or demonstrated that the measure " 'necessarily and inevitably' " would produce the feared effects. (*Brosnahan, supra,* 32 Cal.3d at p. 261, quoting *Amador, supra,* 22 Cal.3d at pp. 225–226.)

Accordingly, finding that "nothing contained in [the 1982] Proposition 8 necessarily or inevitably *will alter the basic governmental framework set forth in our Constitution*" (*Brosnahan, supra,* 32 Cal.3d at p. 261, italics added), the court in *Brosnahan* concluded that the measure constituted an amendment to, and not a revision of, the California Constitution.

### 4

A few years after the decision in *Brosnahan, supra,* 32 Cal.3d 236, our court in *In re Lance W.* (1985) 37 Cal.3d 873 [210 Cal.Rptr. 631, 694 P.2d 744] (*Lance W.*) addressed a number of issues relating to one of the constitutional provisions that had been added by the same initiative measure at issue in *Brosnahan*—article I, section 28, former subdivision (d) (now subd. (f)(2)) of the California Constitution (hereafter section 28(d))—which provided in relevant part that "[e]xcept as provided by statute hereafter enacted by a two-thirds vote of the membership in each house of the Legislature, relevant evidence shall not be excluded in any criminal proceeding . . . ."

The initial issue addressed in *Lance W.* was whether section 28(d) should be interpreted as having altered the preexisting state constitutional rule excluding evidence obtained in violation of the *California* constitutional provision prohibiting unlawful searches and seizures, thus rendering the exclusionary rule applicable in the search-and-seizure context only as required by the *federal* Constitution. The defendant in *Lance W.* argued that because section 28(d) did not refer specifically to article I, section 13 (the state constitutional search-and-seizure provision) or to article I, section 24 (the provision confirming that rights guaranteed by the state Constitution are not dependent on those guaranteed by the United States Constitution), section 28(d) should not be interpreted as having repealed or altered the state constitutional exclusionary rule. In analyzing this point, the court in *Lance W.* first agreed with the defendant "that [the 1982] Proposition 8 did not repeal either section 13 or section 24 of article I" and that "[t]he substantive scope of both provisions remains unaffected by [the 1982] Proposition 8. What would have been an unlawful search or seizure in this state before the passage of that initiative would be unlawful today, and this is so even if it would pass muster under the federal Constitution." (*Lance W., supra,* 37 Cal.3d at p. 886.) Nonetheless, the court in *Lance W.* concluded that "[w]hat [the 1982] Proposition 8 does is to eliminate a judicially created *remedy* for violations of the search and seizure provisions of the federal or state Constitutions, through the exclusion of evidence so obtained, except to the

extent that exclusion remains federally compelled." (*Id.* at pp. 886–887.) Accordingly, the court held that section 28(d) properly must be interpreted "to permit exclusion of relevant, but unlawfully obtained evidence, only if exclusion is required by the United States Constitution . . . ." (37 Cal.3d at p. 890.)

After determining that section 28(d) properly should be interpreted as having abrogated the state constitutional exclusionary rule, the court in *Lance W., supra,* 37 Cal.3d 873, turned to an additional argument that was raised in that case—namely, that if section 28(d) were interpreted as having such an effect, the provision properly must be characterized as "an impermissible constitutional revision, rather than amendment, because it abrogates the judicial function of fashioning appropriate remedies for violation of constitutional rights." (37 Cal.3d at p. 885.)

In addressing the amendment/revision argument, the court in *Lance W.* first pointed out that "[w]e have heretofore rejected a similar attack on [the 1982] Proposition 8 in its entirety" (citing *Brosnahan, supra,* 32 Cal.3d 236, 260–261) and that "[o]ur decision [in *Brosnahan*] necessarily encompassed a conclusion that section 28(d) was properly adopted through the amendment procedure . . . ." (*Lance W., supra,* 37 Cal.3d at p. 891.)

The court in *Lance W., supra,* 37 Cal.3d 873, then went on to further explain why the specific constitutional provision at issue in that case properly embodied a constitutional amendment rather than a constitutional revision. The court stated in this regard: "The people could by amendment of the Constitution repeal section 13 of article I in its entirety. The adoption of section 28(d) *which affects only one incident of that guarantee of freedom from unlawful search and seizure,* a judicially created remedy for violation of the guarantee, cannot be considered such a sweeping change *either in the distribution of powers made in the organic document or in the powers which it vests in the judicial branch* as to constitute a revision of the Constitution within the contemplation of article XVIII." (*Id.* at p. 892, italics added.)

## 5

Our court next addressed the amendment/revision issue in *Raven v. Deukmejian, supra,* 52 Cal.3d 336 (*Raven*). Because *Raven* is the only case in which we have found a proposed constitutional amendment to constitute an impermissible constitutional revision resulting from the measure's far-reaching *qualitative* effect on the preexisting constitutional structure, petitioners place considerable reliance upon our decision in that matter. For that reason, we discuss the decision in some detail.

In *Raven, supra,* 52 Cal.3d 336, our court faced a constitutional challenge to an initiative measure referred to as Proposition 115, a diverse criminal justice initiative somewhat analogous to the 1982 Proposition 8 that had been analyzed and upheld in our decision in *Brosnahan, supra,* 32 Cal.3d 236, discussed, *ante,* at pages 430–432. The preamble to Proposition 115 affords an accurate view of the measure's general purpose and scope, stating in part that "we the people . . . find that it is necessary to reform the law as developed in numerous California Supreme Court decisions and as set forth in the statutes of this state. These decisions and statutes have unnecessarily expanded the rights of accused criminals far beyond that which is required by the United States Constitution, thereby unnecessarily adding to the costs of criminal cases, and diverting the judicial process from its function as a quest for truth." (Ballot Pamp., Primary Elec. (June 5, 1990) text of Prop. 115, p. 33.)

Proposition 115 made a significant number of distinct changes to the California Constitution. The measure (1) added a new section 14.1 to article I, providing that "[i]f a felony is prosecuted by indictment, there shall be no postindictment preliminary hearing"; (2) amended article I, section 24 to provide that numerous state constitutional provisions granting rights to criminal defendants shall not be construed to afford greater rights than those afforded by analogous provisions of the United States Constitution (this is the part of Prop. 115 that the court found embodied a constitutional revision and that we quote and discuss below); (3) added a new section 29 to article I, providing that "[i]n a criminal case, the people of the State of California have the right to due process of law and to a speedy and public trial"; (4) added a new section 30, subdivision (a), to article I, providing that "[t]his Constitution shall not be construed by the courts to prohibit the joining of criminal cases as prescribed by the Legislature or by the people through the initiative process"; (5) added a new section 30, subdivision (b), to article I, providing that "hearsay evidence shall be admissible at preliminary hearings"; (6) added a new section 30, subdivision (c), to article I, providing that "discovery in criminal cases shall be reciprocal in nature"; and (7) added and amended a variety of criminal statutory provisions, making procedural changes and altering the substance of a variety of criminal offenses, including the provisions relating to murder and to the death penalty.

After summarizing Proposition 115's numerous provisions, the court in *Raven, supra,* 52 Cal.3d 336, initially addressed the petitioners' single-subject challenge to the measure. Relying primarily upon our earlier decision in *Brosnahan, supra,* 32 Cal.3d 236, the court in *Raven* rejected the single-subject challenge to Proposition 115 (*Raven,* at pp. 346–349) and then turned to the amendment/revision issue.

The court in *Raven* began its discussion of this issue by setting forth the basic constitutional framework: "Although '[t]he electors may amend the Constitution by initiative' (Cal. Const., art. XVIII, § 3), a 'revision' of the Constitution may be accomplished only by convening a constitutional convention and obtaining popular ratification (*id.*, § 2), or by legislative submission of the measure to the voters (*id.*, § 1)." (*Raven, supra*, 52 Cal.3d at p. 349.) The court then observed that "[a]lthough the Constitution does not define the terms 'amendment' or 'revision,' the courts have developed some guidelines helpful in resolving the present issue. As explained in *Amador*, and confirmed in *Brosnahan*, our revision/amendment analysis has a dual aspect, requiring us to examine both the quantitative and qualitative effects of the measure on our constitutional scheme. Substantial changes in either respect could amount to a revision." (*Id.* at p. 350.)

The court then explained that the petitioners' revision argument focused primarily on only one of the constitutional changes made by Proposition 115, "namely, the amendment to article I, section 24, of the state Constitution relating to the independent nature of certain rights guaranteed by that Constitution." (*Raven, supra*, 52 Cal.3d at p. 350.) The court, in expressly rejecting the suggestion that any of the *other*, more specific constitutional changes made by Proposition 115 constituted a revision, stated: "*The additional constitutional changes effected by Proposition 115*, involving such isolated matters as postindictment preliminary hearings, joinder of cases, use of hearsay, reciprocal discovery, and the People's right to due process and a speedy, public trial, *cannot be deemed matters which standing alone, or in the aggregate, substantially change our preexisting governmental framework.*" (52 Cal.3d at p. 350, italics added.)

The court then proceeded in *Raven, supra*, 52 Cal.3d 336, to analyze the question whether the changes effected by the amendment of article I, section 24 constituted a revision, beginning its analysis by setting forth the changes in full. "Article I, section 24, added in 1974, originally provided in relevant part that 'Rights guaranteed by this Constitution are not dependent on those guaranteed by the United States Constitution.' Proposition 115 would add the important proviso that 'In criminal cases the rights of a defendant to equal protection of the laws, to due process of law, to the assistance of counsel, to be personally present with counsel, to a speedy and public trial, to compel the attendance of witnesses, to confront the witnesses against him or her, to be free from unreasonable searches and seizures, to privacy, to not be compelled to be a witness against himself or herself, to not be placed twice in jeopardy for the same offense, and not to suffer the imposition of cruel or unusual punishment, shall be construed by the courts of this state in a manner consistent with the Constitution of the United States. This Constitution shall not be construed by the courts to afford greater rights to criminal defendants than those afforded by the Constitution of the United States, nor shall it be

construed to afford greater rights to minors in juvenile proceedings on criminal causes than those afforded by the Constitution of the United States.' " (52 Cal.3d at p. 350.)

After explaining there was a dispute between the parties concerning the proper interpretation of the language added by Proposition 115, with the petitioners contending that the measure would impact not only the specifically listed rights but other rights such as the right to jury trial and free speech, and the Attorney General arguing that the last sentence of the new measure "must be read as referring only to the enumerated rights mentioned in the immediately preceding sentence" (*Raven, supra,* 52 Cal.3d at p. 351), the court determined that there was no need to resolve that dispute, "for even if we adopt [the Attorney General's] position, in our view the effect of the measure would be so far reaching as to amount to a constitutional revision beyond the scope of the initiative process." (*Ibid.*)

In explaining the basis for its conclusion, the court in *Raven* discussed both the quantitative and qualitative effects of Proposition 115. The court concluded that "[q]uantitatively, Proposition 115 does not seem 'so extensive . . . as to change directly the "substantial entirety" of the Constitution by the deletion or alteration of numerous existing provisions . . . .' [Citation.] The measure deletes no existing constitutional language and it affects only *one* constitutional article, namely, article I. As previously outlined, the measure adds three new sections to this article and amends a fourth section. In short, the quantitative effects on the Constitution seem no more extensive than those presented in prior cases upholding initiative measures challenged as constitutional revisions." (*Raven, supra,* 52 Cal.3d at p. 351.)

With respect to the qualitative effects of Proposition 115, the court in *Raven* explained: "We have stated that, apart from a measure effecting widespread deletions, additions and amendments involving many constitutional articles, 'even a relatively simple enactment may accomplish such far reaching changes in the nature of our basic governmental plan as to amount to a revision also . . . . [A]*n enactment which purported to vest all judicial power in the Legislature would amount to a revision* without regard either to the length or complexity of the measure or the number of existing articles or sections affected by such change.' [Citations.] [¶] *Proposition 115 contemplates a similar qualitative change.* In essence and practical effect, new article I, section 24, would vest all judicial *interpretive* power, as to fundamental criminal defense rights, in the United States Supreme Court. From a qualitative standpoint, the effect of Proposition 115 is devastating." (*Raven, supra,* 52 Cal.3d at pp. 351–352, first and third italics in original.)

In elaborating upon why this provision constituted a far-reaching change in the nature of our state's basic governmental plan, the court in *Raven* observed

that "new article I, section 24, would substantially alter the substance and integrity of the state Constitution as a document of independent force and effect. As an historical matter, article I and its Declaration of Rights was viewed as the only available protection for our citizens charged with crimes, because the federal Constitution and its Bill of Rights was initially deemed to apply only to the conduct of the federal government. In framing the Declaration of Rights in both the 1849 and 1879 California Constitutions, the drafters largely looked to the constitutions of the other states, rather than the federal Constitution, as potential models. [Citations.] [¶] Thus, Proposition 115 not only unduly restricts judicial power, but it does so in a way which severely limits the independent force and effect of the California Constitution." (*Raven, supra*, 52 Cal.3d at pp. 352–353.) "Proposition 115 . . . substantially alters the preexisting constitutional scheme or framework heretofore extensively and repeatedly used by courts in interpreting and enforcing state constitutional protections. It directly contradicts the well-established jurisprudential principle that, 'The judiciary, from the very nature of its powers and means given it by the Constitution, must possess the right to construe the Constitution in the last resort . . . .' [Citations.] In short, in the words of *Amador, supra*, this 'relatively simple enactment [accomplishes] . . . such far reaching changes in the nature of our basic governmental plan as to amount to a revision . . . .' [Citations.]" (*Id.* at pp. 354–355.)

In the course of its discussion, the court in *Raven* contrasted the proposed change to article I, section 24, with the substantial changes in the state constitutional rights of criminal defendants that the court previously had found to constitute constitutional amendments in *Frierson, supra*, 25 Cal.3d 142, and in *Lance W., supra*, 37 Cal.3d 873—respectively, the measure that reinstated the death penalty and the measure that abrogated the state constitutional exclusionary rule for evidence obtained through an unconstitutional search and seizure. *Raven* explained that "the isolated provisions at issue [in *Frierson* and *Lance W.*] achieved no far reaching, fundamental changes in our governmental plan. . . . [N]either case involved a broad attack on state court authority to exercise independent judgment in construing a wide spectrum of important rights under the state Constitution. New article I, section 24, more closely resembles *Amador*'s hypothetical provision vesting all judicial power in the Legislature . . . . As noted, in practical effect, the new provision vests a critical portion of state judicial power in the United States Supreme Court, certainly a fundamental change in our preexisting governmental plan." (*Raven, supra*, 52 Cal.3d at p. 355.)

After concluding that the changes made by Proposition 115 to article I, section 24, constituted an invalid revision of the California Constitution, the court in *Raven* determined that this provision's invalidity "does not affect the remaining provisions of Proposition 115, which are clearly severable from the invalid portion." (*Raven, supra*, 52 Cal.3d at p. 355.) Accordingly,

although the court held that the proposed addition to article I, section 24, could not become a part of the California Constitution, it at the same time concluded that the other numerous substantive changes to that Constitution contained in Proposition 115 would remain in effect. (52 Cal.3d at pp. 355–356.)

## 6

One year after *Raven, supra,* 52 Cal.3d 336, our court, in the case of *Legislature v. Eu* (1991) 54 Cal.3d 492 [286 Cal.Rptr. 283, 816 P.2d 1309], faced a multipronged constitutional challenge to Proposition 140, an initiative measure that—in order to limit the "power of incumbency" in the legislative branch—added and altered a number of separate constitutional provisions so as to (1) adopt term limits, (2) restrict retirement benefits for state legislators, and (3) limit expenditures for legislative staff and support services. In that case, the initial contention raised by the petitioners and addressed by the court was the claim that Proposition 140 as a whole, "and particularly its term and budgetary limitations on the Legislature, effected a constitutional revision rather than a mere amendment." (54 Cal.3d at p. 506.)

In advancing this argument, the petitioners in *Legislature v. Eu* asserted that the effect of the term and budget limitations of Proposition 140 on the Legislature were as drastic as the provisions that our court had found invalid in *Raven.* The petitioners maintained that those limits would so weaken the Legislature that it would " 'be unable to discharge its traditional duties of policymaker, keeper of the purse, and counterweight to the executive branch in the way the Constitution intends. The result is a change so profound in the structure of our government that it constitutes a revision . . . .' " (*Legislature v. Eu, supra,* 54 Cal.3d at p. 507.)

The court in *Legislature v. Eu, supra,* 54 Cal.3d 492, rejected the petitioners' argument, pointing out that "the basic and fundamental structure of the Legislature as a representative branch of government is left substantially unchanged by Proposition 140. Term and budgetary limitations may affect and alter the particular legislators and staff who participate in the legislative process, but the process itself should remain essentially as previously contemplated by our Constitution. This aspect distinguishes the present case from *Raven,* in which we struck down a provision that would have fundamentally changed and subordinated the constitutional role assumed by the judiciary in the governmental process. [Citation.] [¶] As indicated in *Raven, a qualitative revision includes one that involves a change in the basic plan of California government, i.e., a change in its fundamental structure or the foundational powers of its branches.*" (54 Cal.3d at pp. 508–509, italics added; see also *id.* at p. 506 ["[T]he revision provision is based on the

principle that *'comprehensive changes' to the Constitution* require more formality, discussion and deliberation than is available through the initiative process" (italics added)].)

Although noting that differences of opinion had been voiced regarding how the term and budgetary limits actually would affect the operation of the Legislature *in practice*, the court in *Legislature v. Eu* explained that "[o]ur prior decisions have made it clear that to find such a revision, *it must necessarily or inevitably appear from the face of the challenged provision* that the measure *will substantially alter the basic governmental framework set forth in our Constitution*." (*Legislature v. Eu, supra*, 54 Cal.3d at p. 510, some italics added.) We pointed out that "Proposition 140 on its face does not affect either the structure or the foundational powers of the Legislature. . . . No legislative power is diminished or delegated to other persons or agencies. The relationships between the three governmental branches, and their respective powers, remain untouched." (*Id.* at p. 509.)

Accordingly, we concluded in *Legislature v. Eu, supra*, 54 Cal.3d 492, that the changes embodied in Proposition 140 did not amount to a constitutional revision, but rather that the measure embodied a constitutional amendment that validly could be proposed and adopted through the initiative process.

### 7

Most recently, in *Professional Engineers in California Government v. Kempton* (2007) 40 Cal.4th 1016 [56 Cal.Rptr.3d 814, 155 P.3d 226] (*Professional Engineers*), we addressed a contention that Proposition 35, an initiative measure that added article XXII to the state Constitution relating to the contracting out of architectural and engineering services for public works, amounted to a constitutional revision. In that case, the challengers contended that " '[t]aking away the Legislature's plenary power to determine contracting out policies and procedures for the State of California, and shifting that power to the Executive branch, constitutes a fundamental restructuring of our traditional tripartite system of government.' " (40 Cal.4th at p. 1047.) In rejecting this contention, our decision in *Professional Engineers* pointed out that the challengers' claim rested on their erroneous characterization of the effects of Proposition 35, and emphasized that the measure "does not usurp the Legislature's plenary authority to regulate private contracting by public agencies in a global sense, but simply permits public agencies to enter into contracts with private entities for architectural and engineering services without article-VII-derived restrictions [that is, civil service restrictions] on their ability to do so." (40 Cal.4th at p. 1047.) Furthermore, we noted that "this is not a case in which the Legislature has been stripped of authority to regulate private contracting but, rather, a case in which a permissible

legislative decision has been made [by the electorate] to remove previous limitations on the ability of public agencies to contract for architectural and engineering services." (*Ibid.*) Accordingly, we concluded in *Professional Engineers* that Proposition 35 did not create "such 'far reaching changes [to] our basic governmental plan as to amount to a revision.' " (40 Cal.4th at p. 1047.)

## J

Having extensively reviewed (1) the origin and history of the distinction drawn in the California Constitution between constitutional amendments and constitutional revisions throughout our state's existence (*ante,* at pp. 412–426), and (2) the numerous decisions that have applied this distinction to a wide variety of measures that have added or altered provisions of our state Constitution (*ante,* at pp. 426–440), we now evaluate petitioners' contention that the measure before us today—the current Proposition 8—should be considered a constitutional revision rather than a constitutional amendment.

As already noted, Proposition 8 adds a single section—section 7.5—to article I of the California Constitution, a section that provides, in its entirety, that "Only marriage between a man and a woman is valid or recognized in California." Pursuant to the analysis prescribed in our past decisions, we examine "both the quantitative and qualitative effects of the measure on our constitutional scheme." (*Raven, supra,* 52 Cal.3d 336, 350.)

From a quantitative standpoint, it is obvious that Proposition 8 does not amount to a constitutional revision. The measure adds one 14-word section (§ 7.5) to article I—a section that affects two other sections of article I (§§ 1, 7) by creating an exception to the privacy, due process, and equal protection clauses contained in those two sections as interpreted in the majority opinion in the *Marriage Cases, supra,* 43 Cal.4th 757. Quantitatively, Proposition 8 unquestionably has much less of an effect on the preexisting state constitutional scheme than virtually any of the previous constitutional changes that our past decisions have found to constitute amendments rather than revisions. Indeed, petitioners do not even advance the argument that Proposition 8 constitutes a revision under the quantitative prong of the amendment/revision analysis.

Instead, petitioners rest their claim that Proposition 8 constitutes a constitutional revision solely upon the qualitative prong of the amendment/revision analysis. The constitutional change embodied in Proposition 8, however, differs fundamentally from those that our past cases have identified as the kind of qualitative change that may amount to a revision of the California Constitution.

As we have seen, the numerous past decisions of this court that have addressed this issue all have indicated that the type of measure that may constitute a revision of the California Constitution is one that makes "far reaching changes in the nature *of our basic governmental plan*" (*Amador, supra,* 22 Cal.3d 208, 223, italics added), or, stated in slightly different terms, that "substantially alter[s] *the basic governmental framework set forth in our Constitution.*" (*Legislature v. Eu, supra,* 54 Cal.3d 492, 510, italics added.) Thus, for example, our decision in *Amador,* in providing an example of the type of "relatively simple enactment" that may constitute a revision, posed a hypothetical enactment "which purported to vest *all judicial power in the Legislature.*" (*Amador, supra,* 22 Cal.3d at p. 223, italics added.) Similarly, in *Raven*—the *only* case to find that a measure constituted a revision of the California Constitution because of the qualitative nature of the proposed change—the court relied upon the circumstance that the provision there at issue "would substantially alter the substance and integrity of the state Constitution as a document of independent force and effect" (*Raven, supra,* 52 Cal.3d at p. 352) by implementing "a broad attack on state court authority to exercise independent judgment in construing a wide spectrum of important rights under the state Constitution." (*Id.,* at p. 355.) (See also *Brosnahan, supra,* 32 Cal.3d at p. 261 ["[N]othing contained in [the 1982] Proposition 8 necessarily or inevitably *will alter the basic governmental framework set forth in our Constitution. It follows that [the 1982] Proposition 8 did not accomplish a 'revision' of the Constitution* within the meaning of article XVIII" (italics added)]; *Lance W., supra,* 37 Cal.3d at p. 892 ["The adoption of section 28(d) which affects only one incident of [the state constitutional] guarantee of freedom from unlawful search and seizure . . . cannot be considered *such a sweeping change either in the distribution of powers* made in the organic document or *in the powers which it vests in the judicial branch as to constitute a revision* of the Constitution within the contemplation of article XVIII" (italics added)]; *Legislature v. Eu, supra,* 54 Cal.3d at p. 509 ["*a qualitative revision includes one that involves a change in the basic plan of California government, i.e., a change in its fundamental structure or the foundational powers of its branches*" (italics added)]; *Professional Engineers, supra,* 40 Cal.4th at p. 1047 ["we cannot agree that Proposition 35 creates such 'far reaching changes [*to*] *our basic governmental plan as to amount to a revision*' " (italics added)].)

 Proposition 8 works no such fundamental change in the *basic governmental plan or framework* established by the preexisting provisions of the California Constitution—that is, "in [the government's] fundamental structure or the foundational powers of its branches." (*Legislature v. Eu, supra,* 54 Cal.3d at p. 509.) Instead, Proposition 8 simply changes the substantive content of a state constitutional rule in one specific subject area—the rule relating to access to the designation of "marriage." Contrary to petitioners'

contention, the measure does not transform or undermine the judicial function: California courts will continue to exercise their basic and historic responsibility to enforce *all* of the provisions of the California Constitution, which now include the new section added by the voters' approval of Proposition 8.

Petitioners contend, however, that even if Proposition 8 does not make a fundamental change in the basic *governmental plan* or *framework* established by the Constitution, the measure nonetheless should be found to constitute a revision because it allegedly "strike[s] directly at the foundational constitutional principle of equal protection . . . by establishing that an unpopular group may be selectively stripped of fundamental rights by a simple majority of voters." Petitioners' argument rests, initially, on the premise that a measure that abrogates a so-called *foundational constitutional principle of law*, no less than a measure that makes a fundamental change in the basic governmental structure or in the foundational power of its branches as established by the state Constitution, should be viewed as a constitutional revision rather than as a constitutional amendment. Petitioners suggest that their position is not inconsistent with our past amendment/revision decisions, on the theory that none of those decisions *explicitly* held that *only* a measure that makes a fundamental change in the state's governmental plan or framework can constitute a constitutional revision. The concurring opinion of Justice Werdegar and the concurring and dissenting opinion of Justice Moreno embrace petitioners' proposed interpretation of the relevant California precedent. (See conc. opn. of Werdegar, J., *post*, at pp. 477–481; conc. & dis. opn. of Moreno, J., *post*, at pp. 490–496.)

■ In our view, a fair and full reading of this court's past amendment/revision decisions demonstrates that those cases stand for the proposition that in deciding whether or not a constitutional change constitutes a qualitative revision, a court must determine whether the change effects a substantial change in the governmental plan or structure established by the Constitution. As we have seen, a number of our past amendment/revision decisions have involved initiative measures that made very important substantive changes in fundamental state constitutional principles such as the right not to be subjected to cruel or unusual punishment (*Frierson, supra*, 25 Cal.3d 142) and the right to be protected against unlawful searches and seizures (*Lance W., supra*, 37 Cal.3d 873)—initiative measures that, like the current Proposition 8, cut back on the greater level of protection afforded by preceding court decisions and were challenged as constitutional revisions on the ground that the constitutional changes they effected deprived individuals of important state constitutional protections they previously enjoyed and left courts unable to fully protect such rights. Nonetheless, in each case this court did not undertake an evaluation of the relative importance of the constitutional right at issue or the degree to which the protection of that right had

been diminished, but instead held that the measure did not amount to a qualitative revision *because it did not make a fundamental change in the nature of the governmental plan or framework established by the Constitution.*

In *Frierson, supra,* 25 Cal.3d 142, for example, the defendant argued that because the constitutional measure at issue in that case—by providing that the death penalty was to be deemed not to contravene either the cruel or unusual punishment clause *or any other provision of the California Constitution*—totally removed the state's imposition of the death penalty "from a carefully built state constitutional structure," the provision resulted in " 'a significant change *in a principle underlying our system of democratic government* and can only be accomplished by constitutional revision.' " (25 Cal.3d at p. 186, italics added.) In rejecting this argument, the opinion in *Frierson* explained that the measure did not make a far-reaching or sweeping change in the nature of our basic governmental plan, because the judiciary retained its traditional "broad powers of judicial review of death sentences to assure that each sentence has been properly and legally imposed and to safeguard against arbitrary or disproportionate treatment." (*Id.* at p. 187.) In other words, the court concluded that the measure did not significantly alter the basic structure or foundational powers of any branch of state government, including the judiciary.

The court's analysis in *Lance W., supra,* 37 Cal.3d 873, was even more explicit in this regard in rejecting the defendant's claim that a measure that abolished the state constitutional exclusionary rule for evidence obtained by unlawful search and seizure constituted a constitutional revision. The court there concluded that the measure "cannot be considered such a sweeping change either *in the distribution of powers made in the organic document* or *in the powers which it vests in the judicial branch* as to constitute a revision of the Constitution within the contemplation of article XVIII." (*Lance W.,* 37 Cal.3d at p. 892, italics added.)

Furthermore, as we have seen, in *Legislature v. Eu, supra,* 54 Cal.3d 492, in explicating the phrase "a change *in the basic plan of California government*" as used in the earlier California amendment/revision line of cases, we explained that this phrase refers to "a change *in [the] fundamental [governmental] structure or the foundational powers of its branches*" (*id.* at p. 509, italics added) and not, as petitioners suggest, simply to any change in an important constitutional right or principle.

Although petitioners seize upon isolated passages in a few decisions as assertedly supporting their position that a change other than a modification

in the governmental plan or framework may constitute a revision,[22] a fair reading of those decisions in their entirety discloses that they do not provide such support but instead affirmatively reiterate and apply the established rule that, in order to constitute a qualitative revision, a constitutional measure must make a far-reaching change in the fundamental governmental structure or the foundational power of its branches as set forth in the Constitution. Under this standard, which has been applied repeatedly and uniformly in the precedents that govern this court's jurisprudence, it is evident that because Proposition 8 works no change of that nature in the California Constitution, it does not constitute a constitutional revision.[23]

---

[22] Thus, for example, petitioners rely upon the circumstance that at one point the opinion in *Legislature v. Eu, supra*, 54 Cal.3d 492, 509, states that "[a]s indicated in *Raven*, a qualitative revision *includes* one that involves a change in the basic plan of California government, i.e., a change in its fundamental structure or the foundational powers of its branches." (Italics added.) Petitioners suggest that this use of the word "includes"—instead of "is"—signifies that the decision contemplated that other types of changes could constitute a qualitative revision. (Justice Werdegar's concurring opinion (*post*, at p. 478) advances a similar argument.) Read as a whole, however, it is clear that *Legislature v. Eu* provides no support for this proposition, and instead expressly follows the holdings of past decisions in concluding that "to find such a revision, it must necessarily or inevitably appear from the face of the challenged provision that the measure *will substantially alter the basic governmental framework set forth in our Constitution.*" (54 Cal.3d at p. 510, italics added and omitted.)

Similarly, petitioners point to a passage in *Raven, supra*, 52 Cal.3d 336, 354, in which the court noted that Proposition 115's proposed modification of article I, section 24 "directly contradicts [a] well-established jurisprudential principle," as ostensibly supporting the conclusion that a proposed change to the California Constitution can amount to a constitutional revision whenever it contradicts a "well-established jurisprudential principle." In context, however, the passage in question does not support petitioners' reading. The sentence in *Raven* reads in full: "[The change in article I, section 24] directly contradicts the well-established jurisprudential principle that, 'The judiciary, from the very nature of its powers and means given it by the Constitution, must possess the right to construe the Constitution in the last resort . . . .' " Because the new section contradicted the very nature of the state judiciary's power, the court in *Raven* found that "[n]ew article I, section 24, more closely resembles *Amador's* hypothetical provision vesting all judicial power in the Legislature, a provision we deemed would achieve a constitutional revision. As noted, in practical effect, the new provision vests a critical portion of state judicial power in the United States Supreme Court, *certainly a fundamental change in our preexisting governmental plan.*" (52 Cal.3d at p. 355, italics added.) In the course of its analysis, *Raven* explicitly distinguished the challenged provisions of article I, section 24, from the discrete restrictions on state constitutional protections that had been found *not to constitute constitutional revisions in Frierson, supra*, 25 Cal.3d 142, and *Lance W., supra*, 37 Cal.3d 873, thus refuting petitioners' suggestion that under *Raven* any measure that makes a change in an "underlying constitutional principle" may constitute a revision.

[23] Notwithstanding its rhetorical flourishes, Justice Werdegar's concurring opinion cannot escape the circumstance that there is *no* judicial authority to support its proposed reading of our past decisions addressing the distinction between constitutional amendments and constitutional revisions. As we have explained, the standard for determining whether an alteration of the California Constitution amounts to a constitutional revision within the meaning of article XVIII has been repeated and applied in *all* of the numerous recent California decisions addressing the amendment/revision issue; and a leading state constitutional treatise confirms, in

Furthermore, even if, as petitioners urge, our past decisions were to be interpreted as not precluding the possibility that a constitutional change other than a change in the governmental plan or framework could, under some circumstances, constitute a constitutional revision rather than a constitutional amendment, petitioners' contention that Proposition 8 represents a constitutional revision still would lack merit. As is revealed by the foregoing history of the amendment/revision distinction, and as our past cases demonstrate in applying that distinction, a change in the California Constitution properly is viewed as a constitutional revision only if it embodies a change of such *far-reaching scope* that is fairly comparable to the example set forth in the *Amador* decision, namely, a change that "vest[s] all judicial power in the Legislature." (*Amador, supra,* 22 Cal.3d at p. 223.) It is only a qualitative change *of that kind of far-reaching scope* that the framers of the 1849 and 1879 Constitutions plausibly intended to be proposed *only* by *a new constitutional convention,* and *not* through the ordinary amendment process. As we shall explain, the constitutional change embodied in Proposition 8—although without question of great importance to the affected individuals—by no means makes such a far-reaching change in the California Constitution as to amount to a constitutional revision.

 To begin with, although petitioners describe Proposition 8 as "eliminating" or "stripping" same-sex couples of a fundamental constitutional right, as we have explained above that description drastically overstates the effect of Proposition 8 on the fundamental state constitutional rights of same-sex couples. As demonstrated, Proposition 8 does *not* eliminate the substantial substantive protections afforded to same-sex couples by the state constitutional rights of privacy and due process as interpreted in the majority opinion in the *Marriage Cases, supra,* 43 Cal.4th 757. Rather, same-sex couples continue to enjoy the same substantive core benefits afforded by those state constitutional rights as those enjoyed by opposite-sex couples—including the constitutional right to enter into an officially recognized and protected family relationship with the person of one's choice and to raise children in that family if the couple so chooses—with the sole, albeit significant, exception that the designation of "marriage" is, by virtue of the new state constitutional provision, now reserved for opposite-sex couples. Similarly, Proposition 8 does not by any means "repeal" or "strip" gay individuals or same-sex couples of the very significant substantive protections afforded by the state equal protection clause either with regard to the fundamental rights of privacy and due process *or in any other area,* again with the *sole* exception of access

discussing the meaning of the term "revision" as analyzed in our past decisions, "[t]he test is whether it appears 'necessarily or inevitably . . . from the face of the challenged provision that the measure will substantially alter the basic governmental framework set forth in our Constitution' . . . ." (Cal. Constitution Reference Guide, *supra,* p. 304 [quoting *Legislature v. Eu, supra,* 54 Cal.3d 492, 510].) Justice Werdegar's concurring opinion does not accurately describe the governing California case law in this area.

to the designation of "marriage" to describe their relationship. Thus, except with respect to the designation of "marriage," any measure that treats individuals or couples differently on the basis of their sexual orientation continues to be constitutionally "suspect" under the state equal protection clause and may be upheld only if the measure satisfies the very stringent strict-scrutiny standard of review that also applies to measures that discriminate on the basis of race, gender, or religion. Because Proposition 8 has only this limited effect on the fundamental rights of privacy and due process and the guarantee of equal protection of the laws under the state Constitution as interpreted by the majority opinion in the *Marriage Cases, supra,* 43 Cal.4th 757, there is no need for us to consider whether a measure that actually deprives a minority group of the *entire* protection of a fundamental constitutional right or, even more sweepingly, leaves such a group vulnerable to public or private discrimination in *all* areas without legal recourse (cf. *Romer v. Evans* (1996) 517 U.S. 620 [134 L.Ed.2d 855, 116 S.Ct. 1620]), would constitute a constitutional revision under the provisions of the California Constitution. A narrowly drawn exception to a generally applicable constitutional principle does not amount to a constitutional revision within the meaning of article XVIII of the California Constitution.

In explaining and relying upon the circumstance that Proposition 8 exclusively affects access to the designation of "marriage" and leaves intact all of the other very significant constitutional protections afforded same-sex couples under the majority opinion in the *Marriage Cases, supra,* 43 Cal.4th 757, we emphasize that we are not in any way suggesting that the change embodied in Proposition 8 is unimportant or insignificant. In considering the amendment/revision distinction embodied in the California Constitution, however, it is crucial to understand that the *amendment* process *never* has been reserved only for minor or unimportant changes to the state Constitution. In this regard, it is useful to keep in mind that (1) the right of women to vote in California, (2) the initiative, referendum, and recall powers, (3) the reinstatement of the death penalty, (4) an explicit right of privacy, (5) a substantial modification of the statewide real property tax system, and (6) legislative term limits—to list only a very few examples—all became part of the California Constitution by *constitutional amendment, not by constitutional revision.*[24] Thus, it is clear that the distinction drawn by the California

---

[24] The right of women to vote in California was adopted by amendment at the November 10, 1911 election. (See Cal. Const., former art. II, § 1 [as amended in 1911].) The initiative, referendum, and recall powers also were adopted by amendments approved at that same 1911 election. (See Cal. Const., former art. IV, § 1 [as amended in 1911].) The death penalty was reinstated as a valid punishment under the California Constitution by an amendment adopted at the November 7, 1972 election. (See Cal. Const., art. I, § 27.) An explicit right of privacy also was added to the California Constitution by an amendment adopted at the 1972 general election. (Cal. Const., art. I, § 1.) The statewide system of real property taxation was modified

Constitution between an amendment and a revision does *not* turn on the relative *importance* of the measure but rather upon the measure's *scope*: as we have explained, only if a measure embodies a constitutional change that is *so far-reaching and extensive* that the framers of the 1849 and 1879 Constitutions would have intended that the type of change could be proposed only by a constitutional convention, and not by the normal amendment process, can the measure properly be characterized as a constitutional revision rather than as a constitutional amendment. In light of the discrete subject area affected by Proposition 8, and (as we have explained) the limited effect of the measure on that subject area, we conclude that Proposition 8 cannot plausibly be characterized as a constitutional revision.

Petitioners advance a number of additional arguments in support of their claim that Proposition 8 should be considered a constitutional revision, but none of these arguments withstands analysis. First, petitioners contend that Proposition 8 represents an "unprecedented" instance in which a majority of voters have altered the California Constitution so as to diminish the constitutional rights of a minority group; petitioners assert that because such alteration is contrary to the "countermajoritarian" purpose served by constitutional provisions, such a change has not and cannot be effected by a constitutional amendment. Contrary to petitioners' contention, however, the current Proposition 8 is by no means the first instance in which the California Constitution has been altered, by a constitutional *amendment* approved by a majority of voters, in a manner that lessens the state constitutional rights of a minority group that has been the subject of past discrimination.

Thus, for example, two prominent initiative measures, adopted by majority vote, added provisions to the California Constitution modifying the protections that the Constitution otherwise would afford to groups that historically have been the subject of prejudice and discrimination: Proposition 14 (a state constitutional amendment, adopted in 1964, that repealed a statutory provision barring racial discrimination in the sale or rental of housing) and Proposition 209 (a state constitutional amendment, adopted in 1996, that prohibits—in public employment, public education, and public contracting—certain types of affirmative action aimed at overcoming the continuing effects of past societal discrimination against racial minorities and women).[25] Although Proposition 14 subsequently was held invalid *under the federal Constitution (Mulkey v. Reitman* (1966) 64 Cal.2d 529 [50 Cal.Rptr. 881,

---

by the adoption of Proposition 13 as a constitutional amendment at the June 6, 1978 election. (Cal. Const., art. XIII A, §§ 1–4.) And legislative term limits were instituted by the adoption of Proposition 140 as a constitutional amendment at the November 6, 1990 election. (Cal. Const., art. IV, §§ 1.5, 2.)

[25] In *Hi-Voltage Wire Works, Inc. v. City of San Jose* (2000) 24 Cal.4th 537, 557–558 [101 Cal.Rptr.2d 653, 12 P.3d 1068], this court recognized that Proposition 209 changed the state constitutional standard reflected in our earlier decisions in *Price v. Civil Service Com.* (1980) 26 Cal.3d 257, 284–285 [161 Cal.Rptr. 475, 604 P.2d 1365], and *DeRonde v. Regents of University*

413 P.2d 825], affd. *sub nom. Reitman v. Mulkey* (1967) 387 U.S. 369 [18 L.Ed.2d 830, 87 S.Ct. 1627]), neither that measure nor Proposition 209 was found to constitute an impermissible constitutional revision *under the state Constitution.* Indeed, although vigorous legal challenges were waged against each of these measures (see *Mulkey, supra,* 64 Cal.2d at pp. 535–543 [Prop. 14]; *Coalition for Economic Equity v. Wilson* (9th Cir. 1997) 122 F.3d 692 [rejecting federal equal protection challenge to Prop. 209], revg. (N.D.Cal. 1996) 946 F.Supp. 1480), the circumstance that in neither case did the challengers *even argue* that the measure at issue should be characterized as a constitutional revision rather than as a constitutional amendment affords a realistic indication of the weakness and unprecedented nature of petitioners' present claim.[26]

Similarly, there also have been a number of instances in which a constitutional *amendment* (rather than a constitutional *revision*) diminishing the state constitutional rights of a minority group has been proposed by the Legislature and ratified by a majority vote of the electorate. One such example is the 1979 constitutional amendment that added a proviso to the state equal protection clause in response to a decision of this court authorizing California courts to impose the busing of students as a remedy for de facto school segregation. (See *Crawford v. Board of Education* (1976) 17 Cal.3d 280, 310 [130 Cal.Rptr. 724, 551 P.2d 28].) This amendment, which carves out an exception to the state equal protection clause and remains part of article I, section 7, subdivision (a) of the California Constitution, states in part that "nothing contained herein or elsewhere in this Constitution imposes upon the State of California or any public entity, board, or official any obligations or responsibilities which exceed those imposed by the Equal Protection Clause of the 14th Amendment to the United States Constitution with respect to the use of pupil school assignment or pupil transportation." Although a vigorous constitutional challenge under *the federal Constitution* was leveled against this amendment, no claim was raised that the measure was mislabeled as a

---

*of California* (1981) 28 Cal.3d 875, 890 [172 Cal.Rptr. 677, 625 P.2d 220], which had upheld the validity of the type of affirmative-action programs that the new constitutional provision now bars.

[26] Although at one point the court in *Mulkey v. Reitman* stated that "we do not find it necessary to discuss claims of the unconstitutionality of [Proposition 14] based on California constitutional provisions and law" (*Mulkey v. Reitman, supra,* 64 Cal.2d at p. 533), our review of the briefs filed in this court reveals that no state constitutional challenge to Proposition 14 was raised in that case.

In petitions for rehearing, petitioners point out that the amendment/revision issue was among the numerous issues raised in the briefs filed in another case involving Proposition 14 that was decided one month after *Mulkey v. Reitman* (*Hill v. Miller* (1966) 64 Cal.2d 757 [51 Cal.Rptr. 689, 415 P.2d 33]), but in *Hill* this court affirmed the trial court's rejection of the plaintiff's lawsuit without addressing that issue (*id.,* at pp. 759–760), and petitioners acknowledge that the amendment/revision issue was not raised by any party in *Mulkey,* the lead case challenging Proposition 14.

constitutional amendment but actually constituted a constitutional revision under California law. (See *Crawford v. Board of Education* (1980) 113 Cal.App.3d 633, 650–657 & fn. 5 [170 Cal.Rptr. 495], affd. 458 U.S. 527 [73 L.Ed.2d 948, 102 S.Ct. 3211] [discussing single-subject and other state law objections to the measure, as well as a federal constitutional claim]; *Tinsley v. Superior Court* (1983) 150 Cal.App.3d 90, 105–109 [197 Cal.Rptr. 643] [discussing single-subject and other state law objections to the measure].)

An additional, quite dramatic example of a constitutional amendment, proposed by the Legislature and adopted by a majority of voters, which diminished the state constitutional rights of a disfavored minority group, is the 1894 amendment to the California Constitution that entirely *withdrew the right to vote* from all persons not literate *in the English language*. (Cal. Const., former art. II, § 1 [as amended at Nov. 6, 1894 election].) This provision of the California Constitution remained in effect until 1970, when this court struck it down as a violation of the *federal* Constitution. (See *Castro v. State of California* (1970) 2 Cal.3d 223, 232–243 [85 Cal.Rptr. 20, 466 P.2d 244]; *id.* at pp. 230–232 [discussing history of the 1894 amendment and concluding that "[i]t is obvious that fear and hatred played a significant role in the passage of the literacy requirement"].) As with the challenges to each of the other constitutional amendments that have diminished state constitutional rights of minority groups since the time the 1894 measure was adopted, no claim was made that the addition of the voter literacy require-ment represented a constitutional *revision*. This is so despite the circumstance that the amendment was put before the voters in 1894, the very same year as this court's decision in *Livermore, supra*, 102 Cal. 113, in which the court for the first time discussed the distinction drawn under the 1879 Constitution between constitutional amendments and constitutional revisions and empha-sized that the Legislature was not authorized to propose a constitutional revision. The successful challenge to the English-language literacy provision that was brought almost 75 years after its adoption included no claim or suggestion that its adoption had been fundamentally flawed from the outset because the measure was proposed and adopted as a constitutional amend-ment rather than as a constitutional revision.

In addition to the foregoing examples of past state constitutional amend-ments that diminished state constitutional rights of racial and ethnic minorities and women (refuting petitioners' description of Prop. 8 as "unprecedented" in this regard), there are numerous constitutional amendments—the subjects of decisions previously discussed in this opinion—that diminished many state constitutional rights of criminal defendants, further belying petitioners' asser-tion that Proposition 8 represents a unique instance in which a majority of California voters, by the approval of a constitutional amendment, have modi-fied state constitutional provisions intended to serve a countermajoritarian function. As past California cases have recognized, the numerous constitutional

guarantees afforded to defendants in criminal proceedings by all of the provisions included in our state constitutional Declaration of Rights are intended to shield such individuals from overreaching actions by the state (through statutory enactments or executive conduct) that at times may be approved by a current majority of the populace. (See, e.g., *Anderson, supra*, 6 Cal.3d 628, 634–640 [setting forth the history of the state constitutional prohibition on the infliction of cruel *or* unusual punishment and concluding that this clause, "like other provisions of the Declaration of Rights, operates to restrain legislative and executive action and *to protect fundamental individual and minority rights against encroachment by the majority*" (*id.* at p. 640, italics added)].)

Under the California Constitution, the constitutional guarantees afforded to individuals accused of criminal conduct are no less well established or fundamental than the constitutional rights of privacy and due process or the guarantee of equal protection of the laws. (See, e.g., *Miller v. Superior Court* (1999) 21 Cal.4th 883, 892 [89 Cal.Rptr.2d 834, 986 P.2d 170] [distinct provisions of the Cal. Const. "have equal dignity as constituents of the state Constitution"].) As we have seen, in past years a majority of voters has adopted several state constitutional amendments—for example, the measure reinstating the death penalty, and the multitude of constitutional changes contained in the 1982 Proposition 8 and in Proposition 115—that have diminished state constitutional rights of criminal defendants, as those rights had been interpreted in prior decisions of this court. Although a principal purpose of *all* constitutional provisions establishing individual rights is to serve as a countermajoritarian check on potential actions that may be taken by the legislative or executive branches (see, e.g., Bickel, The Least Dangerous Branch (2d ed. 1986) pp. 16–23; Choper, Judicial Review and the National Political Process (1980) pp. 60–128), our prior decisions—reviewed at length above—establish that the scope and substance of an existing state constitutional individual right, as interpreted by this court, may be modified and diminished *by a change in the state Constitution itself*, effectuated through a constitutional *amendment* approved by a majority of the electors acting pursuant to the initiative power.

As is demonstrated by the foregoing discussion, and contrary to petitioners' claim that a determination that Proposition 8 constitutes a constitutional amendment would represent a dramatic change in existing state constitutional principles, it is petitioners' proposal that radically would alter the long and firmly established understanding of the amendment/revision distinction embodied in the California Constitution. In basing their argument entirely on the circumstance that Proposition 8 has the effect of diminishing one aspect of a fundamental right of a group that this court has determined properly should be considered a "suspect class" for purposes of the state constitutional equal protection clause, petitioners in essence ask this court to read into *the*

*amendment/revision distinction* embodied in the California Constitution a number of the distinctive elements of *the state constitutional equal protection jurisprudence* that have been developed and applied by this court in recent years. As we have seen, however, neither the history of the amendment/revision distinction in the California Constitution since its inception in 1849, nor the numerous cases that have applied that distinction, provide support or justification for such a radical transformation of the meaning and scope of the amendment/revision dichotomy.

That petitioners' proposal would mark a sharp departure from this court's past understanding of the amendment/revision dichotomy is further demonstrated by the circumstance that under petitioners' approach, the people would have the ability—through the initiative process—*to extend* a constitutional right to a disfavored group that had not previously enjoyed that right, but the people would lack the power *to undo or repeal* that very same extension of rights through their exercise of the identical initiative process. Thus, for example, had this court rejected the constitutional challenges to the existing marriage statutes in its decision in the *Marriage Cases, supra,* 43 Cal.4th 757, and had the people responded by adopting an initiative measure amending the privacy, due process, and equal protection provisions of the state Constitution to guarantee same-sex couples equal access to the designation of marriage, *that* measure would be viewed as *a constitutional amendment* that properly could be adopted through the initiative process. But if an initiative measure thereafter was proposed to repeal those recently adopted changes to the state Constitution, *that* measure, under petitioners' approach, would be designated *a constitutional revision,* and the people would be powerless to adopt *that* change through the initiative process. Again, neither the history of the provisions governing the making of changes to the California Constitution, nor the many past cases interpreting and applying those provisions, support petitioners' assertion that the amendment/revision distinction properly should be understood as establishing such a "one-way street" or as mandating such a seemingly anomalous result.

In a somewhat related vein, petitioners additionally maintain that Proposition 8 cannot be viewed as a constitutional amendment rather than as a revision because, should this court so hold, there would be nothing to prevent a majority of California voters from adopting future measures designed to carve out still more exceptions to other fundamental rights, leading to a situation in which the state constitutional rights of any and all disfavored minority groups could be entirely obliterated. The "slippery slope" mode of analysis reflected in this argument, however, finds no support in any of the numerous prior California decisions that have considered the question whether other proposed constitutional changes constituted a constitutional amendment or a constitutional revision.

For example, in *Frierson, supra,* 25 Cal.3d 142, our court was faced with the question whether an initiative measure that added a constitutional provision permitting the imposition of the death penalty in California, notwithstanding a recent decision of this court holding that capital punishment violated the state constitutional prohibition on cruel or unusual punishment, constituted a constitutional amendment or a constitutional revision. In addressing that question, we did not approach the issue by considering whether, if that initiative were to be upheld as a permissible amendment, other measures conceivably could be adopted in the future excluding torture or drawing and quartering from the reach of the state cruel or unusual punishment clause, or, indeed, whether other amendments thereafter could be approved that gradually reduced and eliminated *all* of the other fundamental rights encompassed in article I of the California Constitution. Instead, we examined only the actual constitutional provision that was before us in that case to determine whether *that* measure constituted an amendment or a revision to the Constitution.

Similarly, as we have explained, in *Amador, supra,* 22 Cal.3d 208, *Brosnahan, supra,* 32 Cal.3d 236, and *Legislature v. Eu, supra,* 54 Cal.3d 492, we rejected challenges to the measures at issue in those cases that were based on speculation regarding potential future consequences, emphasizing in *Legislature v. Eu* that "[o]ur prior decisions have made it clear that to find such a revision, it must necessarily or inevitably appear from the face of the challenged provision that the measure will substantially alter the basic governmental framework set forth in our Constitution." (54 Cal.3d at p. 510, original italics.) Indeed, all of our cases in this area have followed the approach set forth more than 60 years ago in our decision in *McFadden, supra,* 32 Cal.2d 330, 348: "*Each situation* involving the question of amendment, as contrasted with revision, of the Constitution *must . . . be resolved upon its own facts.*" (Italics added.)

Speculation regarding a potential "parade of horrible amendments" that might be adopted in the future rests upon the dubious factual premise of a highly unrealistic scenario of future events. Resort to such a speculative approach plausibly could provide a basis for a court to conclude that virtually *any* future proposed constitutional change constitutes a constitutional revision because the change proposed could be followed by a series of comparable changes in other areas that fundamentally would alter the constitutional landscape. As we have explained, the past decisions of this court are irreconcilable with the mode of analysis suggested by petitioners. (See also *Raven, supra,* 52 Cal.3d 336, 355 [contrasting a proposed change to art. I, § 24, involving a "wide spectrum" of state constitutional rights, with the "isolated provisions" at issue in *Frierson, supra,* 25 Cal.3d 142, and *Lance W., supra,* 37 Cal.3d 873].)

■ In advancing the claim that Proposition 8 should be characterized as a constitutional revision rather than as a constitutional amendment, petitioners also rely heavily upon the circumstance that the measure was proposed directly by the people through the initiative process rather than by the Legislature, implying that under the state Constitution a measure proposed by initiative is more "constitutionally suspect" than would be a comparable measure proposed by the Legislature. Past California cases, however, provide no support for the suggestion that the people's right to propose amendments to the state Constitution through the initiative process is more limited than the Legislature's ability to propose such amendments through the legislative process. To the contrary, the governing California case law uniformly emphasizes that " 'it is our solemn duty jealously to guard the sovereign people's initiative power, "it being one of the most precious rights of our democratic process" ' " and that " '*we are required to resolve any reasonable doubts in favor of the exercise of this precious right.*' " (*Raven, supra,* 52 Cal.3d 336, 341; see, e.g., *Perry v. Jordan* (1949) 34 Cal.2d 87, 90–91 [207 P.2d 47] ["The measure presented is an initiative constitutional amendment. 'The right of initiative is precious to the people and is one which the courts are zealous to preserve to the fullest tenable measure of spirit as well as letter' "].)

■ The provisions of the California Constitution draw no distinction between the types of constitutional amendments that may be proposed through the initiative process as compared to those that may be proposed by the Legislature, and our past cases indicate that no such distinction exists. (See *McFadden, supra,* 32 Cal.2d 330, 333–334.)

■ In the course of their argument, petitioners also rely upon a portion of the passage in the 1894 decision in *Livermore, supra,* 102 Cal. 113, quoted above (*ante,* at p. 419), in which the court stated that "[t]he very term 'constitution' implies an instrument of a permanent and abiding nature" and "the significance of the term 'amendment' implies such an addition or change within the lines of the original instrument as will effect an improvement, or better carry out the purpose for which it was framed." (102 Cal. at pp. 118–119.) Petitioners maintain that under this standard, Proposition 8 cannot properly be considered an amendment, because it does not "improve" or "better carry out the purpose" of the preexisting constitutional provisions. As suggested by our earlier discussion of the *Livermore* decision, the passage in question was dictum inasmuch as it was not necessary to the court's determination that the measure at issue in that case—changing the location of the state capital—constituted a constitutional amendment. (*Ante,* at p. 420.) Moreover, as demonstrated by the many California decisions rendered since *Livermore,* the question whether a proposed constitutional change constitutes a constitutional amendment or instead a constitutional revision does not turn upon whether *a court* is of the view that the proposal "will effect an improvement" or will "better carry out the purpose" of the preexisting constitutional provisions; the numerous constitutional amendments that have

altered prior constitutional rulings of this court demonstrate that *the people* may amend the Constitution through the initiative process when *they* conclude that a judicial interpretation or application of a preexisting constitutional provision should be changed. Finally, when the *entire* pertinent passage of the *Livermore* decision is considered, it appears reasonable to conclude that the court in *Livermore* itself would have recognized that a measure such as Proposition 8 constitutes a constitutional amendment, because in describing the type of measures that would constitute an amendment, the court in that case noted that "some popular wave of sociological reform, like the abolition of the death penalty for crime, or a prohibition against the manufacture or sale of intoxicating liquors, may induce a legislature to submit for enactment, in the permanent form of a constitutional prohibition, a rule which it has the power itself to enact as a law, but which [as such] might be of only temporary effect." (102 Cal. at p. 119.) In adding to the California Constitution a provision declaring that marriage shall refer only to a union between a man and a woman, Proposition 8 would appear to constitute just the type of discrete "popular" and "sociological" amendment that the *Livermore* decision had in mind.[27]

Although we reject petitioners' contention that the enactment of Proposition 8 was improper because that measure was adopted through the initiative process (as a constitutional amendment rather than as a constitutional revision), in order to dispel any misunderstanding or confusion we wish to make it clear that we are not suggesting it is impossible or improper for a constitution to contain limitations on change designed to address the concerns voiced by petitioners in this case. Like the federal Constitution, many state constitutions do not provide for the people's exercise of the initiative power at all, and in those states, of course, no such constitutional change can be proposed directly by the people.[28] Further, some state constitutions that embrace the initiative power do not permit it to be used to

---

[27] Although Justice Moreno's concurring and dissenting opinion suggests that the quoted passage indicates that the court in *Livermore* would have considered a popular, sociological measure to be a permissible constitutional amendment only if the measure were one the Legislature had authority to enact as a statute (see conc. & dis. opn. of Moreno, J., *post*, at p. 488, fn. 3), it is at least as reasonable to infer that the court in *Livermore* would have included in the category of appropriate constitutional amendments a popular, sociological measure—such as a measure reinstating the death penalty, or enacting Proposition 8—that, in light of a recent judicial decision, could not be adopted by the Legislature as a statutory enactment and thus, if favored by the requisite number of legislators, logically would need to be submitted to the voters as a constitutional amendment.

[28] There are 26 states that do not have a statewide initiative process: Alabama, Connecticut, Delaware, Georgia, Hawaii, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maryland, Minnesota, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Pennsylvania, Rhode Island, South Carolina, Tennessee, Texas, Vermont, Virginia, West Virginia, and Wisconsin. (See Council of State Governments, The Book of the States, *supra*, p. 336.)

propose and adopt constitutional amendments, limiting its use to the proposal and adoption of statutory enactments;[29] in those states, too, no such constitutional change can be proposed directly by the people. And of the 17 other state constitutions (in addition to California's) that permit constitutional amendments to be proposed through the initiative process,[30] two expressly prohibit resort to the initiative process to modify designated provisions of the constitution, including many or all of the rights set forth in the state constitution's bill of rights. (See Mass. Const., amend. art. XLVIII, pt. II, § 2; Miss. Const., art. 15, § 273, subd. (5).)[31] Thus, we have no doubt that an

---

[29] Six states authorize statutory but not constitutional initiatives: Alaska (Alaska Const., art. XI, §§ 1, 7), Idaho (Idaho Const., art. III, § 1), Maine (Me. Const., art. IV, pt. 3d, § 18 [indirect initiative only]), Utah (Utah Const., art. VI, § 1(2)(a)(i)), Washington (Wn. Const., art. II, § 1), and Wyoming (Wyo. Const., art. 3, § 52(a)).

[30] These states are: Arizona (Ariz. Const., art. 4, pt. 1, § 1(2)), Arkansas (Ark. Const., art. 5, § 1), Colorado (Colo. Const., art. V, § 1(1)), Florida (Fla. Const., art. XI, § 3), Illinois (Ill. Const., art. XIV, § 3), Massachusetts (Mass. Const., amend. art. XLVIII, pt. II, § 2), Michigan (Mich. Const., art. XII, § 2), Mississippi (Miss. Const., art. 15, § 273), Missouri (Mo. Const., art. III, § 49), Montana (Mont. Const., art. XIV, § 9), Nebraska (Neb. Const., art. III, §§ 1, 2), Nevada (Nev. Const., art. 19, § 2), North Dakota (N.D. Const., art. III, §§ 1, 9), Ohio (Ohio Const., art. II, §§ 1, 1a), Oklahoma (Okla. Const., art. 5, §§ 1, 2), Oregon (Or. Const., art. IV, §§ 1, 2), and South Dakota (S.D. Const., art. XXIII, § 1).

Although each of the foregoing 17 states permits its constitution to be amended through the initiative process, the states differ (1) in the number, percentage, and geographical distribution of electors who must sign an initiative petition to qualify a measure for the ballot, (2) in the additional hurdles (if any) that must be met in order to place the measure on the ballot (such as obtaining a specified percentage of affirmative legislative support in successive legislative sessions (see, *post*, at p. 462, fn. 40)), and (3) in the percentage of affirmative votes that must be obtained and the number of successive elections that must be held before the proposed amendment will become part of the state constitution. (See Council of State Governments, The Book of the States, *supra*, p. 14.)

[31] Amendment article XLVIII, part II, section 2 of the Massachusetts Constitution excludes numerous matters from the initiative process. As pertinent to the present case, the section provides: "No measure that relates to religion, religious practices or religious institutions; . . . or to the reversal of a judicial decision . . . shall be proposed by an initiative petition . . . . [¶] . . . [¶] No proposition inconsistent with any one of the following rights of the individual, as at present declared in the declaration of rights, shall be the subject of an initiative or referendum petition: The right to receive compensation for private property appropriated to public use; the right of access to and protection in courts of justice; the right of trial by jury; protection from unreasonable search, unreasonable bail and the law martial; freedom of the press; freedom of speech; freedom of elections; and the right of peaceable assembly."

Article 15, section 273, subdivision (5) of the Mississippi Constitution provides in full: "The initiative process shall not be used: [¶] (a) For the proposal, modification, or repeal of any portion of the Bill of Rights of this Constitution; [¶] (b) To amend or repeal any law or any provision of the Constitution relating to the Mississippi Public Employees' Retirement System; [¶] (c) To amend or repeal the constitutional guarantee that the right of any person to work shall not be denied or abridged on account of membership or nonmembership in any labor union or organization; or [¶] (d) To modify the initiative process for proposing amendments to this Constitution."

Under the Illinois Constitution, only the legislative article (art. IV) may be amended by the initiative process. (Ill. Const., art. XIV, § 3.)

express restriction could be fashioned that would limit the use of the initiative power in the manner proposed by petitioners[32]—but the California Constitution presently contains no limits of this nature.

As we have seen, when the initiative power was added to the California Constitution in 1911, the relevant provision specified that the initiative afforded the people authority to propose and adopt statutes and "amendments to the constitution." (Cal. Const., former art. IV, § 1, as adopted Oct. 10, 1911, now art. II, § 8, subd. (a), and art. XVIII, § 3.) The provision placed no subject matter limitation on the initiative process and did not exempt any provision of the existing Constitution from amendment through the initiative process. During the nearly 100 years since adoption of the statewide initiative process in California, a number of constitutional amendments have been adopted that impose some restrictions on the initiative process in this state (see Cal. Const., art. II, § 8, subds. (d), (e), (f)),[33] but no provision purports to place any section or segment of the state Constitution off-limits to the initiative process or to preclude the use of the initiative with respect to specified subjects.

It is not our role to pass judgment on the wisdom or relative merit of the current provisions of the California Constitution governing the means by which our state Constitution may be altered. (See *Wright v. Jordan* (1923) 192 Cal. 704, 711–712 [221 P. 915].) In the absence of an explicit subject matter limitation on the use of the initiative to propose and adopt constitutional

---

[32] With regard to the matter of explicit subject matter limitations on the constitutional amending process, we note that article V (the amendment provision) of the United States Constitution—which does not authorize a constitutional amendment to be proposed by initiative—contains two explicit subject matter limitations. The first prohibited any change to be made, prior to the year 1808, to the provisions of the federal Constitution relating to the slave trade and to direct taxes. The second—which is still operative—prohibits any amendment that deprives a state, without its consent, "of its equal suffrage in the Senate." (U.S. Const., art. V.) There are no other explicit limitations to proposed changes to the United States Constitution.

[33] The cited subdivisions of article II, section 8 provide in full:

"(d) An initiative measure embracing more than one subject may not be submitted to the electors or have any effect.

"(e) An initiative measure may not include or exclude any political subdivision of the State from the application or effect of its provisions based upon approval or disapproval of the initiative measure, or based upon the casting of a specified percentage of votes in favor of the measure, by the electors of that political subdivision.

"(f) An initiative measure may not contain alternative or cumulative provisions wherein one or more of those provisions would become law depending upon the casting of a specified percentage of votes for or against the measure."

In addition to these explicit limitations on the *initiative* power, article II, section 12, of the California Constitution precludes the adoption of *any* constitutional amendment—whether proposed by initiative or by the Legislature—"that names any individual to hold any office, or names or identifies any private corporation to perform any function or to have any power or duty . . . ."

amendments, and in light of the history of the relevant California constitutional provisions regarding the amendment/revision distinction and the numerous California precedents interpreting and applying that distinction, we conclude the existing provisions of the California Constitution governing amendment and revision cannot properly be interpreted in the manner advocated by petitioners.

Accordingly, we hold that Proposition 8 constitutes a constitutional amendment rather than a constitutional revision.

## K

In reaching the conclusion that Proposition 8 represents a constitutional amendment rather than a constitutional revision, we have relied upon the history of the relevant provisions of the California Constitution and upon the numerous California decisions that have applied those provisions. Our Constitution, however, is not the only state constitution that draws a distinction between constitutional amendments and constitutional revisions. As we shall see, each out-of-state decision that has considered whether an initiative measure similar to Proposition 8—that is, an initiative limiting marriage to a union of a man and a woman—represents a constitutional amendment, or instead a constitutional revision under a state constitution that embodies a comparable constitutional amendment/revision distinction, has concluded that the measure constitutes an amendment to, rather than a revision of, the applicable state constitution.[34]

---

[34] The constitutions of 28 states, in addition to California, have been amended over the past decade to include provisions defining marriage as the union of a man and a woman. (Ala. Const., art. I, § 36.03; Alaska Const., art. I, § 25; Ariz. Const., art. 30, § 1; Ark. Const., amend. 83; Colo. Const., art. II, § 31; Fla. Const., art. I, § 27; Ga. Const., art. I, § IV, par. I; Idaho Const., art. III, § 28; Kan. Const., art. 15, § 16; Ky. Const., § 233A; La. Const., art. XII, § 15; Mich. Const., art. I, § 25; Miss. Const., art. 14, § 263A; Mo. Const., art. I, § 33; Mont. Const., art. XIII, § 7; Neb. Const., art. I, § 29; Nev. Const., art. 1, § 21; N.D. Const., art. XI, § 28; Ohio Const., art. XV, § 11; Okla. Const., art. 2, § 35; Or. Const., art. XV, § 5a; S.C. Const., art. XVII, § 15; S.D. Const., art. XXI, § 9; Tenn. Const., art. XI, § 18; Tex. Const., art. I, § 32; Utah Const., art. I, § 29; Va. Const., art. I, § 15A; Wis. Const., art. XIII, § 13.)

The constitutions of at least 17 of these 28 states distinguish between constitutional amendments and constitutional revisions in a manner similar to the California Constitution. (Ala. Const., art. XVIII, §§ 284, 286; Alaska Const., art. XIII, §§ 1, 4; Ariz. Const., art. 21, §§ 1, 2; Colo. Const., art. XIX, §§ 1, 2; Idaho Const., art. XX, §§ 1, 3; Ky. Const., §§ 256, 258; La. Const., art. XIII, §§ 1, 2; Mich. Const., art. XII, §§ 1–3; Mont. Const., art. XIV, §§ 1–9; Neb. Const., art. XVI, §§ 1, 2; Nev. Const., art. 16, §§ 1, 2; Ohio Const., art. XVI, §§ 1, 2; Okla. Const., art. 24, §§ 1, 2; Or. Const., art. XVII, §§ 1, 2; S.C. Const., art. XVI, §§ 1, 3; S.D. Const., art. XXIII, §§ 1, 2; Utah Const., art. XXIII, §§ 1, 2.) In only two of these states—Alaska and Oregon—have the new marriage provisions been challenged as constitutional revisions. We discuss the judicial decisions in those two states below.

The decision of the Alaska Supreme Court in *Bess v. Ulmer* (Alaska 1999) 985 P.2d 979 is a case in point. In that case, the plaintiffs challenged three separate ballot propositions that proposed to add distinct provisions to the Alaska Constitution, on the ground that each measure constituted a constitutional revision rather than a constitutional amendment.[35] The first ballot proposition at issue was a criminal justice measure similar in nature to the proposed amendment to article I, section 24 of the California Constitution that our court found to be an impermissible revision in *Raven, supra,* 52 Cal.3d 336.[36] The second ballot proposition was a measure—quite similar to Proposition 8—that proposed to add a new section to article I of the Alaska Constitution that read in full: "Marriage. To be valid or recognized in this State, a marriage may exist only between one man and one woman. No provision of this constitution may be interpreted to require the State to recognize or permit marriage between individuals of the same sex." The third ballot proposition proposed to alter the reapportionment scheme set forth in the Alaska Constitution by transferring the reapportionment power from the executive branch to a neutral body composed of members appointed by each of the three branches of government.[37]

In analyzing the distinction drawn in the Alaska Constitution between constitutional amendments and constitutional revisions, the court in *Bess v. Ulmer, supra,* 985 P.2d 979, drew very heavily upon the line of California amendment/revision decisions that we have reviewed above, and ultimately generally agreed with the standard set forth in those decisions. (See 985 P.2d at pp. 984–987.) The court then applied that standard to the three ballot propositions before it in that case. With regard to the first ballot measure, the criminal justice proposal, the court observed that "[t]his proposal bears an obvious similarity to the initiative measure at issue in *Raven*" (*id.* at p. 987) and concluded that "[l]ike the *Raven* court, we find the proposal to 'amount to a constitutional revision beyond the scope of the [ballot] process . . . .' " (*Ibid.*) With regard to the second ballot measure—the one providing in part

---

[35] Under the Alaska Constitution, amendments to that constitution may be proposed by a two-thirds vote of each legislative house and take effect if approved by a majority of the voters. A constitutional revision, by contrast, may be proposed only by a constitutional convention. (See Alaska Const., art. XIII, §§ 1, 4.)

[36] The first ballot proposition provided: " 'Rights of Prisoners. Notwithstanding any other provision of this constitution, the rights and protections, and the extent of those rights and protections, afforded by this constitution to prisoners convicted of crimes shall be limited to those rights and protections, and the extent of those rights and protections, afforded under the Constitution of the United States to prisoners convicted of crimes.' " (*Bess v. Ulmer, supra,* 985 P.2d at p. 987.)

[37] As described by the Alaska court, the third measure proposed to transfer the power to draw legislative districts "from the governor, with the advice of a reapportionment board of his own appointment, to a five-member Redistricting Board, two members of which are appointed by the governor and one each by the House Speaker, the Senate President, and the Chief Justice of the Supreme Court." (*Bess v. Ulmer, supra,* 985 P.2d at p. 988, fn. 60.)

that "[t]o be valid or recognized in this State, a marriage may exist only between one man and one woman"—the court in *Bess v. Ulmer* held that "this proposed ballot measure is sufficiently limited in both quantity and effect of change as to be a proper subject for a constitutional amendment. Few sections of the Constitution are directly affected, and nothing in the proposal will 'necessarily or inevitably alter the basic governmental framework' of the Constitution." (*Id.* at p. 988, fn. omitted.) With regard to the third ballot measure, involving the reapportionment power, the court found that although "[r]eassigning this power is unquestionably a significant change in the present system of Alaskan government," it "does not . . . deprive the executive branch of a 'foundational power,' and as a result does not constitute a revision. . . . [¶] This proposal, unlike [the first ballot measure considered in that case], does not 'fundamentally change[] and subordinate[] the constitutional role' of any branch in the governmental process. Therefore, although the proposed change is substantial, it is not so 'far reaching and multifarious' as to comprise a revision." (*Id.* at pp. 988–989, fns. omitted.)

As the foregoing description reveals, in *Bess v. Ulmer, supra,* 985 P.2d 979, the court—faced with essentially the same question that is before us in the present case—concluded that the Alaska measure constituted a constitutional amendment.

The Oregon Court of Appeals reached a similar conclusion in *Martinez v. Kulongoski* (2008) 220 Ore.App. 142 [185 P.3d 498]. In that case, the plaintiffs sought a declaration that a 2004 ballot measure (Measure 36) adding a new section (art. XV, § 5a) to the Oregon Constitution "embodied a voter-initiated *revision* (as opposed to *amendment*) of the constitution in violation of [Oregon Constitution] Article XVII, section 2." (185 P.3d at p. 500.)[38] The new section of that state's constitution added by Measure 36 provides in full: "It is the policy of Oregon, and its political subdivisions, that only a marriage between one man and one woman shall be valid or legally recognized as a marriage." The plaintiffs in *Martinez,* like petitioners in the cases before us, argued that Measure 36 should be considered a revision "because '[t]he intended and inevitable effect of the measure is to exclude a distinct minority group of citizens from the equal benefits and obligations of [state] law . . . .' " (185 P.3d at p. 502.) The court in *Martinez* rejected that claim, concluding that Measure 36 constituted a constitutional amendment rather than a constitutional revision. In rendering its decision, the court in *Martinez* relied heavily upon an earlier Oregon appellate court ruling in *Lowe v. Keisling* (1994) 130 Ore.App. 1 [882 P.2d 91], which held that a

[38] Under the Oregon Constitution, a constitutional amendment may be proposed through the initiative process (Or. Const., art. IV, § 1(2)(b)), but a constitutional revision of all or part of the constitution may be submitted to the voters only upon referral by at least two-thirds of the members of each house of the legislature. (Or. Const., art. XVII, § 2(1).)

much broader initiative measure—one proposing to add a new section to the Oregon Constitution that, among other things, would have prohibited the state or local government from granting " 'marital status or spousal benefits on the basis of homosexuality' " (*Martinez, supra*, 185 P.3d at p. 504)—did not constitute a constitutional revision. (*Martinez, supra*, 185 P.3d at pp. 504–505.) In view of the similarity between Measure 36 and Proposition 8, the Oregon court's decision in *Martinez*, like the Alaska court's decision in *Bess v. Ulmer, supra*, 985 P.2d 979, plainly supports the conclusion we have reached above.

Although the Massachusetts Constitution does not contain a distinction between constitutional amendments and constitutional revisions similar to those embodied in the California, Alaska, and Oregon Constitutions, the relatively recent decision of the Supreme Judicial Court of Massachusetts in *Schulman v. Attorney General* (2006) 447 Mass. 189 [850 N.E.2d 505] (*Schulman*) nonetheless also bears some relevance to the issue before us. In *Schulman*, the Massachusetts high court addressed the validity of an initiative petition that had been drafted in response to that court's decision in *Goodridge v. Department of Public Health, supra*, 798 N.E.2d 941 (*Goodridge*), in which the court held that the Massachusetts marriage statute—which the court interpreted as restricting civil marriages to unions between persons of the opposite sex—violated the due process and equal protection guarantees of the Massachusetts Constitution. The initiative measure at issue in *Schulman* proposed to amend the Massachusetts Constitution to provide that " 'the Commonwealth and its political subdivisions shall define marriage only as the union of one man and one woman.' " (*Schulman, supra*, 850 N.E.2d at p. 506.) Under Massachusetts law, such an initiative petition first must be presented to the state Attorney General, who reviews the proposed measure to determine whether it is a lawful initiative measure or instead is excluded from the initiative process by the Massachusetts Constitution. In *Schulman*, after the Attorney General certified the petition as a permissible initiative measure, a court action was filed challenging the certification, and the issue was brought directly before the Massachusetts high court.

As already noted, unlike the California Constitution, the Massachusetts Constitution places specific substantive limits on the matters that may be proposed by an initiative petition. (See Mass. Const., amend. art. XLVIII, pt. II, § 2, quoted in part, *ante*, at p. 455, fn. 31.) In *Schulman*, the limited issue considered by the court was whether the initiative petition in question was precluded by the portion of amendment article XLVIII, part II, section 2 of the Massachusetts Constitution stating that "[n]o measure that relates to . . . the reversal of a judicial decision . . . shall be proposed by an initiative

petition . . . ." (*Schulman, supra*, 850 N.E.2d at p. 507.)[39] The plaintiff in that case argued that this constitutional provision precluded the use of the initiative process to add a constitutional provision that would "reverse" or "overrule" the Supreme Judicial Court's holding in *Goodridge, supra*, 798 N.E.2d 941, that limiting marriage to opposite-sex couples violated the provisions of the Massachusetts Constitution.

In *Schulman*, the Massachusetts high court unanimously rejected the plaintiff's contention, explaining that " 'reversal of a judicial decision' has a specialized meaning in our jurisprudence" (*Schulman, supra*, 850 N.E.2d at p. 507)—referring only to the vacating or setting aside of a judgment in a particular case—and that such language "does not bar the people from using the initiative process to amend the Constitution prospectively, thereby changing the substantive law to be applied and effectively 'overruling' the precedential effect of a prior court decision interpreting [the Constitution] . . . ." (*Id.* at pp. 508–509.) In reaching that conclusion, the court in *Schulman* quoted with approval an earlier Massachusetts decision that specifically declared: " '[T]he initiative process permits the people to petition for a constitutional amendment that overrules a court decision when the court has declared a statute to be in violation of our Constitution . . . .' " (*Id.* at p. 510, fn. 12, quoting *Albano v. Attorney General* (2002) 437 Mass. 156 [769 N.E.2d 1242, 1250]; see also *Mazzone v. Attorney General* (2000) 432 Mass. 515 [736 N.E.2d 358, 369] ["Citizens [may] . . . overrule a decision based on State constitutional grounds, but they [may] do so only by constitutional amendment."].)

As illustrated by the decision of the Massachusetts Supreme Judicial Court in *Schulman, supra*, 850 N.E.2d 505, even under a state constitution that places significant limits on the initiative process, the people, through the initiative process, validly may propose an amendment to the state constitution that prospectively changes the substantive constitutional rule set forth in a judicial decision analogous to the majority opinion in our *Marriage Cases, supra*, 43 Cal.4th 757. Thus, although the *Schulman* decision does not speak directly to the amendment/revision issue, the Massachusetts court's conclusion in that case demonstrates that, contrary to petitioners' assertions in the

---

[39] We note that the right not to be deprived of liberty without due process of law and the guarantee of equal protection of the laws—the state constitutional rights underlying the Massachusetts Supreme Judicial Court's decision in *Goodridge, supra*, 798 N.E.2d 941, 961—are not specifically included in the list of rights excluded from the initiative process under amendment article XLVIII, part II, section 2. (See, *ante*, at p. 455, fn. 31 [quoting relevant portion of the constitutional provision].)

present case, a measure such as Proposition 8 is not inconsistent with the commonly accepted scope of the initiative process.[40]

Finally, the very recent decision of the Iowa Supreme Court in *Varnum v. Brien, supra,* 763 N.W.2d 862, is also instructive in this regard. In that case, the Iowa Supreme Court held that the Iowa statute limiting marriage to a union between a man and a woman violated the equal protection clause of the Iowa Constitution. Nonetheless, in the course of its *unanimous* opinion, the Iowa high court took care to point out explicitly that "it should be recognized that the constitution belongs to the people, not the government or even the judicial branch of government. *See* Iowa Const. art. I, § 2 ('All political power is inherent in the people. Government is instituted for the protection, security, and benefit of the people, and they have the right, at all times, to alter or reform the same, whenever the public good may require it.').[41] While the constitution is the supreme law and cannot be altered by the enactment of an ordinary statute, *the power of the constitution flows from the people, and the people of Iowa retain the ultimate power to shape it over time. See Iowa Const. art. X ('Amendments to the Constitution')."* (763 N.W.2d at p. 876, italics added.) Thus, even as the Iowa high court emphatically declared in *Varnum v. Brien* that a statute limiting marriage to opposite-sex couples violated a fundamental principle embodied in the constitution of that state, the court at the same time acknowledged the ultimate power of the people to alter the content of the state constitution *through a constitutional amendment.*[42] Although Justice Moreno's concurring and dissenting opinion

---

[40] Under the Massachusetts Constitution, once the attorney general certifies that a petition contains only subjects not excluded from the initiative power, the petition may be circulated for signature. If the measure obtains the requisite number of signatures, it is submitted to the Massachusetts Legislature. If the measure receives the affirmative vote of at least one-quarter of the legislature, it is referred to the next legislative session. If at the next legislative session the measure again obtains the affirmative vote of one-quarter of the members of the legislature, it is submitted to a vote of the people at the next statewide election. (Mass. Const., amend. art. XLVIII, pts. II, III, IV.)

The initiative measure at issue in *Schulman, supra,* 850 N.E.2d 505, obtained the required number of signatures and received an affirmative vote from at least the requisite one-quarter of the state legislators when first presented to the legislature, but failed to obtain the required affirmative vote of the state legislators at the next legislative session. As a consequence, the measure never was submitted to the voters of Massachusetts. (See Belluck, *Massachusetts Gay Marriage to Remain Legal,* N.Y. Times (June 15, 2007) <http://www.nytimes.com/2007/06/15/us/15gay.html?_r=1&pagewanted=print> [as of May 26, 2009].)

[41] As we have seen (*ante,* at pp. 412–413), the California Constitution contains a nearly identical provision.

[42] The Iowa Constitution, like the California Constitution, distinguishes between constitutional amendments and constitutional revisions, providing that a constitutional revision may be proposed only by a constitutional convention. (See Iowa Const., art. X, §§ 1 [amendment], 3 [revision].) Notably, the court in *Varnum v. Brien* did not confine its reference only to the provision authorizing alteration of the Iowa Constitution by constitutional revision.

quotes a number of stirring passages from the Iowa court's decision in *Varnum v. Brien* (see conc. & dis. opn. of Moreno, J., *post*, at pp. 483, 498–499)—passages that mirror the views set forth in the majority opinion in the *Marriage Cases, supra*, 43 Cal.4th 757—his opinion labors to distinguish the above quoted passage in *Varnum v. Brien* in which the Iowa high court speaks most directly to the issue facing us in the present case (in contrast to the issue that was before us in the *Marriage Cases*). (See conc. & dis. opn. of Moreno, J., *post*, at p. 499, fn. 10.)

## L

For the reasons discussed above, we conclude that Proposition 8 constitutes a constitutional amendment, rather than a constitutional revision, and that therefore it is not invalid because it was proposed through the initiative process.

## IV

In addition to contending that Proposition 8 represents a constitutional revision, petitioners assert this measure is invalid because it violates the separation of powers doctrine embodied in the California Constitution. The gist of petitioners' argument is that this doctrine is violated when the initiative process is used to "readjudicate" controversies that have been litigated and settled by the courts. Because, in petitioners' view, Proposition 8 purports to readjudicate the controversy that was litigated and resolved in the *Marriage Cases, supra*, 43 Cal.4th 757, they maintain that this initiative measure violates the state constitutional separation of powers doctrine. As we explain, we conclude this claim lacks merit.

Article III, section 3 of the California Constitution—the state constitutional separation of powers clause—provides: "The powers of State government are legislative, executive, and judicial. Persons charged with the exercise of one power may not exercise either of the others except as permitted by this Constitution." As we observed in *Superior Court v. County of Mendocino* (1996) 13 Cal.4th 45 [51 Cal.Rptr.2d 837, 913 P.2d 1046]: "Although the language of . . . article III, section 3, may suggest a sharp demarcation between the operations of the three branches of government, California decisions have long recognized that, in reality, the separation of powers doctrine ' "does not mean that the three departments of our government are not in many respects mutually dependent" ' [citation], or that the actions of one branch may not significantly affect those of another branch. . . . Such interrelationship . . . lies at the heart of the constitutional theory of 'checks and balances' that the separation of powers doctrine is intended to serve." (*Id.* at pp. 52–53.)

In this case, petitioners' argument is premised upon the assumption that Proposition 8 constitutes a "readjudication" of the issue resolved in the *Marriage Cases, supra,* 43 Cal.4th 757. That claim rests on a fundamental misunderstanding of the effect of Proposition 8. The decision in the *Marriage Cases* evaluated the validity of the California marriage statutes limiting marriage to opposite-sex couples *in the context of the provisions of the state Constitution as they existed at the time of our decision.* Proposition 8 does not address or affect *that* issue, but instead *amends* the California Constitution to add *a new provision* that was not a part of the Constitution when the decision in the *Marriage Cases* was handed down. The new constitutional provision does not purport to declare the state of the law as it existed when the *Marriage Cases* decision was rendered, but instead establishes a new substantive state constitutional rule that became effective once Proposition 8 was approved by the voters. Thus, it is not accurate to suggest that Proposition 8 readjudicates the legal issue that was presented and resolved in the *Marriage Cases.*

■ To the extent petitioners' argument rests upon the theory that once a court has construed a provision of the state Constitution in a particular manner, the people may not employ the initiative power to change the provisions of the state Constitution for the future, their contention similarly lacks merit. Our past cases make clear that "[t]he people may adopt constitutional amendments which define the scope of existing state constitutional protections" (*People v. Valentine* (1986) 42 Cal.3d 170, 181 [228 Cal.Rptr. 25, 720 P.2d 913]), and that when they do so the new "specific command supersedes any previous inconsistent interpretations of our state charter's . . . guarantees." (*Ibid.,* citation omitted.) As demonstrated by the numerous decisions reviewed above (see, e.g., *Frierson, supra,* 25 Cal.3d 142; *Brosnahan, supra,* 32 Cal.3d 236; *Raven, supra,* 52 Cal.3d 336), there have been many instances in the past in which the people have exercised their authority under the initiative power to alter the provisions of the state Constitution in response to decisions of this court, significantly changing the substantive content of the state Constitution with regard to its application to future events and controversies. The suggestion that such action violates the separation of powers doctrine embodied in the California Constitution flies in the face of these authorities.[43]

---

[43] Insofar as petitioners rely by analogy on the United States Supreme Court's decision in *City of Boerne v. Flores* (1997) 521 U.S. 507 [138 L.Ed.2d 624, 117 S.Ct. 2157], we find that decision inapposite. In *City of Boerne,* the high court found that a provision of the federal Religious Freedom Restoration Act of 1993 (42 U.S.C. § 2000bb et seq.) was unconstitutional insofar as it purported to alter the standard adopted in a preceding decision of the court (*Employment Div., Ore. Dept. of Human Res. v. Smith* (1990) 494 U.S. 872 [108 L.Ed.2d 876, 110 S.Ct. 1595]) pertaining to "what constitutes a constitutional violation." (*City of Boerne, supra,* 521 U.S. at p. 519; see also *id.* at pp. 529–536.) There is a crucial distinction between the measure at issue in *City of Boerne* and the one before us today. In *City of Boerne,* the

 Under the California Constitution, the authority to propose and adopt amendments to the Constitution is a power specifically recognized as one that the people may exercise through the initiative process. (Cal. Const., art. II, § 8, subd. (a); *id.*, art. XVIII, § 3.) In utilizing the initiative process in this fashion, the people do not usurp a power that the Constitution allocates exclusively to some other entity or branch of government, but rather employ a power explicitly entrusted to them by the Constitution. Once the people have adopted a constitutional amendment, of course, it is the duty of the courts to apply the state Constitution as amended by the new provision, but that circumstance does not in any sense signify that the adoption of such an amendment improperly impinges upon the judiciary's authority or responsibility, in violation of the separation of powers doctrine. Instead, the court's obligation to follow the mandate of the amended Constitution simply flows from the judiciary's foundational responsibility to act in accordance with the commands of the current governing law. (Accord, *Crawford v. Los Angeles Board of Education* (1982) 458 U.S. 527, 546 [73 L.Ed.2d 948, 102 S.Ct. 3211] (conc. opn. of Blackmun, J.) ["State courts do not create the rights they enforce; those rights originate elsewhere—in the state legislature, in the State's political subdivisions, or in the state constitution itself. When one of those rights is repealed, and therefore is rendered unenforceable in the courts, that action hardly can be said to restructure the State's decisionmaking mechanism."].)

 Accordingly, we conclude there is no merit in the claim that Proposition 8 violates the separation of powers doctrine and should be held invalid on that ground.

## V

In his briefing before this court, the Attorney General agrees with our conclusions that Proposition 8 constitutes a constitutional amendment rather than a constitutional revision, and that the measure does not violate the separation of powers doctrine. The Attorney General, however, advances a novel, alternative theory under which he claims Proposition 8 should be held invalid. Relying largely on the circumstance that article I, section 1 of the California Constitution characterizes certain rights as "inalienable," the

---

challenged measure was *a statutory* provision, whereas Proposition 8 is *a constitutional amendment.* Nothing in *City of Boerne* suggests that a constitutional interpretation set forth in a judicial decision cannot be altered by the subsequent adoption of a constitutional amendment, and history belies any such claim. (See, e.g., U.S. Const., 14th Amend. [changing constitutional rule adopted in *Dred Scott v. Sandford* (1857) 60 U.S. 393 [15 L.Ed. 691], as confirmed in *Bell v. Maryland* (1964) 378 U.S. 226, 300–301 [12 L.Ed.2d 822, 84 S.Ct. 1814]]; U.S. Const., 16th Amend. [changing constitutional rule adopted in *Pollock v. Farmers' Loan & Trust Co.* (1895) 158 U.S. 601 [39 L.Ed. 1108, 15 S.Ct. 912], as confirmed in *Brushaber v. Union Pac. R. R.* (1916) 240 U.S. 1, 18 [60 L.Ed. 493, 36 S.Ct. 236]].)

Attorney General maintains that "Proposition 8 should be invalidated even if it is deemed to amend the Constitution because it abrogates fundamental rights protected by article I without a compelling interest."

The Attorney General's argument is fundamentally flawed on a number of levels. First, as we have explained above and as the Attorney General's brief itself recognizes in its discussion of the amendment/revision issue, Proposition 8 does not "abrogate" or eliminate a same-sex couple's "inalienable" constitutional rights as guaranteed by article I, section 1 of the California Constitution. The language of the new constitutional section added by Proposition 8 does not purport to have such a broad reach or effect, and instead properly must be interpreted as simply carving out a limited exception to the reach of the constitutional rights of privacy and due process as explicated in the majority opinion in the *Marriage Cases, supra,* 43 Cal.4th 757. Same-sex couples retain all of the fundamental substantive components encompassed within the constitutional rights of privacy and due process, with the sole (albeit significant) exception of the right to equal access to the designation "marriage," a term that—for purposes of the California Constitution as it now reads—the people have decreed is to be reserved for an official union between a man and a woman. Although Proposition 8 does diminish the rights of same-sex couples under article I, section 1 in this one respect, it does not have the sweeping constitutional effect suggested by the Attorney General's argument.

██ Second, contrary to the implication of the Attorney General's assertion, the circumstance that the rights listed in article I, section 1—and in other sections of the Constitution—are identified as "inalienable" does not signify that such rights are totally exempt from any limitation or restriction. (See also, e.g., art. I, § 28, subd. (f)(1) ["All students and staff of public primary, elementary, junior high and senior high schools . . . have *the inalienable right to attend campuses which are safe, secure and peaceful*" (italics added)].) This circumstance is apparent from even a cursory examination of the list of inalienable rights embodied in article I, section 1. Article I, section 1 provides in full: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." It is undisputed, of course, that an individual's right to "acquir[e], possess[], and protect[] property"—notwithstanding its "inalienable" status—long has been recognized as subject to reasonable regulation and limitation, and this is so even in the absence of a constitutional amendment explicitly limiting this right. (See, e.g., *In re Weisberg* (1932) 215

Cal. 624, 627–628 [12 P.2d 446] [pursuant to the police power, the Legislature may "place such restrictions upon the use of any property or the conduct of any business as may be reasonably necessary for the public safety, comfort or health"].)

Third, the "inalienable" nature of a constitutional right never has been understood to preclude the adoption of *a constitutional amendment* that limits or restricts the scope or application of such a right. As noted above (*ante,* at p. 413, fn. 12), from the beginnings of our state constitutional history, the right of the people "to alter or reform" the provisions of the Constitution itself has been understood to constitute one of the fundamental rights to which article I, section 1 refers (see 1849 Debates, *supra,* pp. 33–34), and California's 1849 Constitution enshrined this right as an integral part of the original Declaration of Rights in former article I, section 2, which provided: "*All political power is inherent in the people.* Government is instituted for the protection, security, and benefit of the people; and they have *the right to alter or reform* the same, whenever the public good may require it." (Italics added.)[44] Indeed, the drafters of the 1849 Constitution, in their message submitting the proposed Constitution to the people of California, expressly described the people's right to alter or reform the Constitution as an "inalienable right." (1849 Debates, p. 474.)[45] In like manner, when the people's authority to propose and adopt constitutional amendments by initiative was added to the California Constitution in 1911, the constitutional provision spoke of the initiative "not as a right granted the people, *but as a power reserved by them.*" (*Associated Home Builders, supra,* 18 Cal.3d 582, 591, italics added; see, *ante,* at p. 421 [quoting original initiative provision].) Accordingly, there is no basis for suggesting that the inalienable rights set forth in article I, section 1, and the other provisions of the Declaration of Rights, are of a higher order than—and thus exempt from—the people's right to "alter or reform" the Constitution through either the legislative or the initiative constitutional amendment process. Indeed, a review of the current version of the constitutional provisions contained within article I's Declaration of Rights demonstrates that modification of such rights through the amendment process has occurred throughout our state's history.[46]

---

[44] This provision is currently set forth in nearly identical language in article II, section 1 of the California Constitution. (See, *ante,* at p. 412.)

[45] Many other state constitutions explicitly refer to the people's right to alter their constitution as an "inalienable" right. (See, e.g., Ala. Const., art. I, § 2; Ky. Const., § 4; Md. Const., Decl. of Rights, art. 1; Pa. Const., art. 1, § 2; Tex. Const., art. I, § 2; Va. Const., art. I, § 3; W.Va. Const., art. III, § 3; Wyo. Const., art. 1, § 1.)

[46] For example, although article I, section 16 of the current California Constitution refers to the right to trial by jury as an "*inviolate* right" (italics added) (as did the comparable provision in the original Constitution (see Cal. Const. of 1849, art. I, § 3)), the constitutional right to jury trial was altered by a constitutional amendment permitting the Legislature to provide that a

In urging this court to confer upon the "inalienable rights" terminology of article I, section 1 a much more sweeping and far-reaching meaning than it traditionally has borne, the Attorney General cites selected excerpts from a number of mid-19th-century opinions that gave voice to the natural-rights jurisprudence that was common in that era. (See, e.g., *Ex parte Newman* (1858) 9 Cal. 502, 507 (lead opn. of Terry, C. J.); *id.* at p. 511 (conc. opn. of Burnett, J.); *Billings v. Hall* (1857) 7 Cal. 1, 6–7 (maj. opn. of Murray, C. J.).) As pointed out in the response filed by interveners, however, the expansive natural-rights jurisprudence of that time long has been discredited (see Tribe, American Constitutional Law (3d ed. 2000) pp. 1335–1362) and, moreover, even the cited jurists never suggested that courts possess the authority to invalidate *an explicit constitutional amendment,* adopted through a constitutionally prescribed procedure, on the ground that the amendment is inconsistent with the scope of a right previously embodied in the Constitution. (See, e.g., *Ex parte Newman, supra,* 9 Cal. at pp. 511–512 (conc. opn. of Burnett, J.) ["The judiciary is but the creature of the Constitution, and can not judge its creator. It can not rise above the source of its own

---

jury shall consist of *eight* persons (rather than the 12-person jury previously required) in civil cases tried in municipal and justice courts. (See Cal. Const., art. I, former § 16, as amended Nov. 4, 1980.) (Subsequently, in conjunction with the unification of the municipal and superior courts, the reference to "civil causes in municipal or justice court" was changed to refer to "civil causes other than causes within the appellate jurisdiction of the court of appeal" (Cal. Const., art. I, § 16, as amended June 2, 1998).)

Similarly, article I, section 15, which sets out a number of fundamental rights of criminal defendants that also were contained in the Declaration of Rights in California's first state Constitution (see Cal. Const. of 1849, art. I, § 8), was modified in 1934 by a constitutional amendment adopted through the initiative process. This amendment permitted a trial judge in a criminal proceeding to comment on the evidence and, if a defendant chose not to testify, to comment on the defendant's failure to testify. (Cal. Const., art. I, former § 13, as amended Nov. 6, 1934.) The portion of the 1934 amendment permitting judicial comment on a defendant's failure to testify "was deleted in 1974 as violative of the defendant's right to remain silent under the Fifth Amendment to the federal Constitution." (Cal. Const. Reference Guide, *supra,* at p. 54.) The state constitutional rule permitting judicial comment on the evidence remains in effect and currently is set forth in article VI, section 10 of the California Constitution.

In addition, article I, section 19—the current provision barring the taking of private property for public use *without the payment of just compensation (cf. Cal. Const. of 1849, art. I, § 8)*—includes an explicit qualification, first added by a constitutional amendment adopted in 1918, authorizing the Legislature to permit a public entity to obtain possession of property upon "commencement of eminent domain proceedings," but before their completion, by "deposit in court and prompt release to the owner" of an amount "determined by the court to be the probable amount of just compensation." (See Cal. Const., art. I, former § 14, as amended Nov. 5, 1918.)

Finally, as discussed above (see, *ante,* at p. 448), the state equal protection clause set forth in article I, section 7, contains an explicit exception, adopted by a constitutional amendment in 1979, prohibiting a court from requiring the busing of students as a remedy for violations of state equal protection principles except as required by the United States Constitution.

existence. If it could do this, it could annul the Constitution, instead of simply declaring what it means."]; *Nougues v. Douglass* (1857) 7 Cal. 65, 67 (maj. opn. of Burnett, J.) ["where the language of the Constitution is express and the intent plain, there is no power in the judicial department to set it aside . . ."].) As discussed at length above, on numerous occasions in the past this court's interpretation of the fundamental constitutional protections accorded by the state Constitution to the "life and liberty" of those accused of crime has been modified by constitutional amendments proposed and adopted through the initiative process, and the constitutional validity of those amendments repeatedly has been sustained in our prior decisions. (See, e.g., *Frierson, supra*, 25 Cal.3d 142; *Brosnahan, supra*, 32 Cal.3d 236; *Raven, supra*, 52 Cal.3d 336, 350, 355–356 [upholding all constitutional changes embodied in Prop. 115 other than the proposed amendment of art. I, § 24].) In short, the Attorney General's position finds no support in the governing California authorities. (See also *Olson v. Cory* (1982) 134 Cal.App.3d 85, 101 [184 Cal.Rptr. 325] ["there is no inalienable right or natural law which might arguably be above the California Constitution"].)

In defending his argument, the Attorney General emphasizes that he "is duty bound to uphold the *whole* of the Constitution, not only the People's reservation of the initiative power, but also the People's expression of their will in the Constitution's Declaration of Rights." (Original italics.) When we examine the entirety of the California Constitution, however, we find nothing that exempts article I, section 1—or any other section of the Constitution—from the amendment process set forth in article XVIII. As we have noted above, a number of constitutions in other jurisdictions do contain provisions excluding designated provisions of those constitutions from amendment. (See, *ante*, at pp. 454–455 & fn. 31.) The current California Constitution contains no restriction of this kind, however, and in the absence of such an explicit limitation we would exceed the well-established and time-honored limits of the judicial role were we to take it upon ourselves to fashion such a restriction upon the present and future right of the people to determine the content of the Constitution that governs our state.[47]

Accordingly, we must decline to invalidate Proposition 8 on the theory advanced by the Attorney General.

---

[47] As one legal commentator has explained: "To empower the courts not simply to review the procedures whereby amendments were adopted but also to void amendments on the basis of their substantive content would surely threaten the notion of a government founded on the consent of the governed." (Vile, *The Case Against Implicit Limits on the Constitutional Amending Process,* Responding to Imperfection (Levinson edit. 1995) 191, 198; see also Tribe, *A* Constitution *We Are Amending: In Defense of a Restrained Judicial Role* (1983) 97 Harv. L.Rev. 433, 442 ["allowing the judiciary to pass on the merits of constitutional amendments would unequivocally subordinate the amendment process to the legal system it is intended to override and would thus gravely threaten the integrity of the entire structure"].)

## VI

Having concluded that Proposition 8 is not invalid on any of the grounds advanced by petitioners or the Attorney General, we reach the third issue upon which we requested briefing, namely, the effect (if any) of Proposition 8 on the marriages of same-sex couples performed prior to the adoption of Proposition 8.

On this question, petitioners and the Attorney General maintain that Proposition 8 properly must be interpreted to operate only prospectively and not to invalidate or have any other effect on the marriages of same-sex couples that were performed before Proposition 8 became effective. Interveners, by contrast, contend that marriages of same-sex couples performed before Proposition 8 took effect no longer are valid or recognized under California law.

As we shall explain, we conclude that Proposition 8 should be interpreted to apply prospectively and not to invalidate retroactively the marriages of same-sex couples performed prior to its effective date.

We begin with the well-established general principles governing the question whether a statutory or constitutional provision should be interpreted to apply prospectively or retroactively. In *Evangelatos v. Superior Court* (1988) 44 Cal.3d 1188 [246 Cal.Rptr. 629, 753 P.2d 585] (*Evangelatos*)— perhaps the leading California decision on this subject—our court explained that "[i]t is a widely recognized legal principle . . . that in the absence of a clear legislative intent to the contrary statutory enactments apply prospectively." (44 Cal.3d at pp. 1193–1194.) After canvassing numerous past California decisions in this area, the court in *Evangelatos* observed that "California continues to adhere to the time-honored principle . . . that *in the absence of an express retroactivity provision, a statute will not be applied retroactively unless it is very clear from extrinsic sources that the Legislature or the voters must have intended a retroactive application.*" (*Id.* at pp. 1208–1209, italics added.)

Our decision in *Evangelatos, supra,* 44 Cal.3d 1188, itself applied this general principle to a statutory provision adopted through the initiative process, and thus it is clear that this principle applies to initiative measures as well as to legislative enactments. In addition, past cases further establish that this principle applies equally to constitutional amendments adopted through the initiative process. (*Rosasco v. Commission on Judicial Performance* (2000) 82 Cal.App.4th 315, 323 [98 Cal.Rptr.2d 111].) No party disputes these points.

We proceed to evaluate the prospectivity or retroactivity of Proposition 8 in light of these controlling principles. As we have seen, Proposition 8 is very

brief and provides in its entirety: "Only marriage between a man and a woman is valid or recognized in California." It is obvious, of course, that the proposition does not contain a retroactivity provision, that is, a provision explicitly stating that the measure is to have retroactive effect. (Cf., e.g., *Good v. Superior Court* (2008) 158 Cal.App.4th 1494, 1504 [71 Cal.Rptr.3d 125] [where the measure at issue stated that " '[s]ubdivision (a) and all of its paragraphs shall have retroactive application' " and shall apply " 'regardless of when the person was convicted of the qualifying offense' "].) Thus, under the rule of interpretation set forth above, the measure cannot be construed to apply retroactively "unless it is very clear from extrinsic sources that . . . the voters must have intended a retroactive application." (*Evangelatos, supra,* 44 Cal.3d 1188, 1209.)

Interveners contend, however, that even though Proposition 8 does not contain a retroactivity clause, the "plain language" of the measure— "[o]nly marriage between a man and a woman *is valid or recognized* in California" (italics added)—"encompasses both pre-existing and later-created" marriages of same-sex couples and "declares that they are not valid or recognized in California." As past decisions demonstrate, however, the circumstance that the language of a measure is written in the present tense ("is valid or recognized") does not clearly demonstrate that the measure is intended to apply retroactively. (See, e.g., *McClung v. Employment Development Dept.* (2004) 34 Cal.4th 467, 471 [20 Cal.Rptr.3d 428, 99 P.3d 1015] [holding statute providing that " '[a]n employee . . . *is personally liable* for any harassment . . . perpetrated by the employee . . .' " (italics added) does not apply retroactively to harassment committed before the enactment]; *Myers v. Philip Morris Companies, Inc.* (2002) 28 Cal.4th 828, 842 [123 Cal.Rptr.2d 40, 50 P.3d 751] (*Myers*) [holding statute providing that " 'there *exists* no statutory bar' " for claims of smokers " 'who have suffered or incurred injuries' " (some italics omitted) does not apply retroactively to impose liability on tobacco company for sales occurring during period in which tobacco companies enjoyed statutory immunity].)

Although the thrust of their "plain language" argument is somewhat unclear, interveners may be suggesting that so long as Proposition 8 is applied only to acts that occur *after* Proposition 8 became effective, the measure is not being applied retroactively but rather prospectively, even if the marriages that are now (or in the future would be) denied recognition were performed prior to the adoption of Proposition 8. To the extent this accurately reflects interveners' position, our prior cases establish that this contention lacks merit. As we explained in *Myers*: "[A] . . . retrospective law ' "is one which affects rights, obligations, acts, transactions and conditions which are performed or exist prior to the adoption of the statute." ' [Citations.] . . . ' "[E]very statute, which takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a

new disability, in respect to transactions or considerations already past, must be deemed retrospective." ' " (*Myers, supra,* 28 Cal.4th at p. 839; see also *Californians for Disability Rights v. Mervyn's, LLC* (2006) 39 Cal.4th 223, 231 [46 Cal.Rptr.3d 57, 138 P.3d 207]; *Evangelatos, supra,* 44 Cal.3d 1188, 1205; *Aetna Cas. & Surety Co. v. Ind. Acc. Com.* (1947) 30 Cal.2d 388, 391 [182 P.2d 159].) Were Proposition 8 to be applied to invalidate or to deny recognition to marriages performed prior to November 5, 2008, rendering such marriages ineffective in the future, such action would take away or impair vested rights acquired under the prior state of the law and would constitute a retroactive application of the measure.

■ Accordingly, we turn to the question whether "it is very clear from extrinsic sources that . . . the voters must have intended a retroactive application." (*Evangelatos, supra,* 44 Cal.3d 1188, 1209.) When an initiative measure is at issue, the most potentially informative extrinsic source is usually the material contained in the ballot pamphlet that is mailed to each voter. (See, e.g., *People v. Litmon* (2008) 162 Cal.App.4th 383, 407–408 [76 Cal.Rptr.3d 122].) In the case of Proposition 8, neither the official title and summary prepared by the Attorney General, nor the analysis prepared by the Legislative Analyst, contains any reference to the retroactivity issue. Similarly, neither the argument in favor of Proposition 8 nor the argument against it adverts to the question of retroactivity.

To support their claim that extrinsic sources demonstrate that the voters must have intended a retroactive application of the measure, interveners rely upon a sentence that appears in the rebuttal to the argument against Proposition 8. That sentence states: "Your YES vote on Proposition 8 means that only marriage between a man and a woman will be valid or recognized in California, regardless of when or where performed." (Nov. 2008 Voter Information Guide, *supra,* rebuttal to argument against Prop. 8, p. 57.)

In our view, this sentence—which does not explicitly state the measure would invalidate or deny recognition to marriages of same-sex couples lawfully performed in California prior to adoption of the measure—is insufficient to demonstrate, clearly and unambiguously, that the voters *must* have intended a retroactive application. (See, e.g., *Californians for Disability Rights v. Mervyn's, LLC, supra,* 39 Cal.4th 223, 229 [courts "have been cautious not to infer the voters' or the Legislature's intent on the subject of prospective versus retrospective operation from 'vague phrases' [citation] and 'broad, general language' "]; *Myers, supra,* 28 Cal.4th at p. 841 [" 'statute that is ambiguous with respect to retroactive application is construed . . . to be unambiguously prospective' "].) Indeed, the absence of a very clear and unambiguous statement that the measure would have the effect of invalidating the estimated 18,000 marriages of same-sex couples that already had been

lawfully entered into is particularly telling in this instance, because if this asserted effect of the measure "had been brought to the attention of the electorate, it might well have detracted from the popularity of the measure." (*Evangelatos, supra,* 44 Cal.3d at p. 1219.) In this regard, we note that interveners have not cited any California decision in which a measure that changed the qualifications for marriage (or the categories of persons who lawfully can enter into marriage) has been applied retroactively to abrogate the continued validity of marriages that lawfully were entered into before the new measure took effect. (See, e.g., *Wells v. Allen* (1918) 38 Cal.App. 586, 588 [177 P. 180] [giving legal effect to a common law marriage "which was a valid marriage in this state at the time these parties assumed that relation"].)

Furthermore, our determination that Proposition 8 cannot properly be interpreted to apply retroactively to invalidate lawful marriages of same-sex couples that were performed prior to the adoption of Proposition 8 is additionally supported by our recognition that a contrary resolution of the retroactivity issue would pose a serious potential conflict with the state constitutional due process clause.

Past cases establish that retroactive application of a new measure may conflict with constitutional principles "if it deprives a person of a vested right without due process of law." (*In re Marriage of Buol* (1985) 39 Cal.3d 751, 756 [218 Cal.Rptr. 31, 705 P.2d 354] [applying state due process clause].) In *In re Marriage of Bouquet* (1976) 16 Cal.3d 583, 592 [128 Cal.Rptr. 427, 546 P.2d 1371], this court explained that "[i]n determining whether a retroactive law contravenes the due process clause, we consider such factors as the significance of the state interest served by the law, the importance of the retroactive application of the law to the effectuation of that interest, the extent of reliance upon the former law, the legitimacy of that reliance, the extent of actions taken on the basis of that reliance, and the extent to which the retroactive application of the new law would disrupt those actions." (See also *Buol, supra,* 39 Cal.3d at p. 761; *In re Marriage of Fellows* (2006) 39 Cal.4th 179, 189 [46 Cal.Rptr.3d 49, 138 P.3d 200].)

Here, same-sex couples who married after the decision in the *Marriage Cases, supra,* 43 Cal.4th 757, was rendered, and before Proposition 8 was adopted, acquired vested property rights as lawfully married spouses with respect to a wide range of subjects, including, among many others, employment benefits, interests in real property, and inheritances. These couples' reliance upon this court's final decision in the *Marriage Cases* was entirely legitimate. A retroactive application of the initiative would disrupt thousands of actions taken in reliance on the *Marriage Cases* by these same-sex couples, their employers, their creditors, and many others, throwing property rights into disarray, destroying the legal interests and expectations of thousands of couples and their families, and potentially undermining the ability of

citizens to plan their lives according to the law as it has been determined by this state's highest court. By contrast, a retroactive application of Proposition 8 is not essential to serve the state's current interest (as reflected in the adoption of Prop. 8) in preserving the traditional definition of marriage by restricting marriage to opposite-sex couples; that interest is honored by applying the measure prospectively and by having the traditional definition of marriage enshrined in the state Constitution where it can be altered only by a majority of California voters.

Under these circumstances, we conclude that interpreting Proposition 8 to apply retroactively would create a serious conflict between the new constitutional provision and the protections afforded by the state due process clause. In the absence of a clear and unambiguous statement that the new provision is to have such an effect, the general legal guideline that requires courts to interpret potentially conflicting constitutional provisions in a manner that harmonizes the provisions, to the extent possible, further supports the conclusion that Proposition 8 properly must be interpreted to apply only prospectively.

Accordingly, applying these well-established principles of interpretation relating to the question of retroactivity, we conclude that Proposition 8 cannot be interpreted to apply retroactively so as to invalidate the marriages of same-sex couples that occurred prior to the adoption of Proposition 8. Those marriages remain valid in all respects.[48]

## VII

In summary, we conclude that Proposition 8 constitutes a permissible constitutional amendment (rather than an impermissible constitutional revision), does not violate the separation of powers doctrine, and is not invalid under the "inalienable rights" theory proffered by the Attorney General. We further conclude that Proposition 8 does not apply retroactively and therefore that the marriages of same-sex couples performed prior to the effective date of Proposition 8 remain valid.

Having determined that none of the constitutional challenges to the adoption of Proposition 8 have merit, we observe that if there is to be a change to

---

[48] We have no occasion in this case to determine whether same-sex couples who were lawfully married in another jurisdiction prior to the adoption of Proposition 8, but whose marriages were not formally recognized in California prior to that date, are entitled to have their marriages recognized in California at this time. None of the petitioners before us in these cases falls within this category, and in the absence of briefing by a party or parties whose rights would be affected by such a determination, we conclude it would be inappropriate to address that issue in these proceedings.

the state constitutional rule embodied in that measure, it must "find its expression at the ballot box." (*Marriage Cases, supra,* 43 Cal.4th 757, 884 (conc. & dis. opn. of Corrigan, J.); see also *id.* at pp. 861, 878 (conc. & dis. opn. of Baxter, J.).)

In each of the three cases before us, the request for a peremptory writ of mandate is denied. Each party shall bear its own costs.

Kennard, J., Baxter, J., Chin, J., and Corrigan, J., concurred.

**KENNARD, J.,** Concurring.—When California voters exercise their power of initiative, a simple majority vote is sufficient to amend any part of the state Constitution. (Cal. Const., art. XVIII, §§ 3, 4.) To determine whether the voters have validly exercised this power, a judge must put aside any personal views and apply the law as set forth in the state Constitution and in this court's previous decisions. And when the voters have validly exercised this power, as they did here, a judge must enforce the Constitution as amended.

One year ago, this court decided that California's statutory law denying same-sex couples the right to marry violated the privacy, due process, and equal protection provisions of our state Constitution as it then read. (*In re Marriage Cases* (2008) 43 Cal.4th 757 [76 Cal.Rptr.3d 683, 183 P.3d 384] (*Marriage Cases*).) I signed the majority opinion in that case, and I also authored a concurring opinion in which I answered the argument that the marriage rights of same-sex couples did not present an issue of constitutional law for this court to decide but instead was essentially a social or political controversy inappropriate for judicial resolution. In my separate opinion, I wrote: "Absent a compelling justification, our state government may not deny a right as fundamental as marriage to any segment of society. Whether an unconstitutional denial of a fundamental right has occurred is not a matter to be decided by the executive or legislative branch, or by popular vote, but is instead an issue of constitutional law for resolution by the judicial branch of state government. Indeed, this court's decision in *Lockyer* [*v. City and County of San Francisco* (2004) 33 Cal.4th 1055 [17 Cal.Rptr.3d 225, 95 P.3d 459]] made it clear that the courts alone must decide whether excluding individuals from marriage because of sexual orientation can be reconciled with our state Constitution's equal protection guarantee. (*Lockyer, supra,* 33 Cal.4th at pp. 1068–1069.) The court today discharges its constitutional obligation by resolving that issue." (*Marriage Cases, supra,* 43 Cal.4th at p. 860 (conc. opn. of Kennard, J.).) My view on this issue has not changed: Interpreting and enforcing the state Constitution is a judicial responsibility, and the judiciary's duty to exercise this authority is particularly important and grave when constitutionally guaranteed rights and freedoms are at stake. What has changed, however, is the state Constitution that this court interpreted and enforced in the *Marriage Cases.*

Shortly after this court's decision in the *Marriage Cases, supra,* 43 Cal.4th 757, California's voters by initiative changed the text of our state Constitution by adding a new section 7.5 to article I. It reads: "Only marriage between a man and a woman is valid or recognized in California." The main issue before the court here is the validity of that alteration in the language of our state's fundamental charter, which expressly recognizes the people's right to enact constitutional amendments by initiative (Cal. Const., art. II, § 8, subd. (a)).

Although the people through the initiative power *may not change* this court's interpretation of language in the state Constitution, they *may change* the constitutional language itself, and thereby enlarge or reduce the personal rights that the state Constitution as so amended will thereafter guarantee and protect. The difference between interpretation and alteration is the difference between the judicial and legislative powers. Interpretation of existing statutory and constitutional provisions is a fundamental power of the judicial branch, while alteration of existing statutory and constitutional provisions—by addition, deletion, or modification—is a fundamental legislative power that the people may exercise through the initiative process. Although this court's decision in the *Marriage Cases, supra,* 43 Cal.4th 757, remains the final word on the meaning of the state Constitution *as it then read,* the people have now used their initiative power to refashion the wording of the California Constitution and by this means have altered its substance, and thus its meaning, as of the effective date of the initiative measure.

For the reasons explained in the majority opinion, petitioners have failed to establish any legal basis to invalidate the initiative measure that added section 7.5 to article I of our state Constitution. Because it did not fundamentally alter California's state governmental plan, this initiative measure could validly be enacted by the procedures prescribed for constitutional amendments rather than the more rigorous procedures prescribed for constitutional revisions. (See Cal. Const., art. XVIII, §§ 1–4.) Because it does not restrict or impair this court's authority to interpret and enforce the state Constitution, the initiative measure does not violate the separation of powers doctrine. And, contrary to the Attorney General's contention, the state Constitution does not prohibit constitutional amendments qualifying or restricting rights that the state Constitution describes as "inalienable," nor does it require that such amendments be supported by a compelling interest.

Unlike the state Constitution that this court interpreted in the *Marriage Cases, supra,* 43 Cal.4th 757, the currently existing California Constitution, while continuing to protect the rights of same-sex couples to form officially recognized family relationships, now restricts marriage to opposite-sex couples. As members of the judicial branch, the justices of this court have a

solemn obligation to interpret and enforce the entire state Constitution, including that new and valid voter-enacted restriction. Indeed, in deciding that section 7.5 of article I of the state Constitution does not invalidate the marriages of same-sex couples performed before its effective date (see maj. opn., *ante*, at p. 474), this court has already begun to discharge its constitutional obligation to interpret and apply that provision.

With these observations, I concur fully in the court's opinion authored by the Chief Justice.

**WERDEGAR, J.,** Concurring.—I agree with the majority that Proposition 8 (Gen. Elec. (Nov. 4, 2008)) is a valid amendment to the California Constitution rather than a procedurally defective revision.[1] I reject, however, much of the majority's analysis. The majority purports to find in this court's prior decisions a definition of the term "revision"—one focused on governmental structure and organization—that categorically excludes Proposition 8 and thus avoids the daunting task of reconciling with our constitutional tradition a voter initiative clearly motivated at least in part by group bias. In fact our prior decisions do not establish the majority's definition, nor does it find support in the text or history of the Constitution. The drafters of our Constitution never imagined, nor would they have approved, a rule that gives the foundational principles of social organization in free societies, such as equal protection, less protection from hasty, unconsidered change than principles of governmental organization.

## I

The majority's lengthy review of our prior cases on the subject (maj. opn., *ante,* at pp. 418–440) culminates in this conclusion: "[T]he numerous past decisions of this court that have addressed this issue all have indicated that the type of measure that may constitute a revision of the California Constitution is one that makes 'far reaching changes in the nature *of our basic governmental plan*' [citation], or, stated in slightly different terms, that 'substantially alter[s] *the basic governmental framework set forth in our Constitution.*' " (Maj. opn., *ante,* at p. 441, quoting *Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization* (1978) 22 Cal.3d 208, 223 [149 Cal.Rptr. 239, 583 P.2d 1281], and *Legislature v. Eu* (1991) 54 Cal.3d 492, 510

---

[1] I also agree with the majority that Proposition 8 affects only nomenclature and not the other rights associated with marriage, does not invalidate same-sex marriages already in existence when the initiative took effect, and does not change the rule that laws discriminating on the basis of sexual orientation—a suspect classification—must survive the highest level of scrutiny under the state equal protection clause. (Cal. Const., art. I, § 7, subd. (a); see *In re Marriage Cases* (2008) 43 Cal.4th 757, 840–841 [76 Cal.Rptr.3d 683, 183 P.3d 384] (*Marriage Cases*).)

[286 Cal.Rptr. 283, 816 P.2d 1309], italics added in maj. opn.) This is wrong. In fact, until today the court has gone only so far as to say that "a qualitative revision *includes* one that involves a change in the basic plan of California government, i.e., a change in its fundamental structure or the foundational powers of its branches." (*Legislature v. Eu, supra,* at p. 509, italics added.) Today, the majority changes "*includes*" to "*is*," thus foreclosing other possibilities.

Until today, the court has never held that a constitutional initiative was an amendment rather than a revision *because* it affected only individual rights rather than governmental organization. One reads in the opinion that "a number of our past amendment/revision decisions have involved initiative measures that made very important substantive changes in fundamental state constitutional principles such as the right not to be subjected to cruel or unusual punishment ([*People v.*] *Frierson* [(1979)] 25 Cal.3d 142 [158 Cal.Rptr. 281, 599 P.2d 587]) and the right to be protected against unlawful searches and seizures ([*In re*] *Lance W.* [(1985)] 37 Cal.3d 873 [210 Cal.Rptr. 631, 694 P.2d 744])—initiative measures that, like the current Proposition 8, cut back on the greater level of protection afforded by preceding court decisions *and were challenged as constitutional revisions on the ground that the constitutional changes they effected deprived individuals of important state constitutional protections* they previously enjoyed and left courts unable to fully protect such rights." (Maj. opn., *ante,* at p. 442, italics added.) Certainly the initiatives at issue in *Frierson* and *Lance W.* made "important substantive changes" in the rights of criminal defendants. Contrary to the italicized portion of the statement, however, the challengers in those cases contended the initiatives amounted to revisions *not* because of their effect on those rights, but instead *because of their effect on the power of the judicial branch.* The defendant in *Frierson* argued that a 1977 initiative reinstating the death penalty was a constitutional revision because it impaired the judiciary's power to review statutes for constitutionality.[2] Amici curiae, who raised the issue in *Lance W.,* argued that a 1982 initiative limiting the exclusionary rule in criminal proceedings was a revision because it impaired the judicial function of fashioning appropriate remedies for violations of constitutional rights.[3] Those are the arguments we

[2] Specifically, the defendant in *People v. Frierson, supra,* 25 Cal.3d 142, argued in his opening brief that "[t]he second sentence of Proposition 17 [Gen. Elec. (Nov. 7, 1977)] prohibits the judiciary from testing the death penalty against any state constitutional provision. *Removal of judicial review is a significant change in a principle underlying our system of democratic government and can only be accomplished by constitutional revision.*" (Italics added.)

[3] The State Public Defender, as amicus curiae in *In re Lance W., supra,* 37 Cal.3d 873, argued in its brief that Proposition 8 (Primary Elec. (June 8, 1982)), "constitute[d] an improper revision of the California Constitution because it *abrogates the fundamental judicial function* of providing appropriate remedies for violations of constitutional rights." (Italics added.)

addressed.[4] We did not in these cases hold, nor have we before today ever held, that constitutional amendments affecting *only individual liberties* are categorically exempt from the procedural requirements for constitutional revision.

The history of our California Constitution belies any suggestion that the drafters envisioned or would have approved a rule, such as that announced today, that affords governmental structure and organization more protection from casual amendment than civil liberties. The delegates to the 1849 constitutional convention recognized that "government was instituted for the protection of minorities," and that "[t]he majority of any community is the party to be governed; the restrictions of law are interposed between them and the weaker party; they are to be restrained from infringing upon the rights of the minority." (Browne, Rep. of the Debates in Convention of Cal. on Formation of State Const. (1850) p. 22 [remarks of delegate William Gwin].)[5] Similarly, the delegates to the second constitutional convention in 1878–1879

Similarly, amicus curiae California Attorneys for Criminal Justice argued that to interpret the initiative "as nullifying judicial power to exclude unconstitutionally seized evidence [was] *an invitation to eviscerate the inherent power of a coequal branch of government.*" (Italics added.)

[4] In *People v. Frierson, supra,* 25 Cal.3d 142, we noted the defendant's argument that the initiative reinstating the death penalty "*contemplates 'removal of judicial review'* of the death penalty from a carefully built state constitutional structure, thereby resulting in 'a significant change in a principle underlying our system of democratic government and can only be accomplished by constitutional revision.' " (*Id.,* at p. 186, italics added.) Rejecting the argument, we concluded that the initiative "accomplishes no such sweeping result. . . . [*W*]*e retain broad powers of judicial review* of death sentences to assure that each sentence has been properly and legally imposed and to safeguard against arbitrary or disproportionate treatment. In addition, *we possess unrestricted authority* to measure and appraise the constitutionality of the death penalty under the federal Constitution . . . ." (*Id.,* at p. 187, italics added.)

Similarly, we concluded in *In re Lance W., supra,* 37 Cal.3d 873, that "[*t*]*he restriction on judicial authority* to fashion nonstatutory rules of evidence or procedure governing admission of unlawfully seized evidence *does not, either qualitatively or quantitatively, 'accomplish such far reaching changes in the nature of [judicial authority] as to amount to a revision'* of the Constitution." (*Id.,* at p. 891, second brackets in original, italics added.) Likewise, "[t]he adoption of section [28, subdivision (d), of article I] which affects only one incident of that guarantee of freedom from unlawful search and seizure, a judicially created remedy for violation of the guarantee, *cannot be considered such a sweeping change either in the distribution of powers made in the organic document or in the powers which it vests in the judicial branch as to constitute a revision of the Constitution within the contemplation of article XVIII.*" (*In re Lance W., supra,* at p. 892, italics added.)

[5] The occasion for Gwin's remarks was to persuade the minority, native-Californian, Spanish-speaking delegates to join the majority, recently immigrated, English-speaking delegates in the effort to draft a state constitution. "Never in the history of the world did a similar convention come together. They were there to form a state out of unorganized territory; out of territory only lately wrested from a subjugated people, who were elected to assist in framing a constitution in conformity with the political view of the conquerors. These native delegates were averse to the change about to be made." (23 Bancroft's Works, History of California, vol. VI, 1848–1859 (1888) p. 284.)

well understood the charter they were drafting would provide the only effective protection for civil liberties. The initial draft of the 1879 Constitution, in a provision ultimately rejected, would expressly have looked to the federal Constitution for this purpose by declaring "that the U.S. Constitution was 'the great charter of our liberties.' Not so, cried delegate [Horace] Rolfe, for 'we had State charters before there was any Constitution of the United States.' . . . Even the conservative delegates conceded that reliance on the federal Constitution as the principal author of liberties was 'a mistake historically, a mistake in law, and it is a blunder all around.' Thus, the convention's refusal to label the federal Constitution 'the great charter of our liberties' provided a clear indicator 'that the idea of rights rooted in the state's own constitution was a robust one . . .' . . . ." (Grodin et al., The Cal. State Constitution: A Reference Guide (1993) p. 15, fns. omitted, quoting Willis & Stockton, Debates and Proceedings, Cal. Const. Convention 1878–1879, pp. 237–243, 1182.) The delegates, moreover, were suspicious of government to a degree that scholars have described as "[g]eneralized [d]istrust." (Grodin et al., *supra*, at pp. 14–15.) The task on which these delegates embarked was to create a legal structure for *a society*, not just for a *government*. To conclude they intended to protect individual liberties less jealously, and to give them less permanence, than the forms of governmental organization and structure is unsupportable.

The Constitution does not define the terms "revision" and "amendment" (Cal. Const., art. XVIII, §§ 1, 4), but we found these plain English words clear enough when we first considered them in 1894, within the memory of living delegates to the 1878–1879 constitutional convention. (*Livermore v. Waite* (1894) 102 Cal. 113 [36 P. 424].) We wrote then that "[t]he very term 'constitution' implies an instrument of a permanent and abiding nature, and the provisions contained therein for its revision indicate the will of the people that the underlying principles upon which it rests, as well as the substantial entirety of the instrument, shall be of a like permanent and abiding nature. On the other hand, the significance of the term 'amendment' implies such an addition or change within the lines of the original instrument as will effect an improvement, or better carry out the purpose for which it was framed." (*Id.*, at pp. 118–119.) In other words, a revision is a more substantial or extensive change, an amendment a less substantial or extensive one. In the years following *Livermore v. Waite,* experience with the initiative process led us to recognize that a single, concise change proposed as an amendment could have an extensive, revisional effect on the Constitution. (*McFadden v. Jordan* (1948) 32 Cal.2d 330, 345–346 [196 P.2d 787].) Thus we speak today of both "qualitative" and "quantitative" revisions. (*Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization, supra,* 22 Cal.3d 208, 223.) Yet it remains true that the scope of the change, and not its subject matter, is the point of distinction.

The majority seems to agree that scope, not subject matter, is the determinative point. (Maj. opn., *ante*, at pp. 446–447.) Noting that the California Constitution, unlike those of some other states, places no express subject matter limitations on amendments, the majority writes that "[t]his court would radically depart from the well-established limits of the judicial function were it to engraft such a restriction onto the Constitution in the absence of an explicit constitutional provision limiting the amendment power." (Maj. opn., *ante*, at p. 391.) Ironically, without the support of an explicit limiting provision, the majority in effect engrafts just such a subject matter restriction onto the Constitution with its limiting definition of what constitutes a revision. Rejecting petitioners' arguments that the voters may not use the amendment process to restrict individual liberties and must proceed by way of revision, the majority concludes that compliance with the revision procedures is mandatory only for changes affecting governmental organization and structure.

The majority opinion also reflects confusion about the meaning of "scope" in this context. A revision can inhere in a change of sufficient scope, not just to the whole Constitution, but also to one of its foundational principles. The procedural requirements for constitutional revisions were intended to preserve both *"the substantial entirety of the instrument"* and *"the underlying principles upon which it rests . . . ."* (*Livermore v. Waite, supra*, 102 Cal. 113, 118, italics added.) Our decisions embody this understanding. The provision of Proposition 115 (Primary Elec. (June 5, 1990)) that we struck down as a qualitative revision in *Raven v. Deukmejian* (1990) 52 Cal.3d 336 [276 Cal.Rptr. 326, 801 P.2d 1077] affected not the whole Constitution but only a single principle—judicial independence. But the scope of the measure's "attack on state court authority" was "broad." (*Raven v. Deukmejian, supra*, at p. 355.) In contrast, we upheld amendments that impacted judicial power less extensively in *In re Lance W., supra*, 37 Cal.3d 873, 891, and *People v. Frierson, supra*, 25 Cal.3d 142, 186–187. Accordingly, scope is the important point. But just as an amendment of sufficient scope to a single principle as important as judicial power can be a revision, even though it leaves the remainder of the Constitution untouched, so too, in my view, can be an amendment of sufficient scope to a foundational principle of individual liberty in our free society, such as equal protection.[6]

---

[6] The majority opinion contends I have simply "embrace[d] petitioners' proposed interpretation of the relevant California precedent." (Maj. opn., *ante*, at p. 442.) To the extent the majority opinion means that I agree with petitioners that the relevant precedent is of limited effect and adopts no categorical "governmental structure" requirement for constitutional revisions, it is correct. To the extent it implies more than that, it is incorrect. Petitioners have argued that changes to certain fundamental rights categorically may be made only through the revision process. Unlike petitioners—and the majority as well—I think it clear we have no license to engraft onto the definition of a revision or amendment *any* categorical limitation the drafters did not see fit to include.

## II

The question before us then, as I would pose it, is whether Proposition 8 accomplishes a change of sufficient scope in a foundational principle of individual liberty to amount to a constitutional revision. Certainly Proposition 8 affects the principle of equal protection. The initiative, just like the identically worded statute (Fam. Code, § 308.5) we confronted in the *Marriage Cases, supra*, 43 Cal.4th 757, "imping[es] upon the right of [same-sex] couples to have their family relationship accorded respect and dignity equal to that accorded the family relationship of opposite-sex couples." (*Id.,* at p. 845.) Proposition 8 has not, however, in my view, by this impingement brought about such a broad change in the principle of equal protection as to amount to a constitutional revision.

In the *Marriage Cases, supra*, 43 Cal.4th 757, this court determined that the California Constitution requires full equality for same-sex and opposite-sex couples. Proposition 8, as construed by this court, reflects the voters' rejection of one aspect of the *Marriage Cases*—our conclusion that the principle of equal protection requires the state to apply the term "marriage" to legally recognized same-sex unions. (43 Cal.4th at pp. 855–856.) Historically, this conclusion was new. The right of same-sex couples to have the nomenclature of marriage applied to their unions had been only recently and rarely recognized in American constitutional law, and it ran counter to a common understanding of the term. Even today this conclusion is disputed, both here and throughout the United States.

Disagreement over a single, newly recognized, contested application of a general principle does not mean the principle is dead. Equal protection's continuing vitality in the present context is shown by this court's unanimous reaffirmation of its conclusions in the *Marriage Cases, supra*, 43 Cal.4th 757, that laws discriminating on the basis of sexual orientation are subject to strict scrutiny, and that—excepting the name—same-sex couples are entitled to enjoy all of the rights of marriage. Accordingly, all three branches of state government continue to have the duty, within their respective spheres of operation, today as before the passage of Proposition 8, to eliminate the remaining important differences between marriage and domestic partnership, both in substance[7] and

---

[7] For example, the requirements that domestic partners be of the same sex (Fam. Code, § 297, subd. (b)(5)(A)), unless one is over the age of 62 (*id.,* subd. (b)(5)(B)), and the requirement that both persons have a common residence (*id.,* subd. (b)(1)). These are important differences. The first requirement contributes to the perception that domestic partnerships enjoy a lower status than marriages (see *Marriage Cases, supra*, 43 Cal.4th 757, 830–831), and the second requirement can cause both serious inconvenience and the automatic termination of a domestic partnership (Fam. Code, § 299.3, subd. (a); *Velez v. Smith* (2006) 142 Cal.App.4th 1154, 1167–1168 [48 Cal.Rptr.3d 642]; *Holguin v. Flores* (2004) 122 Cal.App.4th 428, 434 [18 Cal.Rptr.3d 749]).

perception.[8] The measure puts one solution beyond reach by prohibiting the state from naming future same-sex unions "marriages," but it does not otherwise affect the state's obligation to enforce the equal protection clause by protecting the "fundamental right . . . of same-sex couples to have their official family relationship accorded the same dignity, respect, and stature as that accorded to all other officially recognized family relationships." (*Marriage Cases, supra,* at p. 830.) For the state to meet its obligations under the equal protection clause will now be more difficult, but the obligation remains. For this reason I concur.

**MORENO, J.,** Concurring and Dissenting.—

> "[T]he 'absolute equality of all' persons before the law [is]
> 'the very foundation principle of our government.' "
> (*Varnum v. Brien* (Iowa 2009) 763 N.W.2d 862, 877.)

In *In re Marriage Cases* (2008) 43 Cal.4th 757, 855–856 [76 Cal.Rptr.3d 683, 183 P.3d 384] (*Marriage Cases*), we held that denying same-sex couples the right to marry denies them equal protection of the law. Proposition 8 partially abrogated that decision by amending the California Constitution to deny same-sex couples fully equal treatment by adding the words: "Only marriage between a man and a woman is valid or recognized in California."

The question before us is not whether the language inserted into the California Constitution by Proposition 8 discriminates against same-sex couples and denies them equal protection of the law; we already decided in the *Marriage Cases* that it does. The question before us today is whether such a change to one of the core values upon which our state Constitution is founded can be accomplished by amending the Constitution through an initiative measure placed upon the ballot by the signatures of 8 percent of the number of persons who voted in the last gubernatorial election and passed by a simple majority of the voters. (Cal. Const., art. II, § 8.) Or is this limitation on the scope of the equal protection clause to deny the full protection of the law to a minority group based upon a suspect classification such a fundamental change that it can only be accomplished by revising the California Constitution, either through a constitutional convention or by a measure passed by a two-thirds vote of both houses of the Legislature and approved by the voters? (Cal. Const., art. XVIII.)

For reasons elaborated below, I conclude that requiring discrimination against a minority group on the basis of a suspect classification strikes at the

---

[8] In the *Marriage Cases, supra,* 43 Cal.4th 757, 845–847, we explained how the assignment of a name other than "marriage" to same-sex unions creates the perception of second-class status, perpetuates disparagement based on sexual orientation, poses practical difficulties for same-sex couples and their children, and threatens privacy.

core of the promise of equality that underlies our California Constitution and thus "represents such a drastic and far-reaching change in the nature and operation of our governmental structure that it must be considered a 'revision' of the state Constitution rather than a mere 'amendment' thereof." (*Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization* (1978) 22 Cal.3d 208, 221 [149 Cal.Rptr. 239, 583 P.2d 1281] (*Amador Valley*).) The rule the majority crafts today not only allows same-sex couples to be stripped of the right to marry that this court recognized in the *Marriage Cases*, it places at risk the state constitutional rights of all disfavored minorities. It weakens the status of our state Constitution as a bulwark of fundamental rights for minorities protected from the will of the majority. I therefore dissent.[1]

Equal protection principles lie at the core of the California Constitution and have been embodied in that document from its inception. (Grodin et al., The California State Constitution: A Reference Guide (1993) p. 47.) Former section 11 of article I of the original 1849 Constitution stated, "All laws of a general nature shall have a uniform operation" and section 21 of article I of the 1879 Constitution added, "nor shall any citizen, or class of citizens, be granted privileges or immunities which, upon the same terms, shall not be granted to all citizens." These provisions were "substantially the equivalent of the equal protection clause of the Fourteenth Amendment to the United States Constitution." (*Department of Mental Hygiene v. Kirchner* (1965) 62 Cal.2d 586, 588 [43 Cal.Rptr. 329, 400 P.2d 321]; see *Sail'er Inn, Inc. v. Kirby* (1971) 5 Cal.3d 1, 15, fn. 13 [95 Cal.Rptr. 329, 485 P.2d 529].) In 1974, an express equal protection clause was added to the California Constitution that mirrors the language of the Fourteenth Amendment to the United States Constitution.[2]

Ensuring equal protection prevents "governmental decisionmakers from treating differently persons who are in all relevant respects alike. [Citation.]" (*Nordlinger v. Hahn* (1992) 505 U.S. 1, 10 [120 L.Ed.2d 1, 112 S.Ct. 2326].) The doctrine's purpose is to protect "against intentional and arbitrary discrimination." (*Sunday Lake Iron Co. v. Wakefield* (1918) 247 U.S. 350, 352 [62

---

[1] I agree with part VI of the majority opinion that Proposition 8 does not invalidate same-sex marriages entered into before its passage. (See maj. opn., *ante*, at p. 392.) I also agree with the majority opinion that Proposition 8 does not entirely repeal or abrogate a same-sex couple's substantive state constitutional right to marry as set forth in the *Marriage Cases*, but rather carves out an exception by "reserving the official *designation* of the term 'marriage' for the union of opposite-sex couples." (Maj. opn., *ante*, at p. 388.)

[2] The equal protection clause was added to the California Constitution, article I, section 7, upon the recommendation of the California Constitution Revision Commission, as part of 1974's Proposition 7, a ballot measure proposed by two-thirds of both the Senate and the Assembly, which, according to the Legislative Counsel's Digest, "[r]evises, renumbers and specifically provides for various constitutional rights of persons." (Legis. Counsel's Dig., Assem. Const. Amend. No. 60 (1973–1974 Reg. Sess.) 2 Stats. 1974, Summary Dig., p. 275.)

L.Ed. 1154, 38 S.Ct. 495].) As such, it is a shield against arbitrary government power, because equal protection "requires the democratic majority to accept for themselves and their loved ones what they impose on you and me." (*Cruzan v. Director, Missouri Dept. of Health* (1990) 497 U.S. 261, 300 [111 L.Ed.2d 224, 110 S.Ct. 2841] (conc. opn. of Scalia, J.).) Thus, it is not so much a discrete constitutional right as it is a basic constitutional principle that guides all legislation and compels the will of the majority to be tempered by justice. The Iowa Supreme Court, in affirming the constitutional right of gays and lesbians to marry, recently recognized the importance of this promise of equality, stating: "If gay and lesbian people must submit to different treatment without an exceedingly persuasive justification, they are deprived of the benefits of the principle of equal protection *upon which the rule of law is founded.*" (*Varnum v. Brien, supra*, 763 N.W.2d 862, 906, italics added.)

Of particular importance for this case is that discrimination against disfavored minorities is presumptively suspect under the equal protection clause. As we affirmed in the *Marriage Cases, supra*, 43 Cal.4th at page 842, and as the majority reaffirms today (maj. opn., *ante*, at p. 411), sexual orientation is such a suspect classification. Under our state equal protection jurisprudence, as in federal law, laws that involve suspect classifications or touch upon fundamental interests are subject to strict scrutiny, meaning that " ' " ' "the state bears the burden of establishing not only that it has a compelling interest which justifies the law but that the distinctions drawn by the law are necessary to further its purpose." [Citation.]' " ' " (*Marriage Cases, supra*, 43 Cal.4th at p. 832, italics omitted.)

The equal protection clause is therefore, by its nature, inherently countermajoritarian. As a logical matter, it cannot depend on the will of the majority for its enforcement, for it is the will of the majority against which the equal protection clause is designed to protect. Rather, the enforcement of the equal protection clause is especially dependent on "the power of the courts to test legislative and executive acts by the light of constitutional mandate and in particular to preserve constitutional rights, whether of individual or minority, from obliteration by the majority." (*Bixby v. Pierno* (1971) 4 Cal.3d 130, 141 [93 Cal.Rptr. 234, 481 P.2d 242].)

California's equal protection doctrine has not been confined to that of federal Fourteenth Amendment jurisprudence: "[O]ur state equal protection provisions . . . are possessed of an independent vitality which, in a given case, may demand an analysis different from that which would obtain if only the federal standard were applicable." (*Serrano v. Priest* (1976) 18 Cal.3d 728, 764 [135 Cal.Rptr. 345, 557 P.2d 929].) The equal protection clause of our state Constitution is important as a provision of independent force and effect

only when this court extends greater protection under that provision than the high court has extended under the equal protection clause of the federal Constitution.

The majority upholds Proposition 8 by reasoning that it does not "*fundamentally alter* the meaning and substance of state constitutional equal protection principles as articulated" in the *Marriage Cases*, because it merely "carves out a narrow and limited exception to these state constitutional rights, reserving the official *designation* of the term 'marriage' for the union of opposite-sex couples . . . ." (Maj. opn., *ante*, at p. 388.) The majority protests that it does not mean to "diminish or minimize the significance that the official designation of 'marriage' holds" (*ibid.*), but that is exactly the effect of its decision.

Denying the designation of marriage to same-sex couples cannot fairly be described as a "narrow" or "limited" exception to the requirement of equal protection; the passionate public debate over whether same-sex couples should be allowed to marry, even in a state that offers largely equivalent substantive rights through the alternative of domestic partnership, belies such a description. "[T]he constitutional right to marry . . . has been recognized as one of the basic, inalienable civil rights guaranteed to an individual by the California Constitution . . . ." (*Marriage Cases, supra*, 43 Cal.4th at p. 781.) Prior to the enactment of Proposition 8, the California Constitution guaranteed "this basic civil right to all Californians, whether gay or heterosexual, and to same-sex couples as well as to opposite-sex couples." (43 Cal.4th at p. 782.) "In light of the fundamental nature of the substantive rights embodied in the right to marry—and their central importance to an individual's opportunity to live a happy, meaningful, and satisfying life as a full member of society—the California Constitution properly must be interpreted to guarantee this basic civil right to *all* individuals and couples, without regard to their sexual orientation." (*Id.* at p. 820, fn. omitted.)

We recognized in the *Marriage Cases* that "draw[ing] a distinction between the name for the official family relationship of opposite-sex couples (marriage) and that for same-sex couples (domestic partnership)" (*Marriage Cases, supra*, 43 Cal.4th at p. 782) "impinges upon a same-sex couple's fundamental interest in having their family relationship accorded the same respect and dignity enjoyed by an opposite-sex couple" (*id.* at p. 784). Denying same-sex couples the right to call their relationships marriages treats them as " 'second-class citizens.' " (*Id.* at p. 785.) As we observed in the *Marriage Cases*, "there exists a substantial risk that a judicial decision upholding the differential treatment of opposite-sex and same-sex couples would be understood as *validating a* more general proposition that our state by now has repudiated: that it is permissible, under the law, for society to

treat gay individuals and same-sex couples differently from, and less favorably than, heterosexual individuals and opposite-sex couples." (43 Cal.4th at p. 855.)

Describing the effect of Proposition 8 as narrow and limited fails to acknowledge the significance of the discrimination it requires. But even a narrow and limited exception to the promise of full equality strikes at the core of, and thus fundamentally alters, the guarantee of equal treatment that has pervaded the California Constitution since 1849. Promising equal treatment to some is fundamentally different from promising equal treatment to all. Promising treatment that is almost equal is fundamentally different from ensuring truly equal treatment. Granting a disfavored minority only some of the rights enjoyed by the majority is fundamentally different from recognizing, as a constitutional imperative, that they must be granted all of those rights. Granting same-sex couples all of the rights enjoyed by opposite-sex couples, except the right to call their " 'officially recognized, and protected family relationship' " (maj. opn., *ante,* at p. 388) a marriage, still denies them equal treatment.

There is no doubt that the ultimate authority over the content of the California Constitution lies with the people. "All political power is inherent in the people. Government is instituted for their protection, security, and benefit, and they have the right to alter or reform it when the public good may require." (Cal. Const., art. II, § 1.) But there are two methods for the people to alter the California Constitution: by revising it or by amending it. A revision to the Constitution must be initiated by the Legislature in one of two ways: the Legislature, by a two-thirds vote, "may submit at a general election the question whether to call a convention to revise the Constitution" (Cal. Const., art. XVIII, § 2), or the Legislature, by a two-thirds vote, may propose a revision of the Constitution to be submitted to the voters (Cal. Const., art. XVIII, § 1). This is in contrast to a constitutional amendment, which can be accomplished by a majority of the electorate after the signatures of 8 percent of the number of persons who voted in the last gubernatorial election have qualified it for the ballot. (Cal. Const., art. II, § 8, subd. (b).)

We have long recognized the importance of this distinction between revising and amending the Constitution. In *Livermore v. Waite* (1894) 102 Cal. 113 [36 P. 424], which was decided before the initiative process was created in 1911, we observed that, at that time, there were "two methods by which changes may be effected in [the California Constitution], one by a convention of delegates chosen by the people for the express purpose of revising the entire instrument, and the other through the adoption by the people of propositions for specific amendments that have been previously submitted to it by two-thirds of the members of each branch of the legislature." (*Id.* at

p. 117.) We noted that there was a basic difference between the process of revising the Constitution by means of the constitutional convention and amending the Constitution. "Under the first of these methods [revision] the entire sovereignty of the people is represented in the convention. The character and extent of a constitution that may be framed by that body is freed from any limitations other than those contained in the constitution of the United States." (*Ibid.*) The power of amendment, however, was much more limited: "The power of the legislature to initiate any change in the existing organic law is, however, of greatly less extent, and, being a delegated power, is to be strictly construed under the limitations by which it has been conferred. . . . The legislature is not authorized to assume the function of a constitutional convention, and propose for adoption by the people a revision of the entire constitution under the form of an amendment . . . ." (*Id.* at pp. 117–118.)

We took care in *Livermore* to explain the reason for this difference between the broad power of revision and·the greatly limited power of amendment: "The very term 'constitution' implies an instrument of a permanent and abiding nature, and the provisions contained therein for its revision indicate the will of the people that the underlying principles upon which it rests, as well as the substantial entirety of the instrument, shall be of a like permanent and abiding nature. On the other hand, the significance of the term 'amendment' implies such an addition or change within the lines of the original instrument as will effect an improvement, or better carry out the purpose for which it was framed." (*Livermore v. Waite, supra,* 102 Cal. at pp. 118–119.)[3]

The emergence of the initiative process did nothing to alter the distinction between amending and revising the Constitution. The initiative process was

---

[3] The majority contends that "when the *entire* pertinent passage of the *Livermore* decision is considered, it appears reasonable to conclude that the court in *Livermore* itself would have recognized that a measure such as Proposition 8 constitutes a constitutional amendment, because in describing the type of measures that would constitute an amendment, the court in that case noted that 'some popular wave of sociological reform, like the abolition of the death penalty for crime, or a prohibition against the manufacture or sale of intoxicating liquors, may induce a legislature to submit for enactment, in the permanent form of a constitutional prohibition, a rule which it has the power itself to enact as a law, but which [as such] might be of only temporary effect.' [Citation.] In adding to the California Constitution a provision declaring that marriage shall refer only to a union between a man and a woman, Proposition 8 would appear to constitute just the type of discrete 'popular' and 'sociological' amendment that the *Livermore* decision had in mind." (Maj. opn., *ante,* at p. 454, fn. omitted.) Yet it is clear from reading the "entire" passage, that the majority's interpretation is dubious, because *Livermore* speaks in terms of enacting in "permanent form" "a rule which [the Legislature] has the power itself to enact as a law, but which [as such] might be of only temporary effect." (*Livermore v. Waite, supra,* 102 Cal. at p. 119.) What is at issue in this case is an alteration in the Constitution that the Legislature would have no power to enact, and is therefore fundamentally distinguishable from the type of amendment contemplated by *Livermore* in the above passage.

created in 1911 to permit the people to directly enact statutes and amend, but not revise, the Constitution. As has been well documented and often re-counted, the introduction of direct democracy in California in the form of the initiative, referendum, and recall processes, was in response to government corruption prevalent at the beginning of the last century. (See Cal. Com. on Campaign Financing, Democracy by Initiative: Shaping California's Fourth Branch of Government (1992) pp. 36–40.) Corporate power, principally that of the Southern Pacific Railroad, dominated state government and had undermined both the independence of the judiciary and the Legislature's role as a servant of the popular will. (*Id.* at pp. 36–38.) Also of concern were corrupt political bosses and big-city machines. (*Id.* at pp. 39–40.) Hiram Johnson and his allies in the Progressive movement sought to restore the connection between government and the majority will by allowing the people to bypass an unresponsive Legislature and enact their own legislation. (*Id.* at pp. 40–42.)

Although this initiative process was thereby instituted as a remedy for government corruption, and to free legislation from the influence of powerful special interests and the Legislature's own self-serving inertia, there is no indication that this process was intended to prevent courts from performing their traditional constitutional function of protecting persecuted minorities from the majority will. There is a fundamental difference between preventing politically powerful minorities from unduly influencing legislative and judi-cial decisions on the one hand, and preventing courts from protecting the rights of disfavored minorities unable to obtain equal rights through the usual majoritarian processes on the other. There is no indication that the Progres-sives who framed the initiative process were insensible to that distinction, or that they sought to abolish the judiciary's role as the guardian of minorities' fundamental rights.

The initiative process was itself initiated by a 1911 ballot proposition that amended article IV, section 1 of the Constitution to provide in relevant part that "the people reserve to themselves the power to propose laws and amendments to the constitution, and to adopt or reject the same, at the polls independent of the legislature . . . ." There is no evidence that those enacting the initiative process intended to alter the distinction between amending and revising the Constitution that this court had recognized in *Livermore v. Waite, supra,* 102 Cal. 113, some 17 years earlier, and the language of that decision remains valid today. Nor did the subsequent 1962 constitutional amendment, Proposition 7, which permitted the Legislature by a two-thirds vote to propose constitutional revisions to the electorate short of a constitutional convention (see maj. opn., *ante,* at pp. 425–426) change the meaning of a

revision.[4] "[T]he underlying principles upon which [the Constitution] rests . . . shall be of a . . . permanent and abiding nature" and may only be altered by revising, rather than amending, the Constitution. (*Livermore v. Waite, supra*, 102 Cal. at pp. 118–119.)

As discussed, there is no "underlying" principle more basic to our Constitution than that the equal protection clause protects the fundamental rights of minorities from the will of the majority. Accordingly, Proposition 8's withdrawal of any of those rights from gays and lesbians cannot be accomplished through constitutional amendment.

The majority concludes that in order to constitute a revision, a change in the Constitution must effect a "fundamental change in the *basic governmental plan or framework* established by the preexisting provisions of the California Constitution—that is 'in [the government's] fundamental structure or the foundational powers of its branches.' [Citation.]" (Maj. opn., *ante*, at p. 441.) The cases cited by the majority do indeed hold that a change to the Constitution that alters the structure or framework of government is a revision, but these cases do not, as the majority erroneously concludes, also stand for the inverse of this proposition: that a change to the Constitution that does not alter the structure or framework of the Constitution cannot constitute a revision and, thus, necessarily must be an amendment. The reason is simple. None of the cases cited by the majority considered this issue, because it was not raised.

---

[4] In *Californians for an Open Primary v. McPherson* (2006) 38 Cal.4th 735 [43 Cal.Rptr.3d 315, 134 P.3d 299] (*Californians for an Open Primary*), I attempted in my concurring opinion to explain why the Legislature was subject to the requirement of article XVIII, section 1 of the California Constitution that when the Legislature proposes an amendment of the state Constitution, "[e]ach amendment shall be so prepared and submitted that it can be voted on separately," while the Legislature is not subject to the separate-vote requirement when it submits a constitutional revision to the electorate as per Proposition 7. In accounting for this seeming incongruity, I reasoned that one of the primary purposes of the separate-vote requirement was to prevent "logrolling." (*Californians for an Open Primary, supra*, 38 Cal.4th at p. 789 (conc. opn. of Moreno, J.).) I further reasoned that the danger of logrolling was significantly diminished in the case of an authentic constitutional revision because "[a] constitutional revision, by its very nature and purpose—systematic, comprehensive constitutional renovation and reform—appears to be inherently contrary to the practice of logrolling motivated by political expediency." (*Id.* at p. 790.) The majority cites part of the above statement to suggest that I endorsed a view that a constitutional revision consists only of " 'systematic, comprehensive constitutional renovation and reform.' " (Maj. opn., *ante*, at p. 426, italics omitted.) But when taken in context, it is clear that all that was intended was that one aspect of a legitimate constitutional revision is that it not be used to circumvent the separate-vote rule and engage in logrolling, and that historically the Legislature has not used the revision process in that manner. (38 Cal.4th at pp. 790–791 (conc. opn. of Moreno, J.).) Nothing in my concurring opinion in *Californians for an Open Primary* considers whether depriving a suspect class of a fundamental right may be accomplished through a constitutional amendment.

We recognized in *Amador Valley* that whether a proposed amendment constitutes a revision could turn on either the scope or the substance of the proposed change: "[O]ur analysis in determining whether a particular constitutional enactment is a revision or an amendment must be both quantitative and qualitative in nature. For example, an enactment which is so extensive in its provisions as to change directly the 'substantial entirety' of the Constitution by the deletion or alteration of numerous existing provisions may well constitute a revision thereof. However, even a relatively simple enactment may accomplish such far reaching changes in the nature of *our basic governmental plan* as to amount to a revision also. In illustration, the parties herein appear to agree that an enactment which purported to vest all judicial power in the Legislature would amount to a revision without regard either to the length or complexity of the measure or the number of existing articles or sections affected by such change." (*Amador Valley, supra,* 22 Cal.3d at p. 223, italics added.) We also rejected as hyperbolic the arguments that Proposition 13 constituted a major change in governmental structure involving loss of home rule or of a republican form of government. (22 Cal.3d at pp. 224–228.)

In *Brosnahan v. Brown* (1982) 32 Cal.3d 236, 243 [186 Cal.Rptr. 30, 651 P.2d 274] (*Brosnahan*), we considered the validity of the 1982 Proposition 8 which, among other things, amended the Constitution by adding article I, section 28, subdivision (d) (section 28(d)) to the California Constitution—the so-called "truth-in-evidence provision," which provides that "relevant evidence shall not be excluded in any criminal proceeding." This court quickly rejected the argument that the initiative was "such a 'drastic and far-reaching' measure" that it constituted a revision rather than an amendment to the Constitution. (*Brosnahan, supra,* 32 Cal.3d at p. 260.) Citing our decision in *Amador Valley,* the court employed both a quantitative and qualitative analysis. The court concluded: "From a qualitative point of view, while [the 1982] Proposition 8 does accomplish substantial changes in our criminal justice system, even in combination these changes fall considerably short of constituting 'such far reaching changes in the nature of our *basic governmental plan* as to amount to a revision . . . .' [Citations.]" (*Brosnahan, supra,* 32 Cal.3d at p. 260.) We further rejected the contentions that the 1982 Proposition 8 would lead to significant changes in the structure of government because it would result in "(1) the inability of the judiciary to perform its constitutional duty to decide cases, particularly civil cases; and (2) the abridgement of the constitutional right to public education," comparing this dire forecast to the predictions of loss of home rule and republican government we found baseless in Amador Valley. (*Brosnahan, supra,* 32 Cal.3d at p. 261.)

In its concluding statement, the *Brosnahan* court substituted the word "framework" for the word "plan" in restating the rule in *Amador Valley* that a

revision must alter "our basic governmental plan" (*Amador Valley, supra*, 22 Cal.3d at p. 223), stating: "For the above reasons, nothing contained in [the 1982] Proposition 8 necessarily or inevitably will alter the basic governmental framework set forth in our Constitution. It follows that Proposition 8 did not accomplish a 'revision' of the Constitution . . . ." (*Brosnahan, supra*, 32 Cal.3d at p. 261.) The court in *Brosnahan* did not discuss or explain why it substituted the word "framework" for the word "plan." Nothing in the opinion in *Brosnahan* indicates that the court attached any significance to this single use of the word "framework." There is nothing to indicate that in substituting the word "framework" for the word "plan" in this one instance, the court meant to signal a departure from its holding in *Amador Valley* or to restrict its analysis to whether a proposed amendment would affect the structure of the government. The decision in *Brosnahan* never addressed whether the 1982 Proposition 8 revised the Constitution because it altered fundamental rights. Rather, it simply applied the rule stated in *Amador Valley* that the amendment was proper because it did not make "far reaching changes in the nature of our *basic governmental plan*."

The idea that the electorate may, by amendment, significantly curtail the constitutional rights of minorities is not, contrary to the majority, squarely supported by case law. Even in the area of criminal law and procedure, in which the initiative process has perhaps made its boldest forays into the field of constitutional rights, this court has stopped short of approving the kind of basic constitutional change at issue in the present case. In *In re Lance W.* (1985) 37 Cal.3d 873, 885 [210 Cal.Rptr. 631, 694 P.2d 744], this court considered the 1982 Proposition 8 and rejected the argument that the addition of section 28(d) to the California Constitution—the "truth-in-evidence provision"—constituted "an impermissible constitutional revision, rather than amendment, because it abrogates the judicial function of fashioning appropriate remedies for violation of constitutional rights."

In upholding section 28(d), we equated the power to amend the Constitution to legislative power: "The Legislature and, a fortiori, the people acting through either the reserved power of statutory initiative or the power to initiate and adopt constitutional amendments (art. II, § 8) may prescribe rules of procedure and of evidence to be followed in the courts of this state." (*In re Lance W., supra*, 37 Cal.3d at p. 891.) We thus concluded that restricting the judicially created exclusionary rule "cannot be considered such a sweeping change either in the distribution of powers made in the organic document or in the powers which it vests in the judicial branch as to constitute a revision of the Constitution . . . ." (*Id.* at p. 892.)

Our decision in *Lance W.* did state, in dicta and without explanation or citation to authority: "The people could by amendment of the Constitution

repeal section 13 of article I in its entirety." (*In re Lance W., supra*, 37 Cal.3d at p. 892.)[5] This passing observation was unnecessary to the decision and carries little weight. In light of the history of the revision/amendment distinction discussed above, I very much doubt that those who framed and enacted the 1911 amendment authorizing constitutional amendment by initiative contemplated the elimination of entire constitutional provisions incorporating fundamental constitutional rights. This is particularly true because at the time of the 1911 amendment, the principle that much of the Bill of Rights is applicable to the states through the Fourteenth Amendment was still largely undeveloped. (See Tribe, American Constitutional Law (2d ed. 1988) § 11.2, p. 772, and cases cited therein.) Therefore, eliminating, for example, a prohibition of unreasonable searches and seizures in 1911 would have meant not merely shaving off extra state constitutional protections that supplemented underlying federal protections, but eliminating such protections altogether. There is no evidence, and the majority points to none, that those who enacted the 1911 amendment intended such nullification of fundamental rights to be within the reach of a simple constitutional amendment enacted by a majority of the voters.

It is true that *Lance W.* stands for the proposition that initiative amendments may scale back judicial *remedies* that implement the protection of constitutional rights, but the majority makes the far broader assertion that "the current Proposition 8 is by no means the first instance in which the California Constitution has been altered, by a constitutional *amendment* approved by a majority of voters, in a manner that lessens the state constitutional rights of a minority group that has been the subject of past discrimination." (Maj. opn., *ante*, at p. 447.) The majority cites in support the amendment to article I, section 7, subdivision (a) of the California Constitution, which circumscribed public school busing, and Proposition 209, which curtailed affirmative action programs. (See maj. opn., *ante*, at pp. 447–448; *Hi-Voltage Wire Works, Inc. v. City of San Jose* (2000) 24 Cal.4th 537, 567–568 [101 Cal.Rptr.2d 653, 12 P.3d 1068].) Both of these measures limited *remedies* for discrimination, but no case has ever held that the Constitution properly may be amended to deprive a minority group of a fundamental right on the basis of a suspect classification. Unlike modifying legislative or judicially created remedies, withholding a fundamental right from a minority group on the basis of a suspect classification is inherently antithetical to the core principle of equal protection that minorities are to be

---

[5] Article I, section 13 of the California Constitution follows closely the text of the Fourth Amendment to the United States Constitution, stating: "The right of the people to be secure in their persons, houses, papers, and effects against unreasonable seizures and searches may not be violated; and a warrant may not issue except on probable cause, supported by oath or affirmation, particularly describing the place to be searched and the persons and things to be seized."

protected against the prejudice of majorities by requiring that laws apply equally to all segments of society.[6]

Nor is *Raven v. Deukmejian* (1990) 52 Cal.3d 336, 341–343 [276 Cal.Rptr. 326, 801 P.2d 1077], the one case to invalidate a portion of an initiative on the grounds that it constituted a qualitative revision, contrary to my position. In *Raven*, this court invalidated the portion of Proposition 115 that amended the California Constitution "to provide that certain enumerated criminal law rights . . . shall not be construed to afford greater rights to criminal or juvenile defendants than afforded by the federal Constitution" (*Raven, supra,* 52 Cal.3d at pp. 342–343) because it "contemplates such a far-reaching change in our governmental framework as to amount to a qualitative constitutional revision . . ." (*id.* at p. 341). Relying upon the hypothetical example we posed in *Amador Valley,* that "an enactment which purported to vest all judicial power in the Legislature would amount to a revision without regard either to the length or complexity of the measure . . ." (*Amador Valley, supra,* 22 Cal.3d at p. 223), we held in *Raven* that "Proposition 115 contemplates a similar qualitative change. In essence and practical effect, new article I, section 24, would vest all judicial *interpretive* power, as to fundamental criminal defense rights, in the United States Supreme Court. From a qualitative standpoint, the effect of Proposition 115 is devastating." (*Raven, supra,* 52 Cal.3d at p. 352.) The court added: "In effect, new article I, section 24, would substantially alter the substance and integrity of the state Constitution as a document of independent force and effect." (*Ibid.*)

Our decision in *Raven* addressed whether a structural change to the Constitution was a revision, but nothing in our opinion suggests that *only a* structural change can constitute a revision. To the contrary, our recognition in *Raven* that altering fundamental rights embodied in the Constitution could "substantially alter the substance and integrity of the state Constitution as a document of independent force and effect" suggests just the opposite.

---

[6] The majority also cites in support Proposition 14, a state constitutional amendment adopted in 1964 that repealed a statutory provision barring racial discrimination in the sale or rental of housing. As the majority states: "Although Proposition 14 subsequently was held invalid under the federal Constitution (*Mulkey v. Reitman* (1966) 64 Cal.2d 529 [50 Cal.Rptr. 881, 413 P.2d 825], affd. *sub nom. Reitman v. Mulkey* (1967) 387 U.S. 369 [18 L.Ed.2d 830, 87 S.Ct. 1627]), [it] was [not] found to constitute an impermissible constitutional revision under the state Constitution." (Maj. opn., *ante,* at pp. 447–448, italics omitted.) But in *Mulkey v. Reitman,* Proposition 14 was not even challenged on the ground that it constituted an improper revision of the California Constitution, and its patent violation of the United States Constitution made such a challenge unnecessary. If "an opinion is not authority for a proposition not therein considered" (*Ginns v. Savage* (1964) 61 Cal.2d 520, 524, fn. 2 [39 Cal.Rptr. 377, 393 P.2d 689]), the fact that certain arguments were not raised at all carries even less weight. Moreover, as the majority acknowledges, the issue was raised in the related case of *Hill v. Miller* (1966) 64 Cal.2d 757 [51 Cal.Rptr. 689, 415 P.2d 33]. (Maj. opn., *ante,* at p. 448, fn. 26.)

(*Raven v. Deukmejian, supra*, 52 Cal.3d at p. 352.) Proposition 8 would have a similar effect by emasculating the equal protection clause of the California Constitution as a provision of independent force and effect. Any protection of a minority group recognized by this court under the equal protection clause of our state Constitution that was not recognized by the United States Supreme Court under the federal Constitution could be abrogated through the initiative process by a simple majority of the voters.

The majority's reliance upon the lead opinion in *People v. Frierson* (1979) 25 Cal.3d 142 [158 Cal.Rptr. 281, 599 P.2d 587] (*Frierson*) is also misguided. That opinion stated the view of only three justices that the 1972 initiative measure that added a provision to the California Constitution stating that the death penalty did not constitute cruel or unusual punishment amended, rather than revised, the Constitution. Each of the remaining justices made it abundantly clear that they either declined to address this issue or disagreed with the lead opinion. Nevertheless, the majority treats the lead opinion as if it were a majority opinion, referring to it as "[o]ur opinion" (maj. opn., *ante*, at p. 430), and incorrectly referring to the lead opinion to describe what "the court concluded" (*id.* at p. 443). (See also *id.* at p. 452.)

In a footnote, the majority acknowledges that the lead opinion in *Frierson* "was signed by only three justices; four justices declined to join in the opinion's discussion" upon which the majority now relies. (Maj. opn., *ante*, at p. 430, fn. 21.) Nevertheless, the majority attempts to justify its reliance upon this portion of the lead opinion in *Frierson* by noting that a majority of the court in *People v. Jackson* (1980) 28 Cal.3d 264, 315 [168 Cal.Rptr. 603, 618 P.2d 149], later upheld the validity of the 1977 death penalty law, saying that " '[m]ost of the arguments advanced by defendant were discussed at considerable length in [*Frierson*] and we do not repeat them here.' " (Maj. opn., *ante*, at p. 430, fn. 21.) This cryptic reference to the lead opinion in *Frierson* does not establish that the court in *Jackson* considered whether the 1972 initiative was a constitutional amendment or a revision, and thus does not serve to transform the views of three justices in *Frierson* into a holding of a majority of this court.[7]

---

[7] In emphasizing the limits of *Frierson*, I do not in any sense call into question the constitutionality of California's death penalty law. Rather, I share Justice Mosk's view that *People v. Anderson* (1972) 6 Cal.3d 628 [100 Cal.Rptr. 152, 493 P.2d 880], which held that the death penalty violated the state's constitutional prohibition against cruel or unusual punishment, was erroneously decided. (*Frierson, supra*, 25 Cal.3d at p. 189 (conc. opn. of Mosk, J.).) I therefore find it unnecessary to address the argument of some of the petitioners that the state's cruel or unusual punishment clause is distinguishable from the equal protection clause because the former is not as inherently countermajoritarian as the latter and, therefore, may be amended by initiative.

I also find unpersuasive the majority's reliance upon the fact that "[n]o justice in *Frierson, Jackson,* or any other decision of this court has disagreed with the conclusion that [the 1972 initiative measure] constitutes a permissible amendment to, rather than an impermissible revision of, the California Constitution, and there can be no question that this resolution of the issue is now a firmly settled determination." (Maj. opn., *ante,* at p. 430, fn. 21.) No citation to authority follows this unsupportable assertion. There is no authority that supports the view that this court's failure to disagree with a conclusion makes it law. Rather, it is beyond cavil that "an opinion is not authority for a proposition not therein considered." (*Ginns v. Savage, supra,* 61 Cal.2d at p. 524, fn. 2.)

In sum, none of our prior cases discussed above, nor any other case discussed in the majority opinion, holds that a modification of the California Constitution constitutes a revision only if it alters the structure of government. None of our prior cases considered whether an amendment to the Constitution could restrict the scope of the equal protection clause by adding language that requires discrimination based upon a suspect classification. Nor did these cases consider, as in the present situation, whether a transfer of the authority to protect the equal rights of a suspect class away from the judiciary to an electoral majority is the type of structural change that can be effected by a constitutional amendment. For the reasons discussed above, I believe this kind of change in the countermajoritarian nature of the equal protection clause is the type of fundamental alteration that can be done only through a constitutional revision.

It is apparent, moreover, that limiting the definition of revision only to changes in the structure of government necessarily leads to the untenable conclusion that even the most drastic and far-reaching changes to basic principles of our government do not constitute revisions so long as they do not alter the governmental framework. Counsel for interveners candidly admitted at oral argument that, in his view, the equal protection clause of the California Constitution could be repealed altogether by an amendment passed by a bare majority of voters through the initiative process.

The majority wisely does not embrace this extreme view, but it does not explain how it avoids it, simply stating that "there is no need for us to consider whether a measure that actually deprives a minority group of the *entire* protection of a fundamental constitutional right or, even more sweepingly, leaves such a group vulnerable to public or private discrimination in *all* areas without legal recourse [citation], would constitute a constitutional revision . . . ." (Maj. opn., *ante,* at p. 446.) But the possible basis for limiting the broad rule adopted by the majority is not apparent. If a change in the Constitution that leaves a minority group vulnerable to discrimination in all

areas might be a revision, why not a change that leaves that group subject to discrimination in most areas, or a change like Proposition 8 that requires discrimination based upon a suspect classification in one very important area?[8]

Thus, under the majority's view, it is not clear what sorts of state constitutional constraints limit the power of a majority of the electorate to discriminate against minorities. As petitioners point out, "imagine if *Perez v. Sharp*, 32 Cal.2d 711 [198 P.2d 17] (1948), striking down California's ban on interracial marriages, had been decided on state constitutional grounds rather than federal constitutional grounds. And imagine if a bare majority had attempted to overturn that landmark ruling by enshrining the ban into the Constitution." Other equally unattractive hypotheticals suggest themselves. Under the majority's reasoning, California's voters could permissibly amend the state Constitution to limit Catholics' right to freely exercise their religious beliefs (Cal. Const., art. I, § 4), condition African-Americans' right to vote on their ownership of real property (*id.*, § 22), or strip women of the right to enter into or pursue a business or profession (*id.*, § 8). While the federal Constitution would likely bar these initiatives, the California Constitution is intended to operate independently of (art. I, § 24), and in some cases more broadly than (see, e.g., *Fashion Valley Mall, LLC v. National Labor Relations Bd.* (2007) 42 Cal.4th 850, 857–858 [69 Cal.Rptr.3d 288, 172 P.3d 742]), its federal counterpart.[9] The majority's holding essentially strips the state Constitution of its independent vitality in protecting the fundamental rights of

---

[8] In *Korematsu v. United States* (1944) 323 U.S. 214 [89 L.Ed. 194, 65 S.Ct. 193], Justice Jackson in dissent decried how the court's carefully limited opinion in *Hirabayashi v. United States* (1943) 320 U.S. 81 [87 L.Ed. 1774, 63 S.Ct. 1375] sustaining an order imposing a curfew on Japanese-Americans had led the court to uphold the internment of Japanese-Americans, stating: "[I]n spite of our limiting words we did validate a discrimination on the basis of ancestry for mild and temporary deprivation of liberty. Now the principle of racial discrimination is pushed from support of mild measures to very harsh ones, and from temporary deprivations to indeterminate ones." (*Korematsu v. United States, supra,* at p. 247 (dis. opn. of Jackson, J.).) Justice Jackson observed that once a judicial opinion establishes a principle, "[t]he principle then lies about like a loaded weapon . . . . All who observe the work of courts are familiar with what Judge Cardozo described as 'the tendency of a principle to expand itself to the limit of its logic.' " (*Id.* at p. 246, fn. omitted.)

[9] In *Romer v. Evans* (1996) 517 U.S. 620 [134 L.Ed.2d 855, 116 S.Ct. 1620], the high court invalidated on equal protection grounds an amendment to the Colorado Constitution that would have prohibited the enactment of any law designed to protect homosexuals, repeating Justice Harlan's admonition in his dissent in *Plessy v. Ferguson* (1896) 163 U.S. 537, 559 [41 L.Ed. 256, 16 S.Ct. 1138], that the Constitution "neither knows nor tolerates classes among citizens" and adding: "It is not within our constitutional tradition to enact laws of this sort. . . . ' "Equal protection of the laws is not achieved through indiscriminate imposition of inequalities." ' [Citation.] Respect for this principle explains why laws singling out a certain class of citizens for disfavored legal status or general hardships are rare." (*Romer v. Evans, supra,* 517 U.S. at p. 633.)

suspect classes. And if the majority does not avow that such broad constitutional changes could be made by amendment, but only more "limited" ones, then I disagree with such an implicit distinction. As discussed, denying gays and lesbians the right to marry, by wrenching minority rights away from judicial protection and subjecting them instead to a majority vote, attacks the very core of the equal protection principle.

The majority criticizes petitioners' position because "under petitioners' approach, the people would have the ability—through the initiative process—*to extend* a constitutional right to a disfavored group that had not previously enjoyed that right, but the people would lack the power *to undo or repeal* that very same extension of rights through their exercise of the identical initiative process." (Maj. opn., *ante*, at p. 451.) Whether or not the above accurately characterizes petitioners' position, it does not accurately describe mine. The scenario of a majority of the electorate giving and then taking away rights does not implicate my objections in the present case: that Proposition 8 entirely undermines the countermajoritarian nature of the equal protection clause and usurps the judiciary's special constitutional role as protector of minority rights. Therefore, without deciding cases not before us, my reasons for concluding that Proposition 8 attempts a constitutional change that can only be accomplished through revision do not apply to a situation in which an electoral majority grants and then repeals rights.

I realize, of course, that the right of gays and lesbians to marry in this state has only lately been recognized. But that belated recognition does not make the protection of those rights less important. Rather, that the right has only recently been acknowledged reflects an age-old prejudice (*Marriage Cases, supra*, 43 Cal.4th at pp. 821–822, 846, 853) that makes the safeguarding of that right by the judiciary all the more critical. As the Supreme Court of Iowa recently observed: "[G]ay and lesbian people as a group have long been the victim of purposeful and invidious discrimination because of their sexual orientation. The long and painful history of discrimination against gay and lesbian persons is epitomized by the criminalization of homosexual conduct in many parts of this country until very recently. [Citation.] Additionally, only a few years ago persons identified as homosexual were dismissed from military service regardless of past dedication and demonstrated valor. Public employees identified as gay or lesbian have been thought to pose security risks due to a perceived risk of extortion resulting from a threat of public exposure. School-yard bullies have psychologically ground children with apparently gay or lesbian sexual orientation in the cruel mortar and pestle of

school-yard prejudice. At the same time, lesbian and gay people continue to be frequent victims of hate crimes. [Citation.]" (*Varnum v. Brien, supra,* 763 N.W.2d 862, 889.)[10]

Proposition 8 represents an unprecedented instance of a majority of voters altering the meaning of the equal protection clause by modifying the California Constitution to require deprivation of a fundamental right on the basis of a suspect classification. The majority's holding is not just a defeat for same-sex couples, but for any minority group that seeks the protection of the equal protection clause of the California Constitution.

This could not have been the intent of those who devised and enacted the initiative process. In my view, the aim of Proposition 8 and all similar initiative measures that seek to alter the California Constitution to deny a fundamental right to a group that has historically been subject to discrimination on the basis of a suspect classification, violates the essence of the equal protection clause of the California Constitution and fundamentally alters its scope and meaning. Such a change cannot be accomplished through the initiative process by a simple amendment to our Constitution enacted by a bare majority of the voters; it must be accomplished, if at all, by a

---

[10] The majority quotes dicta in the decision in *Varnum v. Brien* that recognizes that "the power of the constitution flows from the people, and the people of Iowa retain the ultimate power to shape it over time." (*Varnum v. Brien, supra,* 763 N.W.2d 862, 876.) The majority gleans from the Iowa court's citation of a provision authorizing amendments to the Iowa Constitution that "even as the Iowa high court emphatically declared in *Varnum v. Brien* that a statute limiting marriage to opposite-sex couples violated a fundamental principle embodied in the constitution of that state, the court at the same time acknowledged the ultimate power of the people to alter the content of the state constitution *through a constitutional amendment.*" (Maj. opn., *ante,* at p. 462, fn. omitted.)

It is not remarkable that the Iowa Supreme Court recognized that the people retain the ultimate power to shape the constitution. As I stated above, "[t]here is no doubt that the ultimate authority over the content of the California Constitution lies with the people." (*Ante,* at p. 487.) And even if we assume that the Iowa court's citation of a provision authorizing amendments to the Iowa Constitution was intended to express the view that its own decision regarding marriage equality could be overturned by constitutional amendment, that dicta has no bearing on whether Proposition 8 was a proper amendment to the California Constitution, because the process for amending the Iowa Constitution differs substantially from the process for amending the California Constitution. In Iowa, the people cannot directly initiate a constitutional amendment, but can only vote on an amendment after it has been approved by the legislature, then reapproved by a new legislature after the next general election. (See Iowa Const., art. X, § 1.) The Iowa Constitution can only be revised through a constitutional convention. (*Id.,* § 3.) The procedure for amending the Iowa Constitution, therefore, resembles one of the procedures for *revising* the California Constitution, requiring approval both by more than a simple majority of the legislature (in California by a two-thirds majority, in Iowa by a majority of two successive legislatures) and by a majority of the people. Accordingly, the above quoted passage from *Varnum,* even when read expansively, does not support the majority's position that a simple majority of the electorate can amend the California Constitution to deprive a suspect class of a fundamental right.

constitutional revision to modify the equal protection clause to protect some, rather than all, similarly situated persons. I would therefore hold that Proposition 8 is not a lawful amendment of the California Constitution.

The petition of petitioners Karen L. Strauss et al., and City and County of San Francisco for a rehearing was denied June 17, 2009, and the opinion was modified to read as printed above.